## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEBORAH CARR, BRENDA MOORE, MARY ELLEN WILSON, <br><br> PLAINTIFFS, <br><br><br> v. <br><br> XAVIER BECERRA, SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> DEFENDANT. | CIVIL ACTION NO. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     This case concerns the elimination of medically necessary health services during the ongoing COVID-19 pandemic to low-income individuals who rely upon the Medicaid program. These individuals include those threatened with imminent harm, such as institutionalization, as a result of the denial of such services. This population has been and continues to be most at risk of serious illness and death during the COVID-19 pandemic.

2.     Congress sought to mitigate that risk by enacting a "maintenance of effort" provision that increases federal funding to state Medicaid programs to preserve the Medicaid coverage of beneficiaries during the public health emergency ("PHE"). *See* 42 U.S.C. § 1396d note (Temporary Increase of Medicaid reimbursements under Federal Medical Assistance

Percentage ("FMAP") under Families First Coronavirus Response Act, Pub. L. No. 116-127, §

6008) ("Coronavirus Response Act" or "FFRCA")).

3.      To receive the increased federal funding, states must agree to several conditions.

4.      One condition requires states to "provide that an individual who is enrolled for

benefits" in a state's Medicaid program during the PHE "shall be treated as eligible for *such*

benefits [i.e., the benefits for which the person was enrolled] through the end of the month" in

which the PHE ends. *See* Coronavirus Response Act § 6008 (b)(3)(emphasis added). This

condition must be met for a state to obtain enhanced federal matching for all of its Medicaid

expenditures.

5.      There are only two exceptions in the statute to this continuous enrollment

requirement – cases where "the individual requests a voluntary termination of eligibility or the

individual ceases to be a resident of the State."  § 6008(b)(3). Neither exception is applicable to

any of the Plaintiffs.

6.      Soon after the statute was enacted, Defendant's agency, through the Center for

Medicare & Medicaid Services ("CMS"), posted notice to the public reiterating what the statute

plainly meant in a Frequently Asked Questions ("FAQ") page: individuals enrolled for Medicaid

benefits during the PHE must continue to receive "such benefits," i.e., the same amount,

duration, and scope of services, until the end of the month in which the PHE ends. *See* CMS,

*Families First Coronavirus Response Act – Increased FMAP FAQs*, 6 (Mar. 24, 2020).

7.      Defendant repeated this explanation three more times in the ensuing months,

including noting, on May 5, 2020, that any "*reduction in medical assistance would be*

*inconsistent with the requirement at section 6008(b)(3) of the FFRCA that the state ensure that*

beneficiaries be treated as eligible for the benefits in which they were enrolled as of or after

March 18, 2020, through the end of the month in which the emergency period ends." CMS
COVID-19 Frequently Asked Questions (FAQs) for State Medicaid and Children's Health
Insurance Program ("CHIP") Agencies 26 (May 5, 2020) (emphasis added).

8.      Eight months after posting its first FAQ page on the Coronavirus Response Act,
Defendant did an about-face. Without either an intervening change in the Coronavirus Response
Act or the trajectory of the ongoing PHE, or providing the public an opportunity for notice and
comment, Defendant issued an Interim Final Rule ("IFR") on November 6, 2020, which, among
other things, created new exceptions not listed in the statute, under which states could move
individuals enrolled in Medicaid *en mass* into other "comparable" programs for which they
would otherwise be eligible, even if the new eligibility program covers fewer services.

9.      Specifically, the IFR newly authorized or required states to reduce or entirely
eliminate Medicaid coverage for individuals who: (1) are deemed to have "minimum essential
coverage" through eligibility for financial assistance to pay for out-of-pocket Medicare costs
under the very limited benefit Medicaid program known as the Medicare Savings Program
("MSP"); (2) are deemed not "validly enrolled" at the time of the passage of the Coronavirus
Response Act; or (3) are non-citizens otherwise losing Medicaid coverage because of being in
the United States less than five years and no longer being pregnant or a child. 42 C.F.R §
433.400 (c)(2), (d)(2).

10.     Following its issuance of the IFR in November 2020, officials within CMS,
within the Department of Health and Human Services ("HHS"), advised state Medicaid agencies
through several "All State" on-the-record and transcribed telephone meetings that the new rules
not only authorized, but required, all states to reduce or eliminate full-scope Medicaid benefits to
individuals previously protected against such cuts under the Coronavirus Response Act if they

3

fall into one of the IFR's newly-created exceptions. States proceeded to comply, if reluctantly in some cases.

11.     Plaintiffs are Medicaid enrollees in Connecticut who live with various serious medical conditions, including Freidrich's Ataxia, severe circulatory abnormalities and Multiple Sclerosis. Each had been enrolled in Medicaid and was receiving full benefit Medicaid coverage on March 18, 2020, i.e., the date the Coronavirus Response Act went into effect to protect all current (and future, during the PHE) Medicaid enrollees.

12.     Plaintiffs have each been notified that their full benefit Medicaid coverage has terminated because: (1) they no longer meet the eligibility criteria for that coverage, and (2) they qualify for an MSP providing limited financial assistance, which, under the IFR, ends their entitlement to continued enrollment in full-benefit Medicaid.

13.     Defendant claims that the MSP is "comparable" to full benefit Medicaid coverage under the IFR. But, contrary to Coronavirus Response Act's plain terms, the MSP will not provide them the same benefits they have been receiving.

14.     Defendant's revised, unsupported interpretation of the Coronavirus Response Act will cause Plaintiffs harm, including denial of access to needed medical or dental treatment and transportation to get to that treatment, and the concomitant physical and psychological harm that results from not being able to obtain such medically necessary care and treatment, and ultimately, in some cases, irreparable harm in the form of likely entry into a nursing home where COVID death rates have been very high.

15.     The provisions of the IFR promulgating 42 C.F.R. § 433.400 violate Section 6008's unambiguous maintenance of effort requirement by permitting states to receive the enhanced funding while providing fewer "benefits" to individuals enrolled in a state's Medicaid

program when the Coronavirus Response Act went into effect than those individuals received at the start of the PHE.

16.     The IFR was also issued without following the notice and comment procedures under the Administrative Procedure Act ("APA") and, in the case of 42 C.F.R. § 433.400, without the statutorily-required showing that eliminating the opportunity for prior notice and comment was "impractical, unnecessary or contrary to the public interest," 5 U.S.C. § 553(b)(B).

17.     Plaintiffs seek injunctive and declaratory relief to vacate the unlawful portions of the IFR and declare the states' obligations to continue to provide the same level of benefits to Medicaid enrollees for the duration of the PHE, absent satisfaction of one of the two statutory exceptions.

## JURISDICTION AND VENUE

18.     This is an action for declaratory and injunctive relief for violation of the APA and the Families First Coronavirus Response Act.

19.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. §§ 702 to 705. This action, and the remedies it seeks, are further authorized by 28 U.S.C. §§ 1651, 2201, and 2202, and Federal Rule of Civil Procedure 65.

20.     Venue is proper under 28 U.S.C. § 1391(b)(2), (e).

## PARTIES

21.     Plaintiff Deborah Carr is a disabled Connecticut resident who was enrolled in Connecticut's full benefit Medicaid program, HUSKY D, on or after March 18, 2020.

22.     Plaintiff Brenda Moore is a disabled Connecticut resident who was enrolled in HUSKY D on March 18, 2020.

23.     Plaintiff Mary Ellen Wilson is a disabled Connecticut resident who was enrolled in HUSKY D on March 18, 2020.

24.     Defendant Xavier Becerra is the Secretary of HHS and is sued in his official capacity. Defendant Becerra has overall responsibility for administering the Department's programs consistent with federal law, including the Coronavirus Response Act and the APA.

25.     Defendant HHS is a federal agency with responsibility for overseeing implementation of provisions of the Social Security Act, of which the Medicaid Act is a part.

## I.      BACKGROUND AND FACTUAL ALLEGATIONS

### A.  The Medicaid Program

26.     Title XIX of the Social Security Act establishes the medical assistance program known as Medicaid. *See id.* §§ 1396-1396w-5. The purpose of the Medicaid program is to enable each state, as far as practicable, "to furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id*. § 1396-1.

27.     The Medicaid program is federally implemented by HHS. Within HHS, CMS is responsible for administration of the Medicaid program.

28.     States do not have to participate in Medicaid, but all do.

29.     Each participating state must maintain a comprehensive state Medicaid plan for medical assistance that the Secretary has approved. *Id.* § 1396a. The state Medicaid plan must describe the state's Medicaid program and affirm its commitment to comply with the requirements imposed by the Medicaid Act and its implementing regulations.

30.     States also are required under their state plans to administer their Medicaid programs in the "best interests of the recipients," as well as to do so "in a manner consistent with simplicity of administration." 42 U.S.C. § 1396a(a)(19).

31.     States and the federal government share responsibility for funding Medicaid. Section 1396b requires the Secretary to pay each participating state the federal share of "the total amount expended . . . as medical assistance under the State plan." *Id*. §§ 1396b(a)(1), 1396d(b). The federal reimbursement rate is based on the state's relative per capita income and is known as FMAP.

32.     In return for federal funding, participating states must pay the remaining portion of the costs of care and follow all federal requirements, including those regarding the scope of coverage and eligibility for the program. *Id.* §§ 1396-1, 1396b.

33.     Using household income and other specific criteria, the Medicaid Act delineates who is eligible to receive Medicaid coverage. *Id*. §§ 1396a(a)(10)(A), (C).

34.     The Act contains required coverage groups, as well as options for states to extend Medicaid to additional population groups. 42 U.S.C. §§ 1396a(a)(10)(A), (C).

35.     The mandatory population groups include: low-income children; parents and certain other caretaker relatives; pregnant women; the elderly, blind, or disabled; individuals under age 26 who were in foster care until age 18; and adults who are under age 65, are not eligible for Medicare, do not fall within another Medicaid eligibility category, and have household incomes below 133% of the federal poverty level (FPL) (this last group is often referred to as the "expansion population"). 42 U.S.C. § 1396a(a)(10)(A)(i), (e)(14).  The expansion population was initially included as a mandatory eligibility group. The Supreme Court's decision in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 588 (2012), however, barred HHS from terminating Medicaid funding to states that choose not to extend Medicaid coverage to the expansion population.

36.     Generally, individuals must hold a qualified immigration status to be eligible for Medicaid coverage. *See* 8 U.S.C. § 1641(b). In addition, certain categories of qualified immigrants, such as Legal Permanent Residents, must hold that qualified status for five years before they are Medicaid eligible. *Id*. § 1613(a). Individuals without a qualified status, or who have not held their qualified status for the required five years, are eligible only for services to treat an emergency medical condition. *See* 42 U.S.C. § 1396b(v)(3).

37.     Connecticut also has the option to receive federal matching funds to cover certain immigrants who do not have a qualified status or who have a qualified status but have not held it for five years. Specifically, any state may provide Medicaid coverage to "lawfully residing" immigrants if they are pregnant or are children under age 21. *See* 42 U.S.C. § 1396b(v)(4)(A). CMS has defined "lawfully residing" to mean individuals who are "lawfully present" and meet the Medicaid state residency requirement. *See*  CMS, Dear State Health Official Letter, 10-006 (July 1, 2020), https://www.medicaid.gov/federal-policy-guidance/downloads/SHO10006.pdf. Coverage for pregnant people in this category extends through the 60-day period beginning on the last day of the pregnancy and for children until they turn 21.

38.     Connecticut has chosen this option. On July 26, 2022, Connecticut also received permission from CMS to extend post-partum coverage under Medicaid generally to twelve months instead of 60 days. CMS, HHS Approves 12-Month Extension of Postpartum Coverage in Connecticut, Massachusetts, and Kansas, Jul. 26, 2022, https://www.cms.gov/newsroom/press-releases/hhs-approves-12-month-extension-postpartum-coverage-connecticut-massachusetts-and-kansas

39.     States that participate in Medicaid must provide Medicaid beneficiaries with

"medical assistance."  The statute defines "medical assistance" to mean "payment of part or all of

the cost of the following care and services or the care and services themselves, or both." 42

U.S.C. § 1396d.  The "following care" includes a range of health care services that participating

states either must cover or are permitted to cover, from physical therapy and hearing aids to

long-term care at home and in nursing facilities. *Id.* § 1396d(a); 42 U.S.C. §§ 1396a(a)(10)(A).

40.     Non-emergency transportation to medical appointments also is a required

Medicaid service, 42 U.S.C. § 1396u-7(a)(1)(F) (regarding so-called "benchmark" plans); 42

C.F.R. § 431.53.

41.     There are many optional services, including prescription drugs, adult dental

benefits, optometry services, prosthetic devices, and at-home personal care services. *See id.* 42

U.S.C. §§ 1396(a)(10)(A), 1396(d)(a) (Medicaid Act listing 30 categories of medical assistance,

only nine of which are mandatory).

42.     States must specify the amount, duration, and scope of services in the state plan,

and services must also be "sufficient in amount, duration, and scope to reasonably achieve their

purpose." 42 C.F.R. § 440.230.

43.     In Connecticut, the full benefit Medicaid program includes coverage for extensive

services in the form of personal care attendants. Under the optional Community First Choice

program, individuals are eligible for Medicaid-funded personal care attendants when they are

found by the State to meet a nursing facility level of care such that, without these services, they

will be institutionalized.

**B.  The Medicare Program and the Medicare Savings Program**

44.     While Medicare and Medicaid are often confused, the Medicaid program, which is generally only for low-income individuals and is jointly administered by the state and federal governments, is very different from the Medicare program. Medicare is for individuals of any income level who either are totally disabled and have significant work history or are over the age of 65, and it is administered exclusively by the federal government.

45.     Medicare coverage is made up of four parts:

- Part A – Referred to as Hospital Insurance in the statute (inpatient hospital care, inpatient care in skilled nursing facilities, hospice care, some home health care)

- Part B – Referred to as Medical Insurance in the statute (physician services, outpatient care, durable medical equipment, some home health services, many preventive services and some in-office prescription drug coverage). *See* 42 U.S.C. § 1395w-101-116.1

- Part C –Medicare Advantage Plans, a set of private insurance plans which provide Medicare coverage, usually with some minor supplemental benefits

- Part D- Medicare prescription drug coverage.

46.     Medicare coverage does not include all of the benefits covered under Medicaid and certainly not the broad range of services covered under Connecticut's Medicaid program; such as dental services, non-emergency medical transportation, routine vision and hearing exams, glasses, and hearing aids. Home health care and nursing facility services have very limited coverage under Medicare. There is no coverage at all under Medicare for the majority of home and community-based services, such as in-home long term care services.

47.     All of these services are covered under Connecticut's Medicaid program, as are personal care attendant services under what is known as the Community First Choice state option chosen by Connecticut.

48.     Eligible Medicare enrollees must pay monthly premiums, plus deductibles, co-payments, and co-insurance amounts ("cost-sharing").

49.     States must provide limited Medicaid to certain groups of low-income Medicare-eligible beneficiaries to help them cover the Medicare Part B premiums and, in some cases, cost-sharing. These groups are referred to as MSP eligibility groups. The MSP benefit only provides financial assistance to cover some or all of the out-of-pocket costs of services covered under Medicare; the MSP benefit does not provide coverage for *any* services not covered by Medicare.

50.     There are three different MSP eligibility groups, based on income levels, for which the federal government sets minimums, but allows the states to exceed those minimums.

      a.   The first category includes people eligible for Medicare Part A, who meet certain income criteria, receive Medicaid coverage of their Medicare Parts A & B premiums, copays, deductibles, and coinsurance. *See* 42 U.S.C. § 1396d(p). These individuals are referred to as "Qualified Medicare Beneficiaries" ("QMBs"). In Connecticut, the income limit requirements for QMB coverage, currently $2390/month for a single individual, are relatively high, allowing more people to access the program.

      b.   Individuals in the next income eligibility group are referred to as Specified Low Income Medicare Beneficiaries. *See* 42 U.S.C. § 1396a(a)(10)(E)(iii). This program only includes payment of Part B premiums, not cost-sharing.  In Connecticut, the income limit for this program is somewhat higher, currently $2617/month for a single individual,

      c.   Individuals in the next income eligibility group are commonly referred to as Qualifying Individuals or Additional Low Income Medicare Beneficiaries.

This program also only provides payment of Medicare Part B premiums. In Connecticut, the income limit for this program is set at an even higher level, currently $2786/month for a single individual.

51.     Some individuals may be eligible for Medicare, an MSP-eligibility group, and full-scope Medicaid benefits.

52.     Other individuals, however, are eligible only for Medicare and an MSP. These individuals do not receive full-scope Medicaid benefits. As a result, individuals who move from full-scope Medicaid to an MSP-eligibility group lose access to the benefits that are only covered by Medicaid: they only receive financial assistance to pay for their Medicare premiums, and only for those who qualify as Qualified Medicare Beneficiaries, cost-sharing for Medicare-covered services.

**C.  The COVID-19 Pandemic and the Families First Coronavirus Response Act**

53.     On March 13, 2020, former President Donald Trump declared a national emergency due to the rapid spread of the COVID-19 virus. 85 FR 15337, Pres. Proclamation, Mar. 13, 2020.

54.     On January 31, 2020, former Secretary of HHS Alex Azar declared a PHE retroactive to January 27, 2020.

55.     The PHE, which is approved in 90-day increments, *see* 42 U.S.C. § 247d(a)(2), has been repeatedly extended, most recently on July 15, 2022, assuring continuation of the PHE until at least October 13, 2022. Secretary Becerra, like his predecessor, also has assured states that there will be at least 60 days' advance notice of the termination of the declared emergency "Renewal of Determination that a Public Emergency Exists," July 15, 2022, available at https://aspr.hhs.gov/legal/PHE/Pages/covid19-15jul2022.aspx; *see also* Ltr. from Norris

Cochran, Acting HHS Sec'y of Dep't., to State Governors, 1 (Jan. 22, 2021) *available at* https://ccf.georgetown.edu/wp-content/uploads/2021/01/Public-Health-Emergency-Message-to-Governors.pdf.

56. While the end-date is not at all certain, neither is it in sight. *The pandemic remains a global health emergency, the W.H.O. says*, New York Times, July 12, 2022, https://www.nytimes.com/2022/07/12/world/who-covid-health-emergency.html?smid=url-share.

57. As of the time of this complaint, about 400 persons per day are still dying from COVID, and almost 44,000 people are hospitalized.  *Coronavirus in the U.S.: Latest Map and Case Count*, New York Times, *available at* https://www.nytimes.com/interactive/2021/us/covid-cases.html (last visited August 1, 2022).

58. Older individuals and those with weakened immune systems, including Plaintiffs, remain particularly vulnerable, and the Center for Disease Control and Prevention ("CDC") warns that the latest variants pose a continuing risk that may accelerate this fall. CDC, COVID 19, *People with Certain Medical Conditions*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 14, 2022).

59. Similarly, people of color have experienced COVID-19 at disproportionate rates and have died at rates that greatly exceed their representation in the population. For example, Black people are 2.3 times more likely to get COVID-19 than white people, and 1.7 times more likely to die from it.  CDC, *Risk for COVID-19 Infection, Hospitalization, and Death By Race/Ethnicity, available at* https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last visited July 14, 2022)

60.     In addition, people of color are disproportionately on Medicaid, largely due to disparate income levels compared with white Americans. In Connecticut,  for example, 18.2 % of the Medicaid population identifies as Black or African-American, Workbook: People Served (ct.gov), while only 12.7% of the state population overall is Black,  U.S. Census Bureau QuickFacts: Connecticut.

61.     On March 18, 2020, the Coronavirus Response Act was signed into law. Recognizing that states would face financial pressure as a result of the pandemic, the Coronavirus Response Act includes significant financial relief for state Medicaid programs by enhancing each state's FMAP by 6.2 percent for nearly all Medicaid expenditures. Coronavirus Response Act §6008 (a). This has, for example, resulted in several hundred million dollars in additional federal Medicaid reimbursements to Connecticut since the passage of the Coronavirus Response Act.

62.     To be eligible for the enhanced FMAP, states must meet several conditions. These conditions, referred to as the "maintenance of effort" requirements, establish protections for Medicaid enrollees during the public health emergency. As relevant here, States must "provide that an individual who is enrolled for benefits  under such plan (or waiver) as of" March 18, 2020, "or enrolls for benefits under such plan (or waiver) during" the PHE, "shall be treated as eligible for *such benefits* through the end of the month" in which the public health emergency ends. *Id.* § 6008(b)(3) (emphasis added).

63.     There are only two specific statutory exemptions to the maintenance of effort provision requiring continued coverage of the same services: when "the individual requests a voluntary termination of eligibility or the individual ceases to be a resident of the State." *Id*. § 6008(b)(3).

64.     The Coronavirus Response Act is designed to balance the need for states to receive enhanced federal funding with the need to protect beneficiaries against state efforts to terminate or reduce Medicaid benefits during the public health emergency. The statute allows terminations or reductions only in those two narrow circumstances where continuation of benefits was deemed to be unreasonable. The Coronavirus Response Act gives Defendant no authority to create additional exceptions, much less to do so under rules adopted without prior notice and comment.

**D.  CMS's Spring 2020 Guidance**

65.     Contemporaneous with the enactment of the Coronavirus Response Act, CMS published several sub-regulatory documents containing FAQs to advise states of the requirements necessary to receive the enhanced funding offered under § 6008 of the Coronavirus Response Act.

66.     On March 24, 2020, CMS explained that, pursuant to § 6008(b)(3):

> while states may increase the level of assistance provided to a beneficiary who experiences a change in circumstances, such as moving the individual to another eligibility group which provides additional benefits, states may not reduce benefits for any beneficiary enrolled in Medicaid on or after March 18, 2020, through the end of the month in which the emergency period ends, and still qualify for increased FMAP.

CMS *Families First Coronavirus Response Act – Increased FMAP FAQs*, 6 (Mar. 24, 2020).

67.     On April 13, 2020, CMS again stated that states "may not reduce benefits for any beneficiary enrolled in Medicaid" during the public health emergency, including by moving them to a new eligibility group that provides fewer benefits. CMS, "Families First Coronavirus Response Act – Increased FMAP FAQs," 6 (Apr. 13, 2020) available at https://sss.usf.edu/covid19/resources/medicaid/Family%20First%20Coronavirus%20Response%20Act%20_%20Increased%20FMAP%20FAQs.pdf.

15

68.     In that same April 13, 2020 statement, CMS repeatedly emphasized that, to satisfy § 6008(b)(3), states must continue providing individuals with the same amount, duration, and scope of services throughout the public health emergency, regardless of changes in individual circumstances:

> To be eligible for the enhanced FMAP authorized by the FFRCA, states may not reduce benefits for any beneficiary enrolled in Medicaid on or after March 18, 2020, through the end of the month in which the emergency period ends, and still qualify for increased FMAP. This means that states must continue to provide coverage to such beneficiaries in the eligibility group in which the beneficiary is enrolled if transitioning the beneficiary to another eligibility group would result in a reduction in benefits. If there is a separate eligibility group for which the individual is eligible and which provides the same amount, duration and scope of benefits, then a state may shift the individual to that group; *what is critical for ensuring eligibility for the temporary FMAP increase is that the same amount, duration and scope of medical assistance be maintained.*

CMS, "Families First Coronavirus Response Act (FFCRA), Public Law No. 116-127 Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law No. 116-136 Frequently Asked Questions (FAQs)," 9 (Apr. 13, 2020) (emphasis added); available at https://sss.usf.edu/covid19/resources/medicaid/Family%20First%20Coronavirus%20Response%20Act%20_%20Increased%20FMAP%20FAQs.pdf; *see also*, *id.* (explaining that a state may not move an individual from one eligibility group to another, "unless the individual is eligible for a separate eligibility group which provides the same amount, duration and scope of benefits."); *id.* ("If . . . the individual is ineligible for another eligibility group which confers the same amount, duration and scope of benefits, the state must continue to furnish services available to beneficiaries enrolled in the adult group until the last day of the month in which the emergency period ends."); *id.* at 11 ("If . . . there is no other eligibility group for which the individual is eligible under the state plan or waiver that provides the same amount, duration and scope of benefits as those available to beneficiaries in the group under which the individual has been receiving coverage . . . then the state must continue to furnish the benefits available under such

group in order to qualify for the temporary FMAP increase."); *id.* at 11 ("A state must maintain, during the emergency period, an individual's eligibility for at least the same amount, duration, and scope of benefits as are covered for the group in which the individual is enrolled.").

69.     On May 5, 2020, CMS confirmed for the third time that § 6008(b)(3) of the Coronavirus Response Act prohibits any ***reduction*** in the services or medical assistance provided to an individual:

> **Are states prohibited from increasing cost-sharing during the emergency period as a condition of receiving the FFRCA [Coronavirus Response Act] enhanced FMAP?**
>
> Yes. A state is not eligible for the temporary FMAP increase authorized by section 6008 of the FFRCA if it reduces the medical assistance for which a beneficiary is eligible and if that beneficiary was enrolled as of March 18, 2020, or becomes enrolled after that date but not later than the last day of the month in which the emergency period ends. ***Such a reduction in medical assistance would be inconsistent with the requirement at section 6008(b)(3) of the FFRCA*** *that the state ensure that beneficiaries be treated as eligible for the benefits in which they were enrolled as of or after March 18, 2020, through the end of the month in which the emergency period ends.* Because an increase in cost-sharing reduces the amount of medical assistance for which an individual is eligible, a state is not eligible for the enhanced FMAP if it increases cost sharing for individuals enrolled as of or after March 18, 2020.

CMS, *COVID-19 Frequently Asked Questions (FAQs) for State Medicaid and Children's Health Insurance Program (CHIP) Agencies* 26 (May 5, 2020) (emphasis added).  For good measure, CMS issued a fourth statement to the same effect in late June 2020.  CMS, "COVID-19 Frequently Asked Questions (FAQs) for State Medicaid and Children's Health Insurance Program (CHIP) Agencies," 29-30 (June 30, 2020) (repeating guidance from May 5, 2020).

70.     Connecticut's Medicaid agency responded to these clear and consistent pronouncements under the Coronavirus Response Act by assuring policymakers that no one on Medicaid would have their Medicaid benefits *reduced* during the PHE: it assured the members of

the Medical Assistance Program Oversight Council that, "[f]or the duration of the PHE, DSS is

not taking action on changes (e.g. change in family income, aging out of coverage) that would

result in a change of eligibility group or termination of coverage." July 10, 2020 PowerPoint

presentation, slide 10, available at 2906a2 (ct.gov).

**E.  Defendant's Interim Final Rule**

71.     In early November 2020, CMS reversed course and issued an IFR that included

provisions significantly weakening the beneficiary protections Congress enacted in § 6008(b)(3)

of the Coronavirus Response Act. *See* Additional Policy and Regulatory Revisions in Response

to the COVID-19 Public Health Emergency, 85 Fed. Reg. 71142, 71160 (Nov. 6, 2020).

72.     The IFR newly authorized or required states to reduce or entirely eliminate

Medicaid coverage for individuals who: (1) are eligible for financial assistance to pay for out-of-

pocket Medicare costs under an MSP; (2) are deemed not "validly enrolled" at the time of the

passage of the Coronavirus Response Act; or (3) are non-citizens otherwise losing Medicaid

coverage because of being in the United States less than five years and no longer being pregnant

or a child, 42 C.F.R § 433.400 (c)(2), (d)(2).

73.     The IFR was issued with no intervening change in CMS's public position or in the

statutory language, nor any improvement in the COVID-19 pandemic itself. Rather, CMS

claimed that its revised statutory interpretation was prompted by the concerns of unidentified

states (it does not say which states or how many) that its "existing interpretation of Section

6008(b)(3) of the Coronavirus Response Act makes it challenging for them to manage their

programs effectively and still qualify for the increased Federal financial participation." *Id.* at

71161.

74.     The IFR was issued without the notice and comment procedures ordinarily required by the APA. CMS did ask for *post*-implementation comments on the IFR, 85 Fed. Reg. at 71142. But while the overwhelming majority of the more than 260 comments received opposed the IFR, the rule has remained in effect on an "interim" basis for twenty-one months.

75.     As relevant here, the IFR adds a new subpart G, Temporary FMAP Increase During the Public Health Emergency for COVID–19, to 42 C.F.R. part 433, including a new § 433.400.

76.     The new provisions in 42 C.F.R. § 433.400 became "effective immediately upon display of this rule." 85 Fed. Reg. 71144.

77.     Defendant's terse explanation for proceeding without notice and comment was that an interim final rule was "immediately necessary to ensure that states can determine eligibility and provide care and services during the [public health emergency] in a manner that is consistent with simplicity of administration and the best interests of beneficiaries and also claim the temporary funding increase." 85 Fed. Reg. 71181. It did not explain what harm, if any, had befallen states in the months they had operated without the IFR. And the explanation that this was in the "best interests of the beneficiaries" made no sense because, in fact, it is completely **against** the best interests of Medicaid beneficiaries to cut them off at all, let alone to do so under an immediately-effective interim final rule. The Agency's explanation does not rise to the good cause required to bypass the statutorily-required prior notice and comment rule-making process.

78.     No final rule has been issued by the Defendant. His agency has not subsequently explained why it has yet to address any of the comments it invited or to issue a final rule.

79.     After four previous times reiterating and reaffirming a contrary interpretation during the same calendar year, CMS's IFR announced, for the first time, that Section 6008(b)(3)

19

of the Coronavirus Response Act is "somewhat ambiguous" and that a new interpretation of the statute was needed to respond to unnamed states requesting unspecified "increased flexibility." *See* 85 Fed. Reg. at 71160. Defendant provided no basis for his contention that cutting people off of necessary health benefits for which they have no other coverage, particularly during an ongoing public health emergency which may require prompt treatment for any infected individual, is "consistent with simplicity of administration," let alone in the "best interests of beneficiaries," as required under federal Medicaid law, 42 U.S.C § 1396a(a)(19).

80.    The IFR permits states to continue receiving the enhanced FMAP, while authorizing, and in some cases requiring, them to reduce or eliminate coverage for Medicaid enrollees.

81.    CMS subsequently told the states that under the IFR they *must* conduct these terminations. CMS COVID-19 Medicaid & CHIP All State Call, 11-17-20, at pages 12-17, available at https://www.medicaid.gov/state-resource-center/downloads/allstatecall-20201117.pdf.

82.    CMS officials made clear that the terminations under the IFR were, in fact, mandatory in response to a question from a Connecticut Medicaid official ("Krist[i]n [Dowty]"). CMS COVID-19 Medicaid & CHIP All State Call, 12-1-20, at pages 29-30, available at https://www.medicaid.gov/resources-for-states/coronavirus-disease-2019-covid-19/cmcs-medicaid-and-chip-all-state-calls/cmcs-medicaid-and-chip-all-state-calls-2020/index.html.  This was followed by email correspondence between this same Connecticut official and CMS in March 2021, in which CMS stated, on March 27, 2021: "Consistent with CMS regulation at 42 C.F.R. § 433.400(c)(2), Connecticut must transfer the individual described in this scenario from

the adult group to the MSP-related group under which the individual is eligible. It is not optional

for states." (email correspondence between Kristin Dowty and Marie DiMartino, CMS).

83.     The IFR not only permits but, per the later CMS pronouncements, requires states

to make "changes to beneficiary coverage, . . . including both changes affecting an individual

beneficiary and approved changes to the state plan," or waiver "impacting multiple

beneficiaries," without impacting "a state's ability to claim the temporary FMAP increase." 42

C.F.R. § 433.400(c)(3).

84.     According to the IFP preamble, this change permits states to "eliminate[e] an

optional benefit from its state plan," such as dental benefits, and still claim the enhanced FMAP.

85 Fed. Reg. 71166.

85.     Contrary to the Coronavirus Response Act, the IFR not only permits, but, per the

agency's pronouncements on how it intended to apply the IFR, it requires states to transition

Medicaid enrollees to different eligibility groups, even when this would result in a reduction in

the amount, duration, or scope of services. 42 C.F.R. § 433.400(c)(2); 85 Fed. Reg. 71,161.

86.     While the IFR does retain some limitations on states' ability to move individuals

between eligibility groups, id. §§ 433.400(c)(2)(i)(A)-(B) (regarding individuals with minimum

essential coverage under the Affordable Care Act); 42 C.F.R. § 433.400(c)(2)(ii) (regarding

Medicaid coverage for COVID-19 testing and treatment), the limitations are quite narrow.

87.     The IFR, as confirmed by CMS, requires states to move individuals from full-

scope Medicaid to "coverage under a Medicare Savings Program [MSP] eligibility group," 42

C.F.R. § 433.400(c)(2)(i)(B).

88.     In doing so, the IFR conflates coverage standards in non-Medicaid regulations

applicable only to market-based insurance in the Affordable Care Act with Medicaid, to justify

eliminating Medicaid coverage, asserting that Medicare provides "essential coverage." However, MSP-eligibility provides payment only for Medicare costs and neither Medicare nor MSP provide the same full-scope Medicaid benefits previously received, such as vision and hearing exams, non-emergency medical transportation, hearing aids, dental services, home and community-based services, personal care services, and long-term nursing facility services.

89.     The IFR also requires states to terminate Medicaid coverage for certain immigrants. For "lawfully residing" children or pregnant women, who no longer meet the definition of "lawfully residing," "child," or "pregnant women," states "*must* limit coverage for such beneficiaries . . . to services necessary for treatment of an emergency medical condition." 42 C.F.R. § 433.400(d)(2) (emphasis added).

90.     The IFR added one further exemption from the statutory duty to maintain continuous coverage for individuals on Medicaid in March of 2020: an individual can be denied coverage if that individual is deemed not to have been "validly enrolled" in Medicaid in the first place. 42 C.F.R. § 433.400(b) and (c)(2). The statute, however, reflecting Congress' determination that keeping individuals of limited means on Medicaid benefits during the public health emergency, regardless of why they were on in the first place or changes that might otherwise affect their eligibility, draws no distinction between enrolled individuals; its protection applies to anyone "who is enrolled for benefits under such plan" mistakenly or otherwise (unless one of the two statutory exceptions applies).

**F.  State Responses to Guidance**

91.     Some states were initially reluctant to comply with the extra-statutory exceptions under the IFR, but CMS informed states through the All State calls and in specific written responses to states' inquiries that "it is not optional for states" to conduct the terminations.

Transcript of December 1, 2020 All State Call, at pages 29-30; Transcript of March 9, 2021 All State Call, at page 13 (available at CMCS Medicaid and CHIP All State Calls - 2021 | Medicaid); March 11 and 27, 2021 email correspondence between CMS and Connecticut Medicaid official.

92.     Upon information and belief, this led to the termination of Medicaid benefits for hundreds of thousands of Americans and legal permanent residents, which in many cases resulted in the termination of ongoing services essential to health, to avoiding institutionalization, or even to maintaining life itself.

93.     In Connecticut, at least 6,600 people were initially terminated from full-benefit Medicaid under the IFR solely because they qualified for an MSP program. Hundreds more have since lost protected benefits under the IFR because they now qualify for the lesser coverage of Medicare and related MSP programs. This total does not include those terminated for some other basis contained in the IFR, such as because they have secured legal status in this country for less than five years and are no longer pregnant or under 18, or because they are deemed not to have been validly enrolled for some reason.

**G.  Effects of the IFR on Named Plaintiffs**

**Plaintiff Deborah Carr**

94.     Plaintiff Deborah Carr is a 63-year-old white woman who lives in her own home in New Haven, Connecticut.  She has been on full-benefit Medicaid her entire life due to long-term, chronic conditions.  Ms. Carr needs daily assistance in her home due to her progressive neurological condition, Freidrich's Ataxia. She needs help with dressing and bathing, in using the toilet, transferring from her wheelchair or out of bed, and with eating food. She has for years been receiving many hours per week of home health services, paid for under the Medicaid

program (HUSKY D) to help her with all of her activities of daily living and allow her to continue to live outside of an institutional setting.

95.     Ms. Carr has income of $1300 per month and she cannot afford to pay on her own for needed home care services, the cost of which is several thousand dollars per month.

96.     Following issuance of the IFR and Defendant's declaration to all states that its newly-created exceptions to maintenance of effort under the Coronavirus Response Act were mandatory, Connecticut's Medicaid agency terminated Ms. Carr's full benefit Medicaid coverage under HUSKY D, based on Defendant's mandate.

97.     Ms. Carr timely challenged the termination of her Medicaid coverage through the administrative appeal process. During that appeal, her personal care benefits of about 70 hours per week continue pending the decision by the hearing officer, which could be issued at any time.  If she is unsuccessful, she will be subject to repayment to the state of the cost of care provided by the Medicaid program.  Once such a decision is issued, her continued benefits will cease.

### Plaintiff Brenda Moore

98.     Plaintiff Brenda Moore is a 57-year-old Black woman who lives in her own home with her adult son and three-year-old grandchild in New Haven, Connecticut. Ms. Moore's son works full-time out of the house and is unavailable to provide the daily care she requires. Ms. Moore has a severe vascular condition which has led to blood clots and required multiple surgeries, which have been only partially successful.  Due to her severe circulation issues, she requires daily assistance with bathing, dressing, transferring and toileting, and also with meal preparation.  She also has a significant risk of falling and has fallen several times. She is able to

ambulate, but only with a walker or cane.  Ms. Moore also has severe depression and Post-Traumatic Stress Disorder.

99.     Ms. Moore's entire income is $1402 in monthly Social Security Disability Insurance benefits, so she is unable to pay for the needed assistance herself.

100.    Ms. Moore had been receiving Medicaid-funded daily assistance from personal care attendants starting in July of 2020, due to her developing vascular condition which was causing falls and other symptoms. The personal care services paid for under the Medicaid program, currently totaling 39 hours per week, allow her to live outside of an institutional setting.

101.    Following issuance of the IFR and Defendant's declaration to all states that its newly-created exceptions to maintenance of effort under the Coronavirus Response Act were mandatory, Connecticut's Medicaid agency terminated Ms. Moore's full benefit Medicaid coverage under HUSKY D, based on Defendant's mandate.

102.    Ms. Moore has accrued extensive debt for services rendered during a period when her home health aide worked but was not paid, because of the termination of full-scope Medicaid coverage (under HUSKY D), as required by Defendant under the IFR.  She was able to meet the Medicaid "spend down" for an alternative full-benefit Medicaid program, based on the application of this debt, which allowed her to continue coverage for a limited one-time six-month period ending on August 31, 2022.  She will not be able to accrue such a large debt to so qualify a second time, meaning payment for her personal care attendant will abruptly end on that day.

### Plaintiff Mary Ellen Wilson

103.    Mary Ellen Wilson is a 62-year-old white woman who lives at home in Stamford, Connecticut.  She had seizures as a child, surgery related to this, and has Multiple Sclerosis and

dental complications related to decades of anti-seizure medication usage.  Her income is $1391 per month.

104.    Ms. Wilson was terminated from full benefit Medicaid coverage under the HUSKY D program, also, on the basis she is on Medicare and an MSP.  As a result, she has lost many benefits covered only by the Medicaid program. For example, her dental work is not covered by Medicare, other than cleanings covered by her Medicare Advantage plan; dental coverage under Medicaid is far more comprehensive.  She has paid for cabs to get to medical appointments, even though Medicaid pays for this.

105.    Multiple Sclerosis is generally a degenerative neurological disease, and so Ms. Wilson's course is uncertain and she could need additional services not covered under Medicare at any time (e.g., home care services, durable medical equipment not covered under Medicare, and etc.).

106.    Following issuance of the IFR and Defendant's clarification to all states that its newly-created exceptions to maintenance of effort under the Coronavirus Response Act were mandatory, Connecticut's Medicaid agency terminated Ms. Wilson's full benefit Medicaid coverage under HUSKY D, based on Defendant's mandate.

**Irreparable Harm**

107.    Absent relief from the Court enjoining the application of the IFR, the termination of full-benefit Medicaid coverage to each of the named Plaintiffs will continue for the duration of the PHE, for however many months or years it lasts, putting them at risk of institutionalization and other irreparable harm because of the lack of access to necessary health services that are covered under Medicaid, but not Medicare.

108.    Plaintiffs have no adequate remedy at law.

26

### COUNT ONE: PROCEDURAL VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

109.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

110.    The APA provides that a reviewing court may "hold unlawful and set aside" agency actions found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

111.    Absent a showing of good cause, the APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c). The APA further requires that a rule be published 30 days prior to its effective date. *Id.* § 553(d).

112.    The IFR is final agency action and a legislative rule within the meaning of the APA.

113.    The Defendant did not engage in notice and comment rulemaking before issuing the IFR, did not observe the 30-day period between publication and effective date, and had no authority or good cause to disregard the APA's rulemaking requirements.

114.    Defendant's implementation of the IFR without first receiving and considering any of the comments to the rule was arbitrary and capricious.

### COUNT TWO: SUBSTANTIVE VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

115.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

116.    The APA provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

117.    The IFR contradicts Section 6008(b)(3) of the Coronavirus Response Act, and is contrary to law, because the statutory authority is unambiguous and does not allow for the additional exceptions to the maintenance of effort requirements appearing in the IFR.  Even assuming any ambiguity, the agency's interpretation is unreasonable, arbitrary and capricious as an unexplained departure from a prior consistently-applied policy.

118.    Plaintiffs are in danger of suffering irreparable harm and have no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that this Court:

    A.  Declare that Defendant's issuance of 42 C.F.R. § 433.400 through the IFR violates the APA and the Families First Coronavirus Response Act in the respects set forth above;

    B.   Find that Defendant's implementation of the enhanced FMAP authorized by Section 6008 of the Families First Coronavirus Response Act while permitting and requiring states to eliminate benefits or reduce the amount, duration, and scope of services available to individuals enrolled in Medicaid on or after March 18, 2020, even where neither of the two statutory exceptions applies was unlawful, arbitrary and capricious and should be set aside;

C.  Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28

U.S.C. § 2412; and

D.  Grant such other and further relief as may be just and proper.


DATED this 3rd day of August, 2022.

Respectfully submitted,

SHELDON V. TOUBMAN
Fed Bar No. ct08533
Phone: (475)345-3169
E-mail: sheldon.toubman@disrightsct.org
DEBORAH A. DORFMAN (Application
for Admission *Pro Hac Vice* pending)
CT Juris No. 442946
Phone: (860)469-4463
E-mail: deborah.dorfman@disrightsct.org
Disability Rights Connecticut
846 Wethersfield Avenue
Hartford, CT 06114

CAROL A. WONG (Application for
Admission *Pro Hac Vice* pending)
DC Bar No. 1035086
Justice in Aging
1444 I Street, NW, Suite 1100
Washington, DC  20005
Phone: (202) 683-1995
E-mail: cwong@justiceinaging.org

REGAN BAILEY (Application for
Admission *Pro Hac Vice* pending)
DC Bar No. 465677
Justice in Aging
1444 I Street, NW, Suite 1100
Washington, DC  20005
Phone: (202) 683-1990
E-mail: rbailey@justiceinaging.org

JANE PERKINS
NC Bar No. 9993
CA Bar No. 104784
Email: perkins@healthlaw.org

MIRIAM HEARD
NC Bar. No. 39747
Email: heard@healthlaw.org
(Applications for Admission *Pro Hac Vice*
pending)
National Health Law Program
1512 E. Franklin St., Ste. 110
Chapel Hill, NC 27514
Phone: (984) 278-7661

HARVEY L. REITER
(Application for Admission *Pro Hac Vice*
pending)
STINSON LLP
1775 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 2006
Email: harvey.reiter@stinson.com
Phone: (202)728-3016
Fax: (202)572-9968

Counsel for Plaintiffs