## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEBORAH CARR, BRENDA MOORE, MARY ELLEN WILSON, MARY SHAW and CAROL KATZ, on behalf of themselves and those similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES<br><br>Defendant. | Civil Action No. 3:22-cv-988 (MPS)<br><br><br><br>August 26, 2022 |

## CLASS ACTION AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This case, brought as a nationwide class action, through this Class Action Complaint amending the original Complaint in this matter filed August 3, 2022, concerns the elimination of medically necessary health services for low-income individuals who rely upon the Medicaid program during the ongoing COVID-19 pandemic. Many of these individuals face imminent harm, such as institutionalization or untreated cancer, as a result of losing their Medicaid-covered services. This population has been, and continues to be, most at risk of serious illness and death during the COVID-19 pandemic.

2.      Congress sought to mitigate that risk by enacting a "maintenance of effort" provision that increases federal funding to state Medicaid programs and requires that they preserve the Medicaid coverage of beneficiaries during the public health emergency ("PHE").  *See* 42

U.S.C. § 1396d note (Temporary Increase of Medicaid reimbursements under Federal Medical Assistance Percentage ("FMAP") under Families First Coronavirus Response Act, Pub. L. No. 116-127, § 6008) ("Coronavirus Response Act" or "FFRCA").

3.      To receive the increased federal funding, states must agree to several conditions.

4.      One condition requires states to "provide that an individual who is enrolled for benefits" in a state's Medicaid program during the PHE "shall be treated as eligible for *such* benefits [i.e., the benefits for which the person was enrolled] through the end of the month" in which the PHE ends. *See* Coronavirus Response Act § 6008(b)(3) (emphasis added). This condition must be met for a state to obtain enhanced federal matching for all of its Medicaid expenditures.

5.      There are only two exceptions in the statute to this continuous enrollment requirement – cases where "the individual requests a voluntary termination of eligibility or the individual ceases to be a resident of the State."  § 6008(b)(3). Neither exception is applicable to any of the Named Plaintiffs or members of the proposed class.

6.      Soon after the statute was enacted, Defendant's agency, the U.S. Department of Health and Human Services ("HHS"), through its Center for Medicare & Medicaid Services ("CMS"), posted notice to the public reiterating what the statute plainly meant in a Frequently Asked Questions ("FAQ") page: individuals enrolled for Medicaid benefits during the PHE must continue to receive "such benefits," i.e., the same amount, duration, and scope of services, until the end of the month in which the PHE ends. *See* CMS, *Families First Coronavirus Response Act – Increased FMAP FAQs*, 6 (Mar. 24, 2020).

7.      Defendant repeated this explanation three more times in the ensuing months, including noting, on May 5, 2020, that any "*reduction in medical assistance would be inconsistent*

*with the requirement at section 6008(b)(3)* of the FFRCA that the state ensure that beneficiaries be treated as eligible for the benefits in which they were enrolled as of or after March 18, 2020, through the end of the month in which the emergency period ends." CMS COVID-19 Frequently Asked Questions (FAQs) for State Medicaid and Children's Health Insurance Program ("CHIP") Agencies 26 (May 5, 2020) (emphasis added).

8.     Eight months after posting its first FAQ page on the Coronavirus Response Act, Defendant did an about-face. Without either an intervening change in the Coronavirus Response Act or the trajectory of the ongoing PHE, or providing the public an opportunity for notice and comment, Defendant issued an Interim Final Rule ("IFR") (later codified as 42 C.F.R. §433.400) on November 6, 2020, which, among other things, created new exceptions not listed in the statute. This included instructing states to move individuals enrolled in Medicaid *en mass* into other "comparable" programs for which they would otherwise be eligible, even if the new eligibility program covers significantly fewer services.

9.     Specifically, the IFR newly authorized or required states to reduce or entirely eliminate Medicaid coverage for individuals who: (1) are deemed to have "minimum essential coverage" through eligibility for financial assistance to pay for some Medicare costs under the very limited benefit Medicaid program known as the Medicare Savings Program ("MSP"); (2) are deemed not "validly enrolled" at the time of the passage of the Coronavirus Response Act; or (3) are non-citizens otherwise losing Medicaid coverage because of being in the United States less than five years and no longer being pregnant or a child. 42 C.F.R § 433.400 (c)(2), (d)(2).

10.     Following the issuance of the IFR in November 2020, officials within CMS advised state Medicaid agencies through several "All State" on-the-record and transcribed telephone meetings that the new rules not only authorized, but required, all states to reduce or eliminate full-

scope Medicaid benefits and to reduce the benefits provided under the MSP to individuals it previously recognized as protected against such cuts under the Coronavirus Response Act, if they fall into one of the IFR's newly-created exceptions. States proceeded to comply, if reluctantly in some cases.

11.     Named Plaintiffs are Medicaid enrollees in Connecticut, Nebraska and Delaware who live with various serious medical conditions, including Friedreich's Ataxia, severe circulatory abnormalities, Multiple Sclerosis, recurrent squamous cell carcinoma, rheumatoid arthritis, COPD and carotid artery disease.  Each had been enrolled in Medicaid and was receiving Medicaid coverage on or after March 18, 2020, i.e., the date the Coronavirus Response Act's PHE-related protections for all current and future Medicaid enrollees went into effect.

12.     Named Plaintiffs have each been notified that, in effect, their full benefit or other Medicaid coverage has terminated because: (1) they no longer meet the eligibility criteria for that coverage, and (2) they qualify for *a* Medicare Savings Program (MSP) providing limited financial assistance.

13.     In issuing the IFR, Defendant maintained that an MSP is "comparable" to full benefit Medicaid coverage under the IFR. But, contrary to the Coronavirus Response Act's plain terms, which do not include any concept of "comparability," transfer to an MSP will not provide them with the same benefits they have been receiving.  MSP also includes several variations of financial assistance for costs under Medicare.  For some individuals moved from one MSP to another, the change results in loss of all coverage for the required cost-sharing (deductibles, copayments and co-insurance) under Medicare, which is often substantial.  As a result, health care services can now be prohibitively expensive.

14.     Defendant's revised, unsupported interpretation of the Coronavirus Response Act harms Named Plaintiffs and members of the proposed class, including by denying them access to needed medical or dental treatment and transportation to get to that treatment, and by imposing concomitant physical and psychological harm that results from not being able to obtain such medically necessary care and treatment.  In some cases, Plaintiffs face irreparable harm in the form of likely entry into a nursing facility, where COVID contagion and death rates have been very high, or delayed access to diagnosis and treatment for cancer.

15.     In the case of individuals losing their Qualified Medicare Beneficiary benefits and being moved to another MSP program, they will lose their ability to receive health care services funded under Medicare if they cannot afford the cost-sharing under that program, which also has caused and will continue to cause irreparable harm.

16.     The provisions of the IFR promulgating 42 C.F.R. § 433.400 violate the Coronavirus Response Act's unambiguous maintenance of effort requirement by permitting states to receive the enhanced funding while actually providing significantly fewer "benefits" to individuals enrolled in a state's Medicaid program.

17.     The IFR was also issued without following the notice and comment procedures under the Administrative Procedure Act ("APA") and, in the case of the part promulgating 42 C.F.R. § 433.400, without the statutorily-required showing that eliminating the opportunity for prior notice and comment was "impractical, unnecessary or contrary to the public interest," 5 U.S.C. § 553(b)(B).

18.     Named Plaintiffs seek class-wide injunctive and declaratory relief to vacate the unlawful portions of the IFR and declare the states' obligations to continue to provide the same

level of benefits to Medicaid enrollees for the duration of the PHE, absent satisfaction of one of the two statutory exceptions in the Coronavirus Response Act.

## JURISDICTION AND VENUE

19.     This is an action for declaratory and injunctive relief for violation of the APA and the Coronavirus Response Act.

20.     The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. §§ 702 to 705. This action, and the remedies it seeks, are further authorized by 28 U.S.C. §§ 1651, 2201, and 2202, and Federal Rule of Civil Procedure 65.

21.     Venue is proper under 28 U.S.C. § 1391(b)(2), (e).

## PARTIES

22.     Plaintiff Deborah Carr is a 63-year-old Connecticut resident with disabilities who was enrolled in Connecticut's full benefit Medicaid program, HUSKY D, on or after March 18, 2020.

23.     Plaintiff Brenda Moore is a 57-year-old Connecticut resident with disabilities who was enrolled in HUSKY D on March 18, 2020.

24.     Plaintiff Mary Ellen Wilson is a 62-year-old Connecticut resident with disabilities who was enrolled in HUSKY D on March 18, 2020.

25.     Plaintiff Mary Shaw is a 65-year-old Nebraska resident who was enrolled in Nebraska's full-benefit Medicaid program after March 18, 2020.

26.     Plaintiff Carol Katz is a 73-year-old Delaware resident who was enrolled in Delaware Medicaid's Qualified Medicare Beneficiary MSP on March 18, 2020 because her countable income was below 100% of the federal poverty level.

27.     Defendant Xavier Becerra is the Secretary of HHS and is sued in his official capacity. Defendant Becerra has overall responsibility for administering the Department's programs consistent with federal law, including the Coronavirus Response Act and the APA.

28.     HHS is a federal agency with responsibility for overseeing implementation of provisions of the Social Security Act, of which the Medicaid Act is a part.

## CLASS ACTION ALLEGATIONS

29.     Pursuant to Rules 23(a)(1)-(4) and (b)(2) of the Federal Rules of Civil Procedure, Named Plaintiffs bring this action as a class action on behalf of all individuals who were enrolled in Medicaid in any state or the District of Columbia on March 18, 2020 or later and had their Medicaid eligibility terminated or reduced to a lower level of benefits on or after November 6, 2020, or will have their Medicaid eligibility terminated or reduced to a lower level of benefits prior to a redetermination conducted after the end of the PHE, for a reason other than moving out of the state or the District (including through death) or voluntarily disenrolling from benefits.

30.     The size of the class is so numerous that joinder of all members is impracticable. For example,  in just one state, Connecticut, the number of people cut off of full-benefit Medicaid, just for the reason of qualifying for Medicare and an MSP, was at least 6,600 at the initial implementation of this exception under the IFR.  This does not count individuals cut off for other reasons authorized and required under the IFR codified in 42 C.F.R. § 433.400, nor does it count individuals who are being terminated or having their benefits reduced each month because of newly falling under one of these exceptions.  Since all states participate in Medicaid, and Connecticut has only about 1% of the population of the United States (3.57 million of about 329.5 million), Plaintiffs estimate a class of hundreds of thousands of individuals nationwide.  Joinder is also impracticable because the class is dynamic and because the absent class members lack the knowledge, sophistication, and financial means to maintain individual actions.

31.     There are questions of law common to the class, including, *inter alia*:

a.      Whether Defendant violated the APA by promulgating the portion of the IFR codified in 42 C.F.R. § 433.400 without providing advance notice and opportunity for comment as required under 5 U.S.C. § 553.

b.      Whether Defendant violated the APA by promulgating the portion of the IFR codified in 42 C.F.R. § 433.400 and making it immediately effective rather than 30 days following publication as required under 5 U.S.C. § 553.

c.      Whether Defendant had any authority or good cause for disregarding the APA's procedural rulemaking requirements in disregarding these advance notice and comment requirements, pursuant to 5 U.S.C. § 553(b)(B).

d.      Whether the portion of the IFR codified in 42 C.F.R. § 433.400 is inconsistent with Section 6008 of the Coronavirus Response Act.

e.      Whether by adopting exceptions to the continuous enrollment requirements of the Coronavirus Response Act which are not authorized by the Act itself and where Congress specified only two narrow exceptions, Defendant violated the APA in that the IFR was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

f.      Whether Defendant violated the APA by reversing its contemporaneous interpretation of the Coronavirus Response Act which it maintained for eight months, without considering the reliance interests of parties based on the statute and its original interpretation of same.

g.      Whether it was in the "best interests of Medicaid beneficiaries" to terminate or substantially reduce their Medicaid benefits during the pandemic and the declared PHE, as claimed by Defendant.

32.     The Named Plaintiffs' claims are typical of the claims of the class.

33.     The representative parties will fairly and adequately protect the interests of the class. Plaintiffs will vigorously represent the interests of the unnamed class members, and all members of the proposed class will benefit by the efforts of the Named Plaintiffs. The interests of the proposed class and those of the Named Plaintiffs in having the IFR set aside is the same.

34.     Plaintiffs are represented by attorneys who are highly experienced in Medicaid litigation, litigation under the APA and class action litigation, satisfying the requirements of Rule 23(g)(1).

35.     The class is ascertainable and thus meets this additional requirement for class certification in the Second Circuit.

36.     Defendant and his predecessor has acted on grounds generally applicable to the plaintiff class, thereby making appropriate injunctive and declaratory relief with respect to the class as a whole under Rule 23(b)(2).

## BACKGROUND AND FACTUAL ALLEGATIONS

### A.      The Medicaid Program

37.     Title XIX of the Social Security Act establishes the medical assistance program known as Medicaid. *See id.* §§ 1396-1396w-5. The purpose of the Medicaid program is to enable each state, as far as practicable, "to furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." *Id.* § 1396-1.

38.     The Medicaid program is federally implemented by HHS. Within HHS, CMS is responsible for administration of the Medicaid program.

39.     States do not have to participate in Medicaid, but all do.

40.     Each participating state must maintain a comprehensive state Medicaid plan for medical assistance that the Secretary has approved. *Id.* § 1396a. The state Medicaid plan must describe the state's Medicaid program and affirm its commitment to comply with the requirements imposed by the Medicaid Act and its implementing regulations.

41.     States also are required under their state plans to administer their Medicaid programs in the "best interests of the recipients," as well as to do so "in a manner consistent with simplicity of administration." 42 U.S.C. § 1396a(a)(19).

42.     States and the federal government share responsibility for funding Medicaid. Section 1396b requires the Secretary to pay each participating state the federal share of "the total amount expended . . . as medical assistance under the State plan." *Id.* §§ 1396b(a)(1), 1396d(b). The federal reimbursement rate is based on the state's relative per capita income and is known as FMAP.

43.     In return for federal funding, participating states must pay the remaining portion of the costs of care and follow all federal requirements, including those regarding the scope of coverage and eligibility for the program. *Id.* §§ 1396-1, 1396b.

44.     Using household income and other specific criteria, the Medicaid Act delineates who is eligible to receive Medicaid coverage. *Id.* §§ 1396a(a)(10)(A), (C).

45.     The Act contains required coverage groups, as well as options for states to extend Medicaid to additional population groups. *Id.* §§ 1396a(a)(10)(A), (C).

10

46.     The mandatory population groups include: low-income children; parents and certain other caretaker relatives; pregnant women; the elderly, blind, or disabled; individuals under age 26 who were in foster care until age 18; and adults who are under age 65, are not eligible for Medicare, do not fall within another Medicaid eligibility category, and have countable household incomes below 133% of the federal poverty level ("FPL") (this last group is often referred to as the "expansion population"). § 1396a(a)(10)(A)(i), (e)(14).  The expansion population was initially included as a mandatory eligibility group. The Supreme Court's decision in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 588 (2012), however, barred HHS from terminating Medicaid funding to states that choose not to extend Medicaid coverage to the expansion population.

47.     Generally, individuals must hold a qualified immigration status to be eligible for Medicaid coverage. *See* 8 U.S.C. § 1641(b).  In addition, certain categories of qualified immigrants, such as Legal Permanent Residents, must hold that qualified status for five years before they are Medicaid eligible.  *Id*. § 1613(a). Individuals without a qualified status, or who have not held their qualified status for the required five years, are eligible only for services to treat an emergency medical condition.  *See* 42 U.S.C. § 1396b(v)(3).

48.     All states and the District of Columbia also have the option to receive federal matching funds to cover certain immigrants who do not have a qualified status or who have a qualified status but have not held it for five years. Specifically, any state may provide Medicaid coverage to "lawfully residing" immigrants if they are pregnant or are children under age 21. *See* 42 U.S.C. § 1396b(v)(4)(A). CMS has defined "lawfully residing" to mean individuals who are "lawfully present" and meet the Medicaid state residency requirement. *See* CMS, Dear State Health Official Letter, 10-006 (July 1, 2020), https://www.medicaid.gov/federal-policy-

guidance/downloads/SHO10006.pdf. Coverage for pregnant people in this category extends through the 60-day period beginning on the last day of the pregnancy and for children until they turn 21.

49. Connecticut, Nebraska and Delaware have all chosen this option, although Nebraska only covers such children until they turn 19.

50. On July 26, 2022, Connecticut joined several other states in receiving permission from CMS to extend post-partum coverage under Medicaid generally to twelve months instead of 60 days. CMS, HHS Approves 12-Month Extension of Postpartum Coverage in Connecticut, Massachusetts, and Kansas, Jul. 26, 2022, https://www.cms.gov/newsroom/press-releases/hhs-approves-12-month-extension-postpartum-coverage-connecticut-massachusetts-and-kansas

51. States that participate in Medicaid must provide Medicaid beneficiaries with "medical assistance."  The statute defines "medical assistance" to mean "payment of part or all of the cost of the following care and services or the care and services themselves, or both." 42 U.S.C. § 1396d.  The "following care" includes a range of health care services that participating states either must cover or are permitted to cover, from physical therapy and hearing aids to long-term care at home and in nursing facilities. *Id.* § 1396d(a); 42 U.S.C. §§ 1396a(a)(10)(A).

52. Non-emergency transportation to medical appointments also is a required Medicaid service, 42 U.S.C. § 1396u-7(a)(1)(F) (regarding so-called "benchmark" plans); 42 C.F.R. § 431.53.

53. There are many optional services, including prescription drugs, adult dental benefits, optometry services, prosthetic devices, and at-home personal care services. *See id.* 42 U.S.C. §§ 1396(a)(10)(A), 1396(d)(a) (Medicaid Act listing 30 categories of medical assistance, only nine of which are mandatory).

54.     States must specify the amount, duration, and scope of services in the state plan, and services must also be "sufficient in amount, duration, and scope to reasonably achieve their purpose." 42 C.F.R. § 440.230.

55.     In Connecticut, the full benefit Medicaid program includes optional coverage for extensive services in the form of personal care attendants. Under the Community First Choice program, individuals are eligible for Medicaid-funded personal care attendants when they are found by the state to meet a nursing facility level of care such that, without these services, they will be institutionalized.

56.     In Nebraska, the full benefit Medicaid program includes coverage for dental services, vision care services, and hearing aids, among many other kinds of services.

57.     In Delaware, the full benefit Medicaid program includes optional coverage for limited optometry services in managed care organizations, and, most recently, adult dental care, among many other kinds of services.

**B.      The Medicare Program and the Medicare Savings Program**

58.     While Medicare and Medicaid are often confused, the Medicaid program, which is generally only for low-income individuals and is jointly administered by the state and federal governments, is very different from the Medicare program. Medicare is for individuals of any income level who either are totally disabled and have significant work history or are over the age of 65, and it is administered exclusively by the federal government.

59.     Medicare coverage is made up of four parts:

- Part A – Referred to as Hospital Insurance in the statute (inpatient hospital care, inpatient care in skilled nursing facilities, hospice care, some home health care)

- Part B – Referred to as Medical Insurance in the statute (physician services, outpatient care, durable medical equipment, some home health services, many preventive services and some in-office prescription drug coverage). *See* 42 U.S.C. § 1395w-101-116.1

- Part C –Medicare Advantage Plans, a set of private insurance plans which provide Medicare coverage, usually with some minor supplemental benefits

- Part D- Medicare prescription drug coverage.

60.     Medicare coverage does not include all of the benefits covered under Medicaid and certainly not the broad range of services typically covered under state Medicaid programs, including mandatory services like non-emergency medical transportation and optional services like dental services. Home health care and nursing facility services have very limited coverage under Medicare. There is no coverage at all under Medicare for the majority of home and community-based services, such as in-home long term care services.

61.     All of these services are covered under the Medicaid programs of Connecticut, Nebraska and Delaware.

62.     Medicare coverage requires recipients to shoulder significant out of pocket expenditures.  Enrollees must pay monthly premiums, plus deductibles, co-payments, and percentage of total charge co-insurance amounts (collectively, "cost-sharing").

63.     To address this burden, states must provide limited Medicaid to certain groups of low-income Medicare-eligible beneficiaries to help them cover the Medicare Part B premiums and, in some cases, cost-sharing. These groups are generally referred to as MSP eligibility groups but may also be referred to by other names. The MSP benefit only provides financial assistance to cover Medicare Part B premiums and the out-of-pocket costs of services covered under Medicare; the MSP benefit does not provide coverage for *any* services not covered by Medicare.

64.     There are three different MSP eligibility groups, based on income levels, for which the federal government sets minimums, but allows the states to exceed those minimums.

a.     The first category includes people eligible for Medicare Part A, who meet certain income criteria, receive Medicaid coverage of their Medicare Parts A & B

premiums, copays, deductibles, and coinsurance. *See* 42 U.S.C. § 1396d(p). These individuals are referred to as "Qualified Medicare Beneficiaries" ("QMBs"). In Connecticut, the income limit requirements for QMB coverage, currently $2390/month for a single individual, are relatively high, allowing more people to access the program. In Delaware the income limit for QMB coverage is set at 100% of the federal poverty guidelines plus a $20 monthly disregard.  16 Del. Admin C. § 17300.3; 17300.3.2.6.  In 2022, that amount is $1,153 per month.  There is no asset/resource test for QMB benefits in Connecticut or Delaware.  In Nebraska, the income limit for a single individual (not including any general disregard) is currently $1133 per month, *see* 477 Neb. Admin. Code 000-012. Nebraska does have a resource limit of $7,970 for a single person for its QMB program. *Id.*

b.      Individuals in the next income eligibility group are referred to as Specified Low Income Medicare Beneficiaries ("SLMBs"). *See* 42 U.S.C. § 1396a(a)(10)(E)(iii). This program only includes payment of Part B premiums, and provides no coverage for cost-sharing.  In Connecticut, the income limit for this program is somewhat higher, currently $2617/month for a single individual. In Delaware, the income limit for SLMB coverage is set at $120% of the federal poverty guidelines plus a $20 monthly disregard. 16 Del Admin. C. § 17400.1.  In 2022, that amount is $1,380 per month.  There is no resource test for SLMB coverage in Delaware. In Nebraska, the income limit for SLMB for a single individual (not including any general disregard) is currently $1360 per month, with a resource limit of $7,970 for a single person, *see* 477 Neb. Admin. Code 000-012.

c.      Individuals in the next income eligibility group are commonly referred to as Additional Low Income Medicare Beneficiaries ("ALMBs") but ay also be referred to

15

by other names.  This program also only provides payment of Medicare Part B premiums. In Connecticut, the income limit for this program is set at an even higher level, currently $2786/month for a single individual.  In Delaware, the income limit for ALMB coverage is set at $135% of the federal poverty guidelines plus a $20 monthly disregard. 16 Del Admin. C. §§ 17500, 17510.  In 2022, that amount is $1,550 per month.  There is no resource test for ALMB coverage in Delaware. In Nebraska, the income limit for ALBM for a single individual (not including any general disregard) is currently $1530 per month, with a resource limit of $7,970 for a single person, *see* 477 Neb. Admin. Code 000-012.

65.     Some individuals may be eligible for Medicare, an MSP-eligibility group, and full-scope Medicaid benefits.

66.     Other individuals, however, are eligible only for Medicare and an MSP. These individuals do not receive full-scope Medicaid benefits.  As a result, individuals who move from full-scope Medicaid to an MSP-eligibility group lose access to the benefits that are only covered by Medicaid: they only receive financial assistance to pay for their Medicare premiums, and only for those who qualify as QMBs, cost-sharing for Medicare-covered services.  Individuals who are moved from QMB to one of the other MSP programs lose coverage for Medicare cost-sharing.

**C.     The COVID-19 Pandemic and the Families First Coronavirus Response Act**

67.     On March 13, 2020, former President Donald Trump declared a national emergency due to the rapid spread of the COVID-19 virus. 85 Fed. Reg. 15337, Pres. Proclamation, Mar. 13, 2020.

68.     On January 31, 2020, former Secretary of HHS Alex Azar declared a PHE retroactive to January 27, 2020.

69.     The PHE, extensions of which are approved in 90-day increments, *see* 42 U.S.C. § 247d(a)(2), has been repeatedly extended, most recently on July 15, 2022, assuring continuation

of the PHE until at least October 13, 2022. Secretary Becerra, like his predecessor, also has assured states that there will be at least 60 days' advance notice of the termination of the declared emergency "Renewal of Determination that a Public Emergency Exists," July 15, 2022, *available at* https://aspr.hhs.gov/legal/PHE/Pages/covid19-15jul2022.aspx; *see also* Ltr. from Norris Cochran, Acting HHS Sec'y of Dep't., to State Governors, 1 (Jan. 22, 2021) *available at* https://ccf.georgetown.edu/wp-content/uploads/2021/01/Public-Health-Emergency-Message-to-Governors.pdf.

70.     Because the Secretary made no announcement on August 15, 2022 that the PHE would be ending, this means that, to comply with his promise of 60 days' advance notice, the PHE will need to be extended, and this means it will continue until at least the middle of January, *see* David Lim, *HHS says it plans to extend Covid-19 public health emergency*, Politico, Aug. 17, 2022, *available at* https://www.politico.com/news/2022/08/17/hhs-covid-health-emergency-00052509

71.     While the end-date is not at all certain, neither is it in sight. *The pandemic remains a global health emergency, the W.H.O. says*, New York Times, July 12, 2022, https://www.nytimes.com/2022/07/12/world/who-covid-health-emergency.html?smid=url-share.

72.     As of the time of this complaint, about 450 persons per day are still dying from COVID, and about 40,000 people are hospitalized. *Coronavirus in the U.S.: Latest Map and Case Count*, New York Times, *available at* https://www.nytimes.com/interactive/2021/us/covid-cases.html?smid=nytcore-ios-share&referringSource=articleShare (last visited August 25, 2022). And, according to the CDC, there are about 100,000 documented new infections every day, see CDC, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#trends_dailycases_select_00 (last visited Aug. 25, 2022).

73.    Older individuals and those with weakened immune systems, including the Named Plaintiffs, remain particularly vulnerable, and the Center for Disease Control and Prevention ("CDC") warns that the latest variants pose a continuing risk that may accelerate this fall. CDC, COVID 19, *People with Certain Medical Conditions*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited July 14, 2022).

74.    Similarly, people of color have experienced COVID-19 at disproportionate rates and have died at rates that greatly exceed their representation in the population. For example, Black people are 2.3 times more likely to get COVID-19 than White people, and 1.7 times more likely to die from it.  CDC, *Risk for COVID-19 Infection, Hospitalization, and Death By Race/Ethnicity,* *available at* https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last visited July 14, 2022)

75.    In addition, people of color are disproportionately on Medicaid, largely due to disparate income levels compared with White Americans. In Connecticut,  for example, 18.2 % of the Medicaid population identifies as Black or African-American, Workbook: People Served (ct.gov), while only 12.7% of the state population overall is Black, U.S. Census Bureau, Quick Facts Connecticut, *available at*   https://www.census.gov/quickfacts/CT (last visited Aug. 25, 2022).    In Delaware, 32.9% of the non-elderly Medicaid population is Black, *see* KFF, Distribution    of    the    Nonelderly    with    Medicaid    by    Race/Ethnicity, https://www.kff.org/medicaid/state-indicator/medicaid-distribution-nonelderly-by-raceethnicity/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Aug. 25, 2022), while only 23.6% of the overall population is Black.    U.S.    Census    Bureau,    Quick    Facts    Delaware,    *available    at*

https://www.census.gov/quickfacts/DE (last visited Aug. 25, 2022). In Nebraska, 10.7% of the non-elderly Medicaid population in Black. *See* Distribution of the Nonelderly with Medicaid by Race/Ethnicity | KFF , while 5.3% of the total population in Black. *See* https://www.census.gov/quickfacts/fact/table/NE/RHI225221 .

76.     On March 18, 2020, the Coronavirus Response Act was signed into law. Recognizing that states would face financial pressure as a result of the pandemic, the Coronavirus Response Act includes significant financial relief for state Medicaid programs by enhancing each state's FMAP by 6.2 percent for nearly all Medicaid expenditures. Coronavirus Response Act §6008(a).

77.     It is estimated that states will have received approximately $100.4 billion in fiscal relief due to the enhanced FMAP as of May 2022, which is more than double the total estimated state costs due to the additional MOE enrollees ($47.2 billion) from FY 2020 – FY 2022. Elizabeth Williams, *Fiscal and Enrollment Implications of Medicaid Continuous Coverage Requirement During and After the PHE Ends*, KFF, May 10, 2022, https://www.kff.org/medicaid/issue-brief/fiscal-and-enrollment-implications-of-medicaid-continuous-coverage-requirement-during-and-after-the-phe-ends/.

78.     This has, for example, resulted in several hundred million dollars in additional federal Medicaid reimbursements just to Connecticut since the passage of the Coronavirus Response Act.

79.     To be eligible for the enhanced FMAP, states must meet several conditions. These conditions, referred to as the "maintenance of effort" requirements, establish protections for Medicaid enrollees during the public health emergency. As relevant here, States must "provide that an individual who is enrolled for benefits  under such plan (or waiver) as of" March 18, 2020,

"or enrolls for benefits under such plan (or waiver) during" the PHE, "shall be treated as eligible for *such benefits* through the end of the month" in which the public health emergency ends. *Id.* § 6008(b)(3) (emphasis added).

80.     There are only two specific statutory exemptions to the maintenance of effort provision requiring continued coverage of the same services: when "the individual requests a voluntary termination of eligibility or the individual ceases to be a resident of the State." *Id.* § 6008(b)(3).

81.     The Coronavirus Response Act is designed to balance the need for states to receive enhanced federal funding with the need to protect beneficiaries against state efforts to terminate or reduce Medicaid benefits during the PHE. The statute allows terminations or reductions only in those two narrow circumstances where Congress found continuation of benefits to be unreasonable. The Coronavirus Response Act gives Defendant no authority to create additional exceptions to these protections, much less to do so under rules adopted without prior notice and comment.

### D.     CMS's Spring 2020 Guidance

82.     Contemporaneous with the enactment of the Coronavirus Response Act, CMS published several sub-regulatory documents containing FAQs to advise states of the requirements necessary to receive the enhanced funding offered under § 6008 of the Coronavirus Response Act.

83.     On March 24, 2020, CMS explained that, pursuant to § 6008(b)(3):

while states may increase the level of assistance provided to a beneficiary who experiences a change in circumstances, such as moving the individual to another eligibility group which provides additional benefits, states may not reduce benefits for any beneficiary enrolled in Medicaid on or after March 18, 2020, through the end of the month in which the emergency period ends, and still qualify for increased FMAP.

CMS Families First Coronavirus Response Act – Increased FMAP FAQs, 6 (Mar. 24, 2020).

84.     On April 13, 2020, CMS again stated that states "may not reduce benefits for any beneficiary enrolled in Medicaid" during the public health emergency, including by moving them to a new eligibility group that provides fewer benefits. CMS, "Families First Coronavirus Response   Act   –   Increased   FMAP   FAQs,"   6   (Apr.   13,   2020), https://sss.usf.edu/covid19/resources/medicaid/Family%20First%20Coronavirus%20Response%20Act%20_%20Increased%20FMAP%20FAQs.pdf.

85.     In that same April 13, 2020 statement, CMS repeatedly emphasized that, to satisfy § 6008(b)(3), states must continue providing individuals with the same amount, duration, and scope of services throughout the public health emergency, regardless of changes in individual circumstances:

> To be eligible for the enhanced FMAP authorized by the FFRCA, states may not reduce benefits for any beneficiary enrolled in Medicaid on or after March 18, 2020, through the end of the month in which the emergency period ends, and still qualify for increased FMAP. This means that states must continue to provide coverage to such beneficiaries in the eligibility group in which the beneficiary is enrolled if transitioning the beneficiary to another eligibility group would result in a reduction in benefits. If there is a separate eligibility group for which the individual is eligible and which provides the same amount, duration and scope of benefits, then a state may shift the individual to that group; *what is critical for ensuring eligibility for the temporary FMAP increase is that the same amount, duration and scope of medical assistance be maintained.*

CMS, "Families First Coronavirus Response Act (FFCRA), Public Law No. 116-127 Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law No. 116-136 Frequently Asked Questions   (FAQs),"   9   (Apr.   13,   2020)   (emphasis   added); https://sss.usf.edu/covid19/resources/medicaid/Family%20First%20Coronavirus%20Response%20Act%20_%20Increased%20FMAP%20FAQs.pdf; *see also*, *id.* (explaining that a state may not move an individual from one eligibility group to another, "unless the individual is eligible for a separate eligibility group which provides the same amount, duration and scope of benefits."); *id.* ("If . . . the individual is ineligible for another eligibility group which confers the same amount,

duration and scope of benefits, the state must continue to furnish services available to beneficiaries enrolled in the adult group until the last day of the month in which the emergency period ends."); *id.* at 11 ("If . . . there is no other eligibility group for which the individual is eligible under the state plan or waiver that provides the same amount, duration and scope of benefits as those available to beneficiaries in the group under which the individual has been receiving coverage . . . then the state must continue to furnish the benefits available under such group in order to qualify for the temporary FMAP increase."); *id.* at 11 ("A state must maintain, during the emergency period, an individual's eligibility for at least the same amount, duration, and scope of benefits as are covered for the group in which the individual is enrolled.").

86.     On May 5, 2020, CMS confirmed for the third time that § 6008(b)(3) of the Coronavirus Response Act prohibits any *reduction* in the services or medical assistance provided to an individual:

> **Are states prohibited from increasing cost-sharing during the emergency period as a condition of receiving the FFRCA [Coronavirus Response Act] enhanced FMAP?**
>
> Yes. A state is not eligible for the temporary FMAP increase authorized by section 6008 of the FFRCA if it reduces the medical assistance for which a beneficiary is eligible and if that beneficiary was enrolled as of March 18, 2020, or becomes enrolled after that date but not later than the last day of the month in which the emergency period ends. *Such a reduction in medical assistance would be inconsistent with the requirement at section 6008(b)(3) of the FFRCA that the state ensure that beneficiaries be treated as eligible for the benefits in which they were enrolled as of or after March 18, 2020, through the end of the month in which the emergency period ends*. Because an increase in cost-sharing reduces the amount of medical assistance for which an individual is eligible, a state is not eligible for the enhanced FMAP if it increases cost sharing for individuals enrolled as of or after March 18, 2020.

CMS, *COVID-19 Frequently Asked Questions (FAQs) for State Medicaid and Children's Health Insurance Program (CHIP) Agencies* 26 (May 5, 2020) (emphasis added).  For good measure, CMS issued a fourth statement to the same effect in late June 2020.  CMS, "COVID-19 Frequently

Asked Questions (FAQs) for State Medicaid and Children's Health Insurance Program (CHIP)

Agencies," 29-30 (June 30, 2020) (repeating guidance from May 5, 2020).

87.     Connecticut's Medicaid agency responded to these clear and consistent

pronouncements under the Coronavirus Response Act by assuring policymakers that no one on

Medicaid would have their Medicaid benefits *reduced* during the PHE: it assured the members of

the Medical Assistance Program Oversight Council that, "[f]or the duration of the PHE, DSS is

not taking action on changes (e.g. change in family income, aging out of coverage) that would

result in a change of eligibility group or termination of coverage." July 10, 2020 PowerPoint

presentation, slide 10, available at 2906a2 (ct.gov).

88.     Similarly, in Delaware, the Medicaid agency, on March 27, 2020, issued a written

policy prohibiting Medicaid terminations consistent with the Coronavirus Response Act, under

which it said "states may not terminate individuals from Medicaid who were enrolled in Medicaid

on or after March 18, 2020, regardless of any changes in circumstances or redeterminations at

scheduled renewals that otherwise would result in termination," except "for individuals who

request a voluntary termination of eligibility, are deceased, or are no longer considered to be

residents of the state." Delaware Health and Social Services, Administrative Notice DMMA- A-

06-2020, Mar. 27, 2020, *available at* https://dhss.delaware.gov/dhss/dmma/files/an_202006.pdf

**E.     Defendant's Interim Final Rule**

89.     In early November 2020, CMS reversed course and issued an IFR that included

provisions significantly weakening the beneficiary protections Congress enacted in § 6008(b)(3)

of the Coronavirus Response Act. *See* Additional Policy and Regulatory Revisions in Response to

the COVID-19 Public Health Emergency, 85 Fed. Reg. 71142, 71160 (Nov. 6, 2020).

90.     The IFR newly authorized or required states to reduce or entirely eliminate

Medicaid coverage for individuals who: (1) are eligible for financial assistance to pay for at least

some out-of-pocket Medicare costs under an MSP; (2) are deemed not "validly enrolled" at the time of the passage of the Coronavirus Response Act; or (3) are non-citizens otherwise losing Medicaid coverage because of being in the United States less than five years and no longer being pregnant or a child, 42 C.F.R § 433.400 (c)(2), (d)(2).

91.     The IFR was issued with no intervening change in CMS's public position or in the statutory language, nor any improvement in the COVID-19 pandemic itself.  Rather, CMS claimed that its revised statutory interpretation was prompted by the concerns of unidentified states (it does not say which states or how many) that its "existing interpretation of Section 6008(b)(3) of the Coronavirus Response Act makes it challenging for them to manage their programs effectively and still qualify for the increased Federal financial participation." *Id.* at 71161.

92.     The IFR was issued without the notice and comment procedures ordinarily required by the APA. CMS did ask for *post*-implementation comments on the IFR, 85 Fed. Reg. at 71142. But while the overwhelming majority of the more than 260 comments received opposed the IFR, the rule has remained in effect on an "interim" basis for the past twenty-one months.

93.     As relevant here, the IFR adds a new subpart G, Temporary FMAP Increase During the Public Health Emergency for COVID–19, to 42 C.F.R. part 433, including a new § 433.400.

94.     The new provisions in 42 C.F.R. § 433.400 became "effective immediately upon display of this rule." 85 Fed. Reg. 71144.

95.     Defendant's terse explanation for proceeding without notice and comment was that an interim final rule was "immediately necessary to ensure that states can determine eligibility and provide care and services during the [public health emergency] in a manner that is consistent with simplicity of administration and the best interests of beneficiaries and also claim the temporary funding increase." 85 Fed. Reg. 71181. It did not explain what harm, if any, had befallen states in

the months they had operated without the IFR, while elsewhere in the preamble it suggested the absence of such harm: "CMS is not aware of any states or territories not currently claiming this temporary FMAP increase, or of any state or territory that intends to cease claiming it." 85 Fed. Reg. 71148.  And the explanation that this was in the "best interests of the beneficiaries" made no sense because, in fact, it is completely **against** the best interests of Medicaid beneficiaries to cut them off at all, let alone to do so under an immediately-effective IFR. The Agency's explanation does not rise to the good cause required to bypass the statutorily-required prior notice and comment rule-making process.

96.     No final rule has been issued by the Defendant. His agency has not subsequently explained why it has yet to address any of the comments it invited or to issue a final rule.

97.     After four previous times reiterating and reaffirming a contrary interpretation during the same calendar year, CMS's IFR announced, for the first time, that Section 6008(b)(3) of the Coronavirus Response Act is "somewhat ambiguous" and that a new interpretation of the statute was needed to respond to unnamed states requesting unspecified "increased flexibility." *See* 85 Fed. Reg. at 71160.  Defendant provided no basis for his contention that cutting people off of necessary health benefits for which they have no other coverage, particularly during an ongoing public health emergency which may require prompt treatment for any infected individual, is "consistent with simplicity of administration," let alone in the "best interests of beneficiaries," as required under federal Medicaid law, 42 U.S.C § 1396a(a)(19).

98.     The IFR permits states to continue receiving the enhanced FMAP, while authorizing, and in some cases requiring, them to reduce or eliminate coverage for Medicaid enrollees.

99.     CMS subsequently told the states that under the IFR they *must* conduct these terminations. CMS COVID-19 Medicaid & CHIP All State Call, 11-17-20, at pages 12-17, *available at* https://www.medicaid.gov/state-resource-center/downloads/allstatecall-20201117.pdf.

100.    CMS officials made clear that the terminations under the IFR were, in fact, mandatory, in response to a question from a Connecticut Medicaid official ("Krist[i]n [Dowty]"). CMS COVID-19 Medicaid & CHIP All State Call, 12-1-20, at pages 29-30, *available at* https://www.medicaid.gov/resources-for-states/coronavirus-disease-2019-covid-19/cmcs-medicaid-and-chip-all-state-calls/cmcs-medicaid-and-chip-all-state-calls-2020/index.html.   This was followed by email correspondence between this same Connecticut official and CMS in March 2021, in which CMS stated, on March 27, 2021: "Consistent with CMS regulation at 42 C.F.R. § 433.400(c)(2), Connecticut must transfer the individual described in this scenario from the adult group to the MSP-related group under which the individual is eligible. It is not optional for states." Email correspondence between Kristin Dowty and Marie DiMartino, CMS (March 11 and 27, 2021).

101.    The IFR not only permits but, per the later CMS pronouncements, requires states to make "changes to beneficiary coverage, . . . including both changes affecting an individual beneficiary and approved changes to the state plan," or waiver "impacting multiple beneficiaries," without impacting "a state's ability to claim the temporary FMAP increase." 42 C.F.R. § 433.400(c)(3).

102.    According to the IFR preamble, this change permits states to "eliminate[e] an optional benefit from its state plan," such as dental benefits, and still claim the enhanced FMAP. 85 Fed. Reg. 71166.

103.    Contrary to the Coronavirus Response Act, the IFR not only permits, but, per the agency's pronouncements on how it intended to apply the IFR, it requires states to transition Medicaid enrollees to different eligibility groups, even when this would result in a reduction in the amount, duration, or scope of services. 42 C.F.R. § 433.400(c)(2); 85 Fed. Reg. 71,161.

104.    While the IFR does retain some limitations on states' ability to move individuals between eligibility groups, *id.* §§ 433.400(c)(2)(i)(A)-(B) (regarding individuals with minimum essential coverage under the Affordable Care Act); 42 C.F.R. § 433.400(c)(2)(ii) (regarding Medicaid coverage for COVID-19 testing and treatment), the limitations are narrow.

105.    The IFR, as confirmed by CMS, requires states to move individuals from full-scope Medicaid to "coverage under a Medicare Savings Program [MSP] eligibility group," 42 C.F.R. § 433.400(c)(2)(i)(B).

106.    In doing so, the IFR conflates coverage standards in non-Medicaid regulations applicable only to market-based insurance in the Affordable Care Act with Medicaid, to justify eliminating full benefit Medicaid coverage and QMB coverage within MSPs, asserting that Medicare provides "essential coverage." However, MSP-eligibility provides payment only for Medicare costs and neither Medicare nor MSP provide the same full-scope Medicaid benefits previously received, such as vision and hearing exams, non-emergency medical transportation, hearing aids, dental services, home and community-based services, personal care services, and long-term nursing facility services. And, within the MSPs, SLMB and ALMB do not provide the coverage for required cost-sharing for Medicare services provided under QMB.

107.    The IFR also requires states to terminate Medicaid coverage for certain immigrants. For "lawfully residing" children or pregnant women, who no longer meet the definition of "lawfully residing," "child," or "pregnant women," states "*must* limit coverage for such

beneficiaries . . . to services necessary for treatment of an emergency medical condition." 42 C.F.R. § 433.400(d)(2) (emphasis added).

108.    The IFR added one further exemption from the statutory duty to maintain continuous coverage for individuals on Medicaid in March of 2020: an individual can be denied coverage if that individual is deemed not to have been "validly enrolled" in Medicaid in the first place. 42 C.F.R. § 433.400(b) and (c)(2). The statute, however, reflecting Congress' determination that keeping individuals of limited means on Medicaid benefits during the public health emergency, regardless of why they were on in the first place or changes that might otherwise affect their eligibility, draws no distinction between enrolled individuals; its protection applies to anyone "who is enrolled for benefits under such plan" mistakenly or otherwise (unless one of the two statutory exceptions applies).

### F.    State Responses to Guidance

109.    Some states quickly implemented the terminations authorized or mandated under the IFR.   For example, the Pennsylvania Medicaid agency responded to the IFR by issuing new written guidance on December 7, 2020 instructing that individuals who fall under the new exceptions should be terminated from their full benefit Medicaid coverage, including individuals who qualify for Medicare and a Medicare Savings Program. The guidance has been updated several times since then, most recently on July 26, 2022.  *See* Pennsylvania Dep't of Human Servs., Operations     Memo.     #20-12-02     (Jul.     26,     2022),     *available     at* http://services.dpw.state.pa.us/oimpolicymanuals/ltc/OPS_20_12_03.pdf

110.    Other states were initially reluctant to comply with the extra-statutory exceptions under the IFR, but CMS informed states through the All State calls and in specific written responses to states' inquiries that "it is not optional for states" to conduct the terminations. Transcript of December 1, 2020 All State Call, at pages 29-30 & Transcript of March 9, 2021 All

State Call, at page 13 (*available at* https://www.medicaid.gov/resources-for-states/coronavirus-disease-2019-covid-19/cmcs-medicaid-and-chip-all-state-calls/cmcs-medicaid-and-chip-all-state-calls-2021/index.html; Email correspondence between CMS and Connecticut Medicaid official Kristin Dowty (March 11 and 27, 2021).

111.    Upon information and belief, this led to the termination of Medicaid benefits for hundreds of thousands of Americans and legal permanent residents throughout the country and in every state, which in many cases resulted in the termination of ongoing services essential to health, to avoiding institutionalization, or even to maintaining life itself.

112.    In Connecticut, at least 6,600 people were initially terminated from full-benefit Medicaid under the IFR solely because they qualified for an MSP program. Hundreds more have since lost protected benefits under the IFR because they now qualify for the lesser coverage of Medicare and related MSP programs. This total does not include those terminated for some other basis contained in the IFR, such as because they have secured legal status in this country for less than five years and are no longer pregnant or under 18, or because they are deemed not to have been validly enrolled for some reason.

113.    In Delaware, the Medicaid agency also changed its position on March 1, 2021, from compliance with the Coronavirus Response Act to implementation of the new exceptions in the IFR.  *See* Delaware Health and Social Services, Administrative Notice DMMA- A-06-2021, Mar. 1, 2021, *available at*  https://dhss.delaware.gov/dhss/dmma/files/an_202106.pdf

G.    **Effects of the IFR on Named Plaintiffs**

**Plaintiff Deborah Carr**

114.    Plaintiff Deborah Carr is a 63-year-old White woman who lives in her own home in New Haven, Connecticut.  She has been on full-benefit Medicaid her entire life due to long-term, chronic conditions. Ms. Carr needs daily assistance in her home due to her progressive

neurological condition, Friedreich's Ataxia. She needs help with dressing and bathing, in using the toilet, transferring from her wheelchair or out of bed, and with eating food. She has for years been receiving many hours per week of home health services, paid for under the Medicaid program (HUSKY D) to help her with all of her activities of daily living and allow her to continue to live outside of an institutional setting.

115.    Ms. Carr has income of $1300 per month and she cannot afford to pay on her own for needed home care services, the cost of which is several thousand dollars per month.

116.    Following issuance of the IFR and Defendant's declaration to all states that its newly-created exceptions to maintenance of effort under the Coronavirus Response Act were mandatory, Connecticut's Medicaid agency terminated Ms. Carr's full benefit Medicaid coverage under HUSKY D, based on Defendant's mandate.

117.    Ms. Carr timely challenged the termination of her Medicaid coverage through the administrative appeal process. During that appeal, her personal care benefits of about 70 hours per week continue pending the decision by the hearing officer, which could be issued at any time.  If she is unsuccessful, she will be subject to repayment to the state of the cost of care provided by the Medicaid program.  Once such a decision is issued, her continued benefits will cease.

**Plaintiff Brenda Moore**

118.    Plaintiff Brenda Moore is a 57-year-old Black woman who lives in her own home with her adult son and three-year-old grandchild in New Haven, Connecticut. Ms. Moore's son works full-time out of the house and is unavailable to provide the daily care she requires. Ms. Moore has a severe vascular condition which has led to blood clots and required multiple surgeries, which have been only partially successful.  Due to her severe circulation issues, she requires daily assistance with bathing, dressing, transferring and toileting, and also with meal preparation.  She

30

also has a significant risk of falling and has fallen several times. She is able to ambulate, but only with a walker or cane.  Ms. Moore also has severe depression and Post-Traumatic Stress Disorder.

119.    Ms. Moore's entire income is $1402 in monthly Social Security Disability Insurance benefits, so she is unable to pay for the needed assistance herself.

120.    Ms. Moore had been receiving Medicaid-funded daily assistance from personal care attendants starting in July of 2020, due to her developing vascular condition which was causing falls and other symptoms. The personal care services paid for under the Medicaid program, currently totaling 39 hours per week, allow her to live outside of an institutional setting.

121.    Following issuance of the IFR and Defendant's declaration to all states that its newly-created exceptions to maintenance of effort under the Coronavirus Response Act were mandatory, Connecticut's Medicaid agency terminated Ms. Moore's full benefit Medicaid coverage under HUSKY D, based on Defendant's mandate.

122.    Ms. Moore has accrued extensive debt for services rendered during a period when her home health aide worked but was not paid, because of the termination of full-scope Medicaid coverage (under HUSKY D), as required by Defendant under the IFR.  She was able to meet the Medicaid "spend down" for an alternative full-benefit Medicaid program, based on the application of this debt, which allowed her to continue coverage for a limited one-time six-month period ending on August 31, 2022.  She will not be able to accrue such a large debt to so qualify a second time, meaning payment for her personal care attendant will abruptly end on that day.

**Plaintiff Mary Ellen Wilson**

123.    Mary Ellen Wilson is a 62-year-old White woman who lives at home in Stamford, Connecticut.  She had seizures as a child, surgery related to this, and has Multiple Sclerosis and dental complications related to decades of anti-seizure medication usage.  Her income is $1391 per month.

31

124.    Ms. Wilson was terminated from full benefit Medicaid coverage under the HUSKY D program, also, on the basis she is on Medicare and an MSP.  As a result, she has lost many benefits covered only by the Medicaid program. For example, her dental work is not covered by Medicare, other than cleanings covered by her Medicare Advantage plan; dental coverage under Medicaid is far more comprehensive.  She has paid for cabs to get to medical appointments, even though Medicaid pays for this.

125.    Multiple Sclerosis is generally a degenerative neurological disease, and so Ms. Wilson's course is uncertain and she could need additional services not covered under Medicare at any time (e.g., home care services, durable medical equipment not covered under Medicare, and etc.).

126.    Following issuance of the IFR and Defendant's clarification to all states that its newly-created exceptions to maintenance of effort under the Coronavirus Response Act were mandatory, Connecticut's Medicaid agency terminated Ms. Wilson's full benefit Medicaid coverage under HUSKY D, based on Defendant's mandate.

**Plaintiff Mary Shaw**

127.    Mary Shaw is a 65-year-old White woman who is a resident of Norfolk, Nebraska with an income of approximately $1252 per month in Social Security benefits.

128.    She was able to begin using Medicaid in October of 2020, having applied for coverage under the new Medicaid expansion program in Nebraska in August of that year. This new coverage allowed her to see a dentist and to have physical therapy, which finally allowed her to walk again after surgery to replace a hip.

129.    Ms. Shaw was diagnosed with cancer about four years ago. This required removal of part of her nose, where the cancer, squamous cell carcinoma, was found.  She has since had

another diagnosis of cancer, in December 2021, also squamous cell carcinoma, but this time on her right shoulder.

130.   In December of 2021, she received a notice from the Nebraska Medicaid agency dated December 13, 2021 stating that her Medicaid would be terminated on January 1, 2022 and she now qualifies for Medicare and payment of her Part B premiums on January 1, 2022, since she turned 65 in January 2022.

131.   She sought and obtained treatment for the cancer on her shoulder on an urgent basis before Medicaid was actually terminated, but she still incurred some costs for a biopsy after the termination went into effect.

132.   Since losing her Medicaid coverage, she has been subject to significant costs for her ongoing medical appointments and has foregone appointments for her emphysema condition and for a post-surgical checkup because of mounting co-insurance (percentage of total charge) bills.

133.   At this time, she believes she may have a new cancer on her leg and it seems to be quick-growing. She needs to make an appointment to get this treated, but is concerned about being able to afford treatment because she already has a balance due at her doctor's office, and is unsure what additional costs she would incur to treat this new issue.

134.   Ms. Shaw also has lost her dental coverage.

135.   Between all of the services that are covered under Medicaid but not covered at all under Medicare and the doctor visits which are covered by Medicare but now require coinsurance that she cannot afford, the loss of Medicaid has been devastating to her.

**Plaintiff Carol Katz**

136.   Carol Katz is a 73-year-old white woman who is a resident of Milford, Delaware. Her income is only $1154 per month in Social Security retirement benefits.

137.    She has severe rheumatoid arthritis ("RA"), a progressive contractual disease, as well as .COPD, lung nodules, high blood pressure, fibromyalgia, a carotid artery occlusion which resulted in a stroke in 2013, cerebrovascular disease, dilation of the aorta, muscle weakness and anxiety disorder.

138.    Ms. Katz has been on the Delaware QMB program since about 2014, when she got on it to cover the high cost-sharing required for Medicare payment for the installation of the carotid artery stent needed to address her carotid artery occlusion which had resulted in the stroke.    She qualified for the QMB program because her countable income was under 100% of the federal poverty level. *See* 16 Del. Admin Code, 17300 et seq,

139.    For eight years, the QMB program covered all of her deductibles, co-pays and co-insurance for doctor visits, hospital and Emergency Room visits, of which she had many.

140.    The cost-sharing coverage under the QMB program included payment under Medicare Part B for all of the costs for the infusion treatments needed every four weeks to treat RA, for the last approximately four years. These infusion treatments were necessary to allow her to walk and to use her hands, by addressing the pain and debilitation in her joints and connective tissue caused by RA.

141.    About four months ago, her doctor changed her infusion schedule to every eight weeks, when the drug used to treat her RA was switched from Orencia to Simponi Aria. According to the office of her rheumatologist, the cost-sharing under Medicare for these treatments is $478 per treatment, which she cannot afford.

142.    In March of 2022, she received a notice dated March 18. 2022 from the State of Delaware Division of Social Services stating that beginning April 1. 2022 she would be switched from the QMB program to SLMB, under which only her Part B premiums would be paid for and

she would "not be eligible for any other health care services." The notice said that "Your Family's income after allowable deductions is $1134.00. The allowable income limit for a Family of 1 is $1133.00.  You are over this limit."

143.    After an unsuccessful appeal, she received another notice from the State of Delaware Division of Social Services dated July 14, 2022 stating that she was being switched from the QMB program to the SLMB program on August 1st.

144.    She no longer has any coverage for any of the cost-sharing under Medicare for all of her doctor or outpatient visits, of which she has about three per month.  This includes the 20% of the doctors' charges for office visits.

145.    The only reason she can continue going to her infusions every eight weeks, for which the cost-sharing is $478 per time, is that her granddaughter managed to persuade the manufacturer of the Simponi Aria infusion, to cover all of this through its Patient Assistance Foundation.

146.    Because of her COPD condition, for the last three years, she has had to go for a CAT scan of her chest as a lung cancer screening.  In a CAT scan of the chest on April 11, 2022, seven nodules were found. Her pulmonologist wants her to do further tests to check for cancer in some of the nodules seen in the April CAT scan.  She cannot afford the cost-sharing involved.

147.    With all of the cost-sharing responsibilities for her doctor visits which are not covered by Medicare and which are no longer covered by the QMB program since she was cut off it as of August 1st, she is very worried about not being able to see her doctors, including to check for possible cancer.

**Irreparable Harm**

148.    Absent relief from the Court enjoining the application of the IFR, the termination of full-benefit Medicaid coverage or QMB coverage to each of the Named Plaintiffs will continue

for the duration of the PHE, for however many months or years it lasts, putting them at risk during the pandemic of institutionalization, lack of treatment for life-threatening cancer and other irreparable harm because of the lack of access to necessary health services that were covered for them under the Medicaid program.

149.    Plaintiffs have no adequate remedy at law.

## COUNT ONE: PROCEDURAL VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

150.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

151.    The APA provides that a reviewing court may "hold unlawful and set aside" agency actions found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

152.    Absent a showing of good cause, the APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c). The APA further requires that a rule be published 30 days prior to its effective date. *Id.* § 553(d).

153.    The IFR is final agency action and a legislative rule within the meaning of the APA.

154.    The Defendant did not engage in notice and comment rulemaking before issuing the IFR, did not observe the 30-day period between publication and effective date, and had no authority or good cause to disregard the APA's rulemaking requirements.

155.    Defendant's implementation of the IFR without first receiving and considering any of the comments to the rule was arbitrary and capricious.

## COUNT TWO: SUBSTANTIVE VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

156.    Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

157.    The APA provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

158.    The IFR contradicts Section 6008(b)(3) of the Coronavirus Response Act, and is contrary to law, because the statutory authority is unambiguous and does not allow for the additional exceptions to the maintenance of effort requirements appearing in the IFR.  Even assuming any ambiguity, the agency's interpretation is unreasonable, arbitrary and capricious as an unexplained departure from a prior consistently-applied policy.

159.    Plaintiffs are in danger of suffering irreparable harm and have no adequate remedy at law.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask that this Court:

A.    Certify a nationwide class of individuals whose Medicaid coverage has been or will be terminated or reduced due to the implementation of the portion of the IFR promulgating 42 C.F.R. § 433.400, as defined in Paragraph 29 above.

B.    Grant a class-wide injunction requiring Defendant to immediately inform all states and the District of Columbia that 42 C.F.R. § 433.400 is not being enforced by him, that they should not enforce it either against anyone on any kind of Medicaid program in their respective

jurisdictions, and that anyone who previously lost Medicaid benefits under this regulation should have their terminated or reduced benefits immediately restored.

C.     Declare that Defendant's issuance of 42 C.F.R. § 433.400 through the IFR violates the APA and the Families First Coronavirus Response Act in the respects set forth above;

D.     Find that Defendant's implementation of the enhanced FMAP authorized by Section 6008 of the Families First Coronavirus Response Act while permitting and requiring states to eliminate benefits or reduce the amount, duration, and scope of services available to individuals enrolled in Medicaid on or after March 18, 2020, even where neither of the two statutory exceptions applies, was unlawful, arbitrary and capricious and should be set aside;

E.     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

F.     Grant such other and further relief as may be just and proper.

      DATED: August 26, 2022.

                                        Respectfully submitted,

                                        /s/ Sheldon V. Toubman
                                        SHELDON V. TOUBMAN
                                        Fed Bar No. ct08533
                                        Phone: (475)345-3169
                                        E-mail: sheldon.toubman@disrightsct.org
                                        DEBORAH A. DORFMAN (Admitted *Pro
                                        Hac Vice*)
                                        CT Juris No. 442946
                                        Phone: (860)469-4463
                                        E-mail: deborah.dorfman@disrightsct.org
                                        Disability Rights Connecticut
                                        846 Wethersfield Avenue
                                        Hartford, CT 06114
                                        CAROL A. WONG (Admitted *Pro Hac
                                        Vice*)
                                        DC Bar No. 1035086
                                        Justice in Aging
                                        1444 I Street, NW, Suite 1100

                                        38

Washington, DC  20005
Phone: (202) 683-1995
E-mail: cwong@justiceinaging.org

REGAN BAILEY (Admitted *Pro Hac Vice*)
DC Bar No. 465677
Justice in Aging
1444 I Street, NW, Suite 1100
Washington, DC  20005
Phone: (202) 683-1990
E-mail: rbailey@justiceinaging.org

JANE PERKINS
NC Bar No. 9993
CA Bar No. 104784
Email: perkins@healthlaw.org
MIRIAM HEARD
NC Bar. No. 39747
Email: heard@healthlaw.org
(Admitted *Pro Hac Vice*)
National Health Law Program
1512 E. Franklin St., Ste. 110
Chapel Hill, NC 27514
Phone: (984) 278-7661

HARVEY L. REITER
(Admitted *Pro Hac Vice*)
STINSON LLP
1775 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 2006
Email: harvey.reiter@stinson.com
Phone: (202)728-3016
Fax: (202)572-9968

COUNSEL FOR PLAINTIFFS

**<u>Certificate of Service</u>**

   I hereby certify that on August 26, 2022, a copy of the foregoing document was filed electronically and served by overnight delivery to anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by overnight delivery to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

         s/Sheldon V. Toubman_____
         Sheldon V. Toubman