## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEBORAH CARR, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 3:22-cv-00988 (MPS) |
| XAVIER BECERRA, SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| Defendant. | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION..............................................................................................................................1

BACKGROUND ...............................................................................................................................3

    I.        The Medicaid Program.................................................................................................3

    II.       Families First Coronavirus Response Act ("FFCRA") ................................................4

    III.     The Interim Final Rule ..................................................................................................5

    IV.    The Present Case............................................................................................................9

LEGAL STANDARD .....................................................................................................................10

ARGUMENT...................................................................................................................................11

    I.        PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR CLAIMS.......................11

         A.       The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims...........................11

              1.      Plaintiffs Lack Article III Standing Because the Federal Government Cannot Redress Their Alleged Injuries. ..................................................12

              2.      Plaintiffs Lack Standing to Challenge Any Provision of 42 C.F.R. § 433.400 Other Than § 433.400(c)(2)(i)(B)..........................................14

         B.       The Rule's Interpretation of § 6008(b)(3) is Reasonable and Thus Should Be Upheld................................................................................................16

              1.      Section 6008(b)(3) Is Ambiguous. ....................................................16

               2.      The Agency's Interpretation of the Statute Set Forth in the Rule Is Reasonable...............................................................................19

         C.       CMS Had Good Cause to Issue the Rule Without Advance Notice and Comment. ...................................................................................24

    II.      PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM..............................25

    III.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST DOES NOT JUSTIFY RELIEF...................................................................................27

    IV.   ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO THE PLAINTIFFS AND THE PROVISION OF THE RULE THAT APPLIES TO THEM...........................28

CONCLUSION ...............................................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of Health & Hum. Servs.,*
    17 F.4th 793 (8th Cir. 2021) .............................................................................26

*Allen v. Wright,*
    468 U.S. 737 (1984) .............................................................................................13

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) .............................................................................12

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) .......................................................................................26

*Biden v. Missouri,*
    142 S. Ct. 647 (2022) ...................................................................................24, 25

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) .............................................................................................15

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) .............................................................................................29

*California v. Texas,*
    141 S. Ct. 2104 (2021) ...........................................................................12, 28, 30

*Carey v. Klutznick,*
    637 F.2d 834 (2d Cir.1980) ...............................................................................26

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency,*
    846 F.3d 492 (2d Cir. 2017) ........................................................................*passim*

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ...............................................................................16, 17, 19

*Citibank, N.A. v. Citytrust,*
    756 F.2d 273 (2d Cir. 1985) ...............................................................................26

*City of L.A. v. Lyons,*
    461 U.S. 95 (1983) ...............................................................................................26

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .......................................................................................11, 13

*Cohen v. JP Morgan Chase & Co.,*
    498 F.3d 111 (2d Cir. 2007) ...............................................................................17

*Costello v. McEnery*,
   767 F. Supp. 72 (S.D.N.Y.), *aff'd*,
   948 F.2d 1278 (2d Cir. 1991) ................................................................................26

*Ctr. for Food Safety v. Becerra*,
   565 F. Supp. 3d 519 (S.D.N.Y. 2021) ..........................................................20, 21

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ...............................................................................11, 12

*Entergy Corp. v. Riverkeeper, Inc.*,
   556 U.S. 208 (2009) ...........................................................................................19

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .....................................................................................23, 24

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005) .............................................................................26

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ...............................................................................28, 29

*Jifry v. FAA*,
   370 F.3d 1174 (D.C. Cir. 2004) .......................................................................24

*Lewis v. Casey*,
   518 U.S. 343 (1996) .....................................................................................15, 29

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) ...........................................................................................14

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
   676 F.3d 83 (2d Cir. 2012) ..............................................................................17

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...........................................................................................14

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ...........................................................................................28

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ...........................................................................................10

*Mizrahi v. Gonzales*,
   492 F.3d 156 (2d Cir. 2007) .............................................................................19

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ...........................................................................................28

*Munaf v. Geren*,
    553 U.S. 674 (2008) ...................................................................................................11

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018) ...............................................................................................28

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) .......................................................................................11

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ...................................................................................................16

*New York v. FERC*,
    783 F.3d 946 (2d Cir. 2015) .......................................................................................19

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................................27

*Printz v. United States*,
    521 U.S. 898 (1997) ...................................................................................................28

*R.R. P.B.A. of State of New York, Inc. v. Metro-N. Commuter R.R.*,
    699 F. Supp. 40 (S.D.N.Y. 1988) ...............................................................................27

*Rodriguez ex rel. Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999) .......................................................................................26

*Simon v. E. Kentucky Welfare Rts. Org.*,
    426 U.S. 26 (1976) .....................................................................................................14

*Smith v. City of Jackson*,
    544 U.S. 228 (2005) ...................................................................................................19

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ...............................................................................................12

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998) .....................................................................................................11

*Sunward Elecs., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004) .........................................................................................11

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) ...............................................................................................11

*United States v. Zukerman*,
    897 F.3d 423 (2d Cir. 2018) .......................................................................................18

*Warth v. Seldin*,
  422 U.S. 490 (1975) ...................................................................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................................... 11

**Statutes**

5 U.S.C. § 553(b)(B) ........................................................................................................... 24

26 U.S.C. § 5000A ................................................................................................................ 6

26 U.S.C. § 5000A(f) ............................................................................................................ 7

42 U.S.C. § 247d(a) .......................................................................................................... 4, 5

42 U.S.C. § 1396a(a)(4) ...................................................................................................... 22

42 U.S.C. § 1396a(a)(19) .................................................................................................... 23

42 U.S.C. § 1396b(v)(4)(A) .................................................................................................. 8

42 U.S.C. § 1396d ............................................................................................................... 17

42 U.S.C. § 1396d(a) ............................................................................................................ 3

42 U.S.C. § 1396d(a)(10)(E)(i) .......................................................................................... 15

42 U.S.C. § 1396d(p)(1) .................................................................................................. 3, 4

42 U.S.C. § 1396d(p)(3)(A)(ii) ............................................................................................ 4

Pub. Law No. 116-127, 134 Stat. 177, 208 (2020) ...................................................... *passim*

**Legislative Materials**

116th Cong. 13 (2020) (statement of Rep. Nita M. Lowey) ............................................... 4

116th Cong. 14 (2020) (statement of Rep. Eddie Johnson) ............................................ 22

116th Cong. 14 (2020) (statement of Rep. Kevin Brady) ................................................. 4

**Regulations**

42 C.F.R. § 433.400 .................................................................................................. 5, 6, 14, 25

42 C.F.R. § 433.400(c)(2)(i)(B) .................................................................................. 7, 10, 16, 29

78 Fed. Reg. 53,655 (Aug. 30, 2013) ................................................................................... 7

79 Fed. Reg. 70,469 (Nov. 26, 2014) ............................................................................7

85 Fed. Reg. 71,142 (Nov. 6, 2020) ........................................................................*passim*

**Other Authorities**

Wright & Miller, 11A Fed. Prac. & Proc., § 2948.1 (3d ed. 2013) ...............................26

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ........................18

*Benefit*, Merriam-Webster Online,
   https://www.merriam-webster.com/dictionary/benefit................................................17

Families First Coronavirus Response Act - Increased FMAP FAQs,
   https://sss.usf.edu/covid19/resources/medicaid/Family%20First%20Coronavirus%20Response
   %20Act%20_%20Increased%20FMAP%20FAQs.pdf ............................................4

Medicare.gov, Medicare Savings Programs,
   https://www.medicare.gov/basics/costs/help/medicare-savings-programs........................4

Nicole Huberfeld, *Federalizing Medicaid*,
   14 U. Pa. J. Const. L. 431, 448 (2011).............................................................................3

## INTRODUCTION

In March 2020, in response to the worsening COVID-19 pandemic, Congress passed the Families First Coronavirus Response Act. Section 6008 of the Act offers states a 6.2 percentage point increase in federal Medicaid funding as long as they comply with certain conditions. One such condition, set forth in § 6008(b)(3), requires that states "provide that an individual who is enrolled for benefits under [the state Medicaid plan or waiver]" as of March 18, 2020, or thereafter, "shall be treated as eligible for such benefits through the end of the month in which" the COVID-19 public health emergency ends. Pub. Law No. 116-127, 134 Stat. 177, 208 (2020).

On November 6, 2020, the Centers for Medicare & Medicaid Services ("CMS") issued an interim final rule ("the Rule") interpreting this statutory provision. 85 Fed. Reg. 71,142, 71,160-67 (Nov. 6, 2020). Under the Rule, states accepting the 6.2 percent increase are required to maintain enrollment for beneficiaries who were enrolled in Medicaid as of or after March 18, 2020. Subject to certain limitations set forth in the Rule, when a beneficiary loses eligibility for one Medicaid group and becomes eligible for another, states are also required to move that beneficiary to the coverage group for which she is eligible. The specific limitations, which are described below, ensure beneficiaries continue to receive the same general level of coverage and are not deprived of vital medical services.

Nearly two years after CMS issued the Rule, Plaintiffs—five[1] Medicaid beneficiaries whose Medicaid coverage has changed since March 18, 2020—seek a preliminary injunction enjoining the Rule. They allege both substantive and procedural violations of the Administrative Procedure Act ("APA"). Plaintiffs' claims fail for several reasons.

Plaintiffs have not shown a likelihood of success on the merits. At the threshold, Plaintiffs lack standing because their alleged injuries are not redressable by Defendant. Plaintiffs' purported

---

[1] Since filing their Motion for a Preliminary Injunction, ECF No. 3, Plaintiffs have amended their complaint to add two additional Plaintiffs. *See* Am. Compl., ECF No. 43. Accordingly, Defendant addresses the allegations of all five Plaintiffs in this brief.

injuries—that they either have been or will be moved from one Medicaid eligibility group to another—can be remedied only by the states. The states, not the federal government, are the entities that establish eligibility criteria, make eligibility determinations and adjudicate appeals of such determinations, subject to certain federal requirements. And only the states can restore a beneficiary to a prior eligibility group in a state Medicaid program. Accordingly, the Court has no jurisdiction over this case. On the merits, the statutory language in § 6008(b)(3) is ambiguous, so the Court should defer to CMS's reasonable interpretation of this provision. And CMS had good cause to issue the Rule without advanced notice and comment in order to ensure that states would continue to receive necessary Medicaid funding amidst the ongoing pandemic.

The other preliminary injunction factors similarly weigh in favor of Defendant. Plaintiffs' delay in requesting emergency relief—over eighteen months after the Rule went into effect and nearly six months after their purported injuries arose—counsels against a finding of irreparable harm. And Plaintiffs have not established imminent irreparable harm that would be remedied by an injunction, since the states in which Plaintiffs reside may decide to reject the increased funding if the Rule is enjoined. The balance of the equities and public interest also weigh against an injunction, which risks putting states in a position where they may either reject the increased Medicaid funding or seek to cut provider rates, ultimately leaving the broader Medicaid population in a more vulnerable state.

Finally, the relief Plaintiffs seek—an injunction preventing Defendant from enforcing the Rule as to all states and instructing all states to reinstate "anyone cut off from full-benefit Medicaid since the" implementation of the Rule—is overbroad and unwarranted. Even if this Court finds Plaintiffs are entitled to some preliminary relief, it should limit the scope of any injunction to only the five named Plaintiffs and to the provision of the Rule that applies to them. And because the temporary funding increase is optional, Defendant has no ability to order states to re-enroll Plaintiffs in Medicaid

programs for which they may no longer be eligible. For the reasons set forth below, this Court should deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### I.    The Medicaid Program

The Medicaid program provides medical assistance to needy populations. It defines "medical assistance" as the "payment of part or all of the cost of" certain medical care and services. 42 U.S.C. § 1396d(a). Medicaid is funded jointly by the federal government and states. *Id.* §§ 1396a(a)(10), 1396c. The federal government pays a percentage of the "total amount expended . . . as medical assistance" under a state Medicaid plan. *Id.* § 1396b(a)(1). The portion of each state's Medicaid expenditures that the federal government reimburses is called the Federal Medical Assistance Percentage ("FMAP"). *Id.* § 1396b(a)(1). On the federal level, the Medicaid program is administered by CMS, an agency within the Department of Health and Human Services.

To participate in the Medicaid program, a State must submit a plan for medical assistance for approval by the Secretary of Health and Human Services. *Id.* § 1396a(b). A State plan defines the categories of individuals eligible for benefits and the specific kinds of services the State covers as medical assistance for each category. *Id.* § 1396a(10)(a), (a)(17). A state must also designate a state agency to administer its Medicaid program. *Id.* § 1396a(a)(5). State Medicaid plans "var[y] greatly from state to state." Nicole Huberfeld, *Federalizing Medicaid*, 14 U. Pa. J. Const. L. 431, 448 (2011).

There are many different pathways to Medicaid eligibility. One pathway is through a Medicare Savings Program ("MSP"), in which states help offset Medicare costs for certain Medicare beneficiaries who also meet a set of Medicaid eligibility criteria. For example, one MSP group— "qualified Medicare beneficiaries"—is comprised of individuals who generally have incomes below the poverty level and resources below a certain standard. *See* 42 U.S.C. § 1396d(p)(1). A beneficiary enrolled in an MSP as a qualified Medicare beneficiary receives Medicaid coverage that helps fund

their Medicare premiums, copayments, and deductibles, including Medicare Part A and Part B premiums. Medicare.gov, Medicare Savings Programs, https://www.medicare.gov/basics/costs/help/medicare-savings-programs ("MSP Overview"). Another MSP group encompasses those who otherwise "would be qualified Medicare beneficiaries" but have higher income or resource levels, and whose income or resource levels still fall below a slightly higher threshold. *See id.* § 1396a(10)(E)(iii), (iv); *id.* § 1396a(10)(E)(i); 42 U.S.C. § 1396d(p)(3)(A)(ii).

## II.    Families First Coronavirus Response Act ("FFCRA")

Nearly two and a half years ago, Congress passed the Families First Coronavirus Response Act. *See* Pub. Law No. 116-127, 134 Stat 177 (2020) ("FFCRA"). It was enacted to "ensure the physical safety and financial security of our Nation's working families during this time of crisis." FFCR, 116th Cong. 13 (2020) (statement of Rep. Nita M. Lowey). The Act was intended to contain "temporary, targeted measures." FFCR, 116th Cong. 14 (2020) (statement of Rep. Kevin Brady).

One such measure concerns the FMAP. Under this provision, each state may qualify for a 6.2 percentage point increase in the FMAP for each quarter during the "public health emergency," a temporary designation made by the Secretary of Health and Human Services. FFCRA § 6008(a); 42 U.S.C. § 247d(a). States may only receive the increased funding if they meet four conditions for the relevant quarter. FFCRA § 6008(b). *One*, the state will not qualify if the "eligibility standards, methodologies, or procedures under" the state's Medicaid plan (or waiver) "are more restrictive during [a] quarter than the eligibility standards, methodologies, or procedures, respectively, under such plan (or waiver) as in effect on January 1, 2020." *Id.* § 6008(b)(1). *Two*, the state will not qualify if "the amount of any premium . . . with respect to an individual enrolled under such plan (or waiver), exceeds the amount of such premium as of January 1, 2020." *Id.* § 6008(b)(2). *Three*, the state will not qualify if "the State fails to provide that an individual who is enrolled for benefits under such plan (or waiver)"

on or after March 18, 2020 "shall be treated as eligible for such benefits through the end of the month in which such emergency period ends unless the individual requests a voluntary termination of eligibility or the individual ceases to be a resident of the State." *Id.* § 6008(b)(3). And *four*, the state will not qualify if it "does not provide coverage under such plan (or waiver), without the imposition of cost sharing, during such quarter for any testing services and treatments for COVID-19, including vaccines, specialized equipment, and therapies." *Id.* § 6008(b)(4).

Shortly after Congress passed the FFCRA, CMS issued several guidance documents outlining its interpretation of Section 6008(b)(3). In three "Frequently Asked Questions" documents, CMS explained that a state could not reduce the level of medical assistance for which a beneficiary was enrolled as of or after March 18, 2020, through the end of the month in which the public health emergency ends. *See* Declaration of Sheldon V. Toubman Declaration, Ex. 1 (March 24, 2020 FAQs),[2] ECF No. 3-5; *id.* Ex. 2 (May 5, 2020 FAQs); *id.* Ex. 3 (June 30, 2020 FAQs). In other words, states were not only required to maintain the eligibility of beneficiaries enrolled as of or after March 18, 2020, but also every service available to them, without any reduction in the frequency of any such service.

## III.    The Interim Final Rule

On November 6, 2020, CMS issued an interim final rule entitled Additional Policy and Regulatory Revisions in Response to the COVID-19 Public Health Emergency. 85 Fed. Reg. 71,142-71,205. In Subpart F of the interim final rule, CMS adopted a new interpretation of FFCRA § 6008(b)(3) that it codified at 42 C.F.R. § 433.400.

In the Rule, CMS explained that states had "made clear" that the agency's existing interpretation of § 6008(b)(3) "severely limits state flexibility to control program costs in the face of

---

[2] Defendant updated this FAQ on April 13, 2020, but no changes were made to the portion relevant here. *See* Families First Coronavirus Response Act – Increased FMAP FAQs, https://sss.usf.edu/covid19/resources/medicaid/Family%20First%20Coronavirus%20Response%20Act%20_%20Incr eased%20FMAP%20FAQs.pdf.

growing budgetary constraints" and that it "could lead to significant backlogs in redeterminations and appeals" after the public health emergency ends. 85 Fed. Reg. at 71,161. CMS further noted that "the only cost-controlling measure available to states under [CMS's] existing interpretation is reducing provider rates." *Id.* CMS acknowledged that the text of § 6008(b)(3) is ambiguous, and accordingly, the agency could adopt a different interpretation proposed by some states—the "enrollment interpretation"—in which states only must maintain the Medicaid enrollment of "beneficiaries who enrolled in the state's Medicaid program as of or after March 18, 2020, through the end of the month in which the [public health emergency] ends, but not the specific benefits package they were receiving at that time." *Id.* at 71,161. Under this interpretation, states also "would be permitted to make programmatic changes" to their Medicaid plans. *Id.* at 71,161.

But because the enrollment approach could "make it more challenging for some beneficiaries to access medically necessary services, including services related to the COVID-19 pandemic," CMS instead chose to adopt a policy that would "balance the beneficiary protections in [its] existing interpretation with the state flexibility that could be afforded through an alternative interpretation." *Id.* at 71,162, 71,160. Under this interpretation, which CMS termed the "blended approach," states must "maintain beneficiary enrollment in an eligibility group that provides one of three tiers of coverage" through the public health emergency. *Id.* The first tier contains individuals whose coverage as of or after March 18, 2020 meets the definition of "Minimum Essential Coverage." *Id.* at 71,164. The phrase "Minimum Essential Coverage" comes from the Affordable Care Act's individual shared payment provision (also known as the "individual mandate"), under which individuals were required to maintain health insurance coverage that qualified as Minimum Essential Coverage to avoid a penalty. 26 U.S.C. § 5000A. Minimum Essential Coverage is defined to include, generally, coverage

under a government-sponsored program such as Medicare,[3] an employer-sponsored plan, a plan offered in an individual market within a state, a grandfathered health plan or other coverage that the Secretary recognizes as Minimum Essential Coverage. 26 U.S.C. § 5000A(f).

For individuals in the first tier, the state must continue to provide Medicaid coverage that meets the definition of Minimum Essential Coverage for the remainder of the public health emergency. 85 Fed. Reg. at 71,164. If a beneficiary becomes ineligible for the group in which she is currently enrolled and eligible for another group with Minimum Essential Coverage, the state must transition that person to the new group. *Id.* For example, if an individual is in an eligibility group other than an MSP that provides Minimum Essential Coverage, but she later loses eligibility for that group and becomes eligible for an MSP group, the state must transition this individual to the MSP because MSPs meet the definition of Minimum Essential Coverage. *Id.* at 71,165; *see also* 42 C.F.R. § 433.400(c)(2)(i)(B).  In other words, the individual will retain Minimum Essential Coverage upon the transition from the original group to the MSP group. But if an individual loses eligibility for a group that provides Minimum Essential Coverage and becomes eligible for a group that does not provide Minimum Essential Coverage, the state may not move the individual to that group. 85 Fed. Reg. at 71,164.

The second tier applies to individuals who, as of or after March 18, 2020, have coverage that is not considered Minimum Essential Coverage but includes COVID-19 testing and treatment. *Id.* at 71,165. If an individual falls in this tier, the state must transition the individual to a new eligibility group for which she is qualified if the new group either offers Minimum Essential Coverage (tier one) or provides COVID-19 testing or treatment (tier two). *Id.* However, if the new group does not cover

---

[3] While Medicaid is "in general" considered Minimum Essential Coverage, 26 U.S.C. § 5000A(f), not all Medicaid coverage is considered Minimum Essential Coverage. For example, the Internal Revenue Service excludes some types of Medicaid coverage from its definition of Minimum Essential Coverage. *See* Shared Responsibility Payment for Not Maintaining Minimum Essential Coverage, 78 Fed. Reg. 53655 (Aug. 30, 2013) and Minimum Essential Coverage and Other Rules Regarding the Shared Responsibility Payment for Individuals, 79 Fed. Reg. 70469 (Nov. 26, 2014), codified at 26 C.F.R. § 1.5000A02(b)(2).

COVID-19 testing services and treatments, the state cannot make that transition and must maintain the individual in the group in which she was enrolled, even though, absent the FFCRA, she would no longer qualify for that coverage. *Id.*

The third tier applies to individuals whose Medicaid coverage does not meet the definition of Minimum Essential Coverage or cover COVID-19 testing or treatment. *Id.* If an individual becomes ineligible for the tier three group in which she is enrolled and becomes eligible for another group within tier three, the state cannot transition the individual to the new eligibility group. *Id.* at 71,165-71,166. This acts as a guardrail to protect beneficiaries enrolled in tier three coverage, as "[t]he coverage available to a beneficiary in tier [three] is more limited and may vary widely from one group or demonstration to the next." *Id.* at 71,165.

Regardless of the tier, a beneficiary's Medicaid enrollment may be terminated if the beneficiary requests a voluntary termination or is no longer a resident of the state. *Id.* at 71,167. A beneficiary may request to be transitioned to a different eligibility group, even if that group would not otherwise satisfy the tier requirements. *Id.* Additionally, the states that have elected to provide Medicaid coverage to lawfully residing children and pregnant women must limit these services to those necessary for the treatment of an emergency medical condition when they no longer meet the eligibility criteria in 42 U.S.C. § 1396b(v)(4)(A)—i.e., when they are no longer pregnant or under 21 years of age. *Id.*

Finally, the Rule permits states to "make programmatic changes to coverage, cost sharing and benefit liability" provided that "such changes do not violate the individual beneficiary protections" described above or § 6008(b)(4)'s requirement to cover COVID-19 testing and treatment without cost-sharing. *Id.* at 71,166. For example, states may eliminate optional services or modify the scope of a given service, as long as they comply with applicable Medicaid law. *Id.* In promulgating the Rule, CMS concluded that there was good cause to waive the advance-notice-and-comment requirement in Section 553(b)(B) of the APA. *Id.* at 71,181.

This framework establishes "safeguards" to ensure that beneficiaries do not experience a substantial reduction in covered benefits. *Id.* at 71,164. It permits beneficiaries who receive Minimum Essential Coverage to maintain a similar level of coverage throughout the public health emergency. *Id.* It also allows those who receive testing and treatment for COVID-19 to continue to benefit from those services. *Id.* at 71,165. And it maintains these beneficiary protections while also giving states some of the "flexibility available through the enrollment interpretation." *Id.* at 71,163.

## IV.    The Present Case

Plaintiffs Deborah Carr, Brenda Moore and Mary Ellen Wilson are three Medicaid beneficiaries living in Connecticut who were enrolled in the Husky D program of Connecticut's Medicaid plan on or after March 18, 2020. Am. Compl. ¶¶ 11, 22-24, ECF No. 43; *see also* Declaration of Deborah Carr ¶ 10, ECF No. 3-2 ("Carr Decl."); Declaration of Brenda Moore ¶ 10, ECF No. 3-3 ("Moore Decl."); Declaration of Mary Ellen Wilson ¶ 10, ECF No. 3-4 ("Wilson Decl."). Carr, Moore, and Wilson each allege that on February 15, 2022, Connecticut sent them a letter informing them that it was transitioning them from Husky D to an MSP because they no longer qualified for their Husky D eligibility group and now qualified for an MSP group. Carr Decl. ¶¶ 11-12; Moore Decl. ¶ 14; Wilson Decl. ¶¶ 11-14. Carr alleges that she administratively appealed this determination, but she has not yet received a decision on her appeal. Carr Decl. ¶¶ 17, 20. Moore alleges that her Husky D coverage has also been terminated, but she enrolled in an alternative Medicaid group that required her to meet a "spend down." Moore Decl. ¶¶ 16, 19. This coverage will continue for a six-month period ending on August 31, 2022. *Id.* ¶ 21. Wilson appealed her determination, but Connecticut concluded that it correctly discontinued her Husky D coverage. Wilson Decl. ¶¶ 15, 18.

Plaintiff Mary Shaw is a Medicaid beneficiary living in Nebraska. Am. Compl. ¶ 127. She alleges that in December 2021, she received a notice from Nebraska saying she now qualifies for Medicare and payment of her Part B premiums by Medicaid. *Id.* ¶ 130. This means she is in a Specified Low-

Income Medicare Beneficiary Program, which is an MSP. *See* https://www.medicare.gov/basics/
costs/help/medicare-savings-programs.

Plaintiff Carol Katz is a Medicaid beneficiary living in Delaware. Am. Compl. ¶ 137. She has
been on Medicare since 2009 and on Delaware's Qualified Medicare Beneficiary Program ("QMB")
since 2014. Declaration of Carol M. Katz ¶¶ 7-8, Ex. 2, ECF No. 44-4 ("Katz Decl."); *see* MSP
Overview. In March 2022, Delaware notified her that she would be switched from the Qualified
Medicare Beneficiary Program, an MSP, to the Specified Low-Income Medicare Beneficiary Program,
another MSP. Am. Compl. ¶ 142. She appealed this determination, but Delaware found that her
income exceeded that required to be eligible for the Qualified Medicare Beneficiary Program. Katz
Decl. Ex. 2.

On August 3, 2022, Plaintiffs Carr, Moore and Wilson filed the Complaint in this action, ECF
No. 1, along with a motion for a temporary restraining order and a preliminary injunction, ECF No.
3 ("Pls.' Mot.").[4] On August 26, 2022, Plaintiffs filed an Amended Complaint adding two new
Plaintiffs—Shaw and Katz—as well as class action allegations. *See* Am. Compl. Plaintiffs separately
filed a motion for class certification. *See* Pls.' Mot. for Class Certification and Appointment of Class
Counsel, ECF No. 44.

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be
granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*,
520 U.S. 968, 972 (1997) (per curiam) (emphasis and citation omitted). "A plaintiff seeking a
preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

---

[4] Plaintiffs requested that the temporary restraining order be entered with respect to only Carr and Moore. Pls.'
Mot. at 1. Defendant has represented that it will not take any action to enforce 42 C.F.R. § 433.400(c)(2)(i)(B) against
Connecticut with respect to those two Plaintiffs until at least 15 days after the Court resolves the motion for preliminary
injunction. *See* Def.'s Notice, ECF No. 20.

irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). And where, as here, "[a] plaintiff . . . seeks a preliminary injunction that will alter the status quo," the plaintiff "must demonstrate a 'substantial' likelihood of success on the merits." *Id.* (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

## ARGUMENT

Plaintiffs have failed to establish the requirements for the "extraordinary and drastic remedy" of a preliminary injunction. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). First, they are not likely to succeed on the merits of their claims. Second, they cannot establish irreparable harm that will be remedied by a preliminary injunction. And third, they have failed to satisfy the final two preliminary injunction factors. Their motion should be denied.

## I.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR CLAIMS.

### A.  The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims.

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "[A]n essential and unchanging part of the case-or-controversy requirement" is that would-be plaintiffs must have "standing to invoke the authority of a federal court[,]" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006), ensuring they have a "personal stake in the outcome of [a] controversy" that "justif[ies] exercise of the court's remedial powers on [their] behalf," *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). Standing is therefore a "threshold jurisdictional question[,]" *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102 (1998), determining "the power of the court to entertain the suit," *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The plaintiff bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

### 1. Plaintiffs Lack Article III Standing Because the Federal Government Cannot Redress Their Alleged Injuries.

Because the states of Connecticut, Nebraska, and Delaware alone are responsible for administering their Medicaid programs, only these states—not the federal government—can redress Plaintiffs' alleged injuries. "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021). Plaintiffs only have standing if they can "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Cuno*, 547 U.S. at 342. Plaintiffs allege they were injured when their state Medicaid agency either transitioned them or sought to transition them from one Medicaid eligibility group to another. *See* Am. Compl. ¶¶ 116, 121, 124 (Connecticut); *id.* ¶ 130 (Nebraska); *id.* ¶ 142 (Delaware). Redressing this alleged injury would require them to be re-enrolled in their prior eligibility group. But the federal government has no authority to reinstate the eligibility of a Medicaid beneficiary or to transition a Medicaid beneficiary from one group to another. Only the states can do that—and the states are not parties to this lawsuit.

After the federal government approves a state's Medicaid plan, the state is solely responsible for administering the plan. The record confirms this. For example, the states of Connecticut, Nebraska, and Delaware made the eligibility determinations about Plaintiffs' Medicaid coverage, not any federal entity. Carr and Moore received letters concerning their eligibility from the state of Connecticut, not from Defendant. *See* Carr Decl. Ex. 1; Moore Decl. Ex. 1. In those letters, Connecticut explained that "*[o]ur* records show that you receive Medicare," so "*we* need to end your

HUSKY D coverage." Carr Decl. Ex. 1 at 1 (emphasis added). The letter stated that the state "ma[d]e this decision" based on information provided by two state entities, the Department of Social Services and Access Health CT. *Id.* The letter also noted that the state would "check to see if you might be eligible for HUSKY C," another state Medicaid program. *Id.* The eligibility determination came directly from Connecticut, not the federal government. And Connecticut acknowledged that it alone possessed the information necessary to make a further eligibility determination.

Additionally, the states, not the federal government, adjudicate disputes over eligibility determinations. The letters, which explain that the beneficiary "can appeal *our* decisions about your health coverage," confirm that the decisions about Medicaid enrollment rest solely with the state. Carr Decl. Ex. 1 at 2 (emphasis added). When Wilson appealed her eligibility determination, Connecticut's Department of Social Services oversaw the administrative hearing. *See* Wilson Decl. Ex. 1. Officials from the Connecticut alone made the final decision to discontinue Wilson's Husky D coverage. *Id.* at 1, 5 ("[Access Health CT] correctly determined that the Appellant is enrolled in the Medicare Savings Program."). It follows that only Connecticut can reinstate Wilson to Husky D.

The relief Plaintiffs seek underscores that Defendant cannot redress Plaintiffs' alleged injuries. Plaintiffs request that the Court order Defendant to "notify" states that they must re-enroll Plaintiffs to full-benefit Medicaid, Pls.' Mot. at 39, recognizing that Defendant has no authority to actually reinstate Plaintiffs to their prior Medicaid coverage. And because the states alone administer Medicaid plans and make enrollment decisions, it is entirely speculative whether any such "notification" from Defendant would actually result in Plaintiffs' re-enrollment. *See Allen v. Wright*, 468 U.S. 737, 751 (1984) (Plaintiffs must demonstrate that their injuries are "likely to be redressed by the requested relief").

It is also speculative whether Plaintiffs' injuries are likely to be redressed because the temporary FMAP increase is optional. *See Clapper v. Amnesty Int'l*, 568 U.S. 398, 414 (2013) (rejecting "standing theories that require guesswork" or "that rest on speculation about the decisions of independent

actors"). Even if this Court were to grant Plaintiffs' requested relief, states would still be free to reject the increased Medicaid funding and the terms set forth in § 6008(b). In that event, Plaintiffs would remain in the Medicaid group for which they would be eligible in the absence of § 6008(b)(3), and their injuries would remain. *See Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 43 (1976) (holding plaintiffs lacked standing because it was "speculative whether the desired exercise of the court's remedial powers in this suit would result in" redressing their injuries); *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973) (holding that the plaintiff, who sought to enforce a statute prosecuting those who refused to pay child support, lacked standing because a favorable decision would not necessarily "result in payment of support").

Because the states of Connecticut, Nebraska, and Delaware are the only entities that can re-enroll Plaintiffs in their previous eligibility groups, only these three states can properly redress Plaintiffs' removal from these groups. Plaintiffs have chosen not to name these states as Defendants in this suit, and the Defendant who is named has no ability to redress Plaintiffs' alleged harm. It is thus not "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" by this Court, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted), and Plaintiffs lack standing.

### 2. Plaintiffs Lack Standing to Challenge Any Provision of 42 C.F.R. § 433.400 Other Than § 433.400(c)(2)(i)(B).

Even if this Court finds that Plaintiffs' alleged injuries are redressable by Defendant, Plaintiffs do not have standing to challenge any part of 42 C.F.R. § 433.400 other than § 433.400(c)(2)(i)(B). This subsection is the only one that applies to Plaintiffs, and thus, their injuries are "fairly traceable" only to that provision. Under § 433.400(c)(2)(i)(B), when a beneficiary whose existing coverage is Minimum Essential Coverage loses eligibility for her original eligibility group and becomes eligible for an MSP, the state must transfer that beneficiary to the MSP. *Id.* As explained, individuals become

eligible for an MSP when, for example, they become eligible for Medicare and also meet the criteria for one of the MSPs. *See* 42 U.S.C. §§ 1396a(a)(10)(E)(i)-(iv); *id.* § 1396d(p)(1), (s).

All five Plaintiffs allege that their respective states have transferred or seek to transfer them to an MSP. Carr alleges that Connecticut told her that, because she received Medicare and also qualified for an MSP, she was no longer eligible for Husky D. Carr Decl. ¶ 12; Carr Decl. Ex. 1 at 1. Similarly, Moore alleges that Connecticut told her that she was no longer eligible for Husky D but that she qualified for an MSP. Moore Decl. ¶ 14; Moore Decl. Ex. 1 at 1. Wilson alleges that she receives Medicare and participates in an MSP, so Connecticut informed her she would no longer receive Husky D coverage. Wilson Decl. ¶¶ 11-12; Wilson Decl. Ex. 1 at 2 ¶ 6. Shaw alleges that Nebraska sent her a notice informing her that she qualifies for payment of her Medicare Part B premiums, Declaration of Mary Shaw ¶ 12, ECF No. 44-3 ("Shaw Decl."), which means she is in a Specified Low-Income Medicare Beneficiary Program—one of the MSPs, *see* MSP Overview. And Katz alleges Delaware transferred her from a Qualified Medicare Beneficiary Program to a Specified Low-Income Medicare Beneficiary Program, also an MSP. Katz Decl. ¶ 12.

Because each Plaintiff's allegations of injury stem from their enrollment in an MSP, they each fall under § 433.400(c)(2)(i)(B), the subsection of the Rule that applies to beneficiaries who "the state subsequently determines are eligible for coverage" under an MSP. Plaintiffs' injuries thus have arisen from this narrow subsection of the Rule, and Plaintiffs have standing to challenge only the part of § 433.400 that has injured them. "[S]tanding is not dispensed in gross. If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review." *Lewis v. Casey*, 518 U.S. 343, 357 n.6 (1996); *see also Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) (A plaintiff does not "possess by virtue of [one] injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been

subject."). Plaintiffs only have standing to challenge the purported "administrative deficiency" set forth in 42 C.F.R. § 433.400(c)(2)(i)(B). Because Plaintiffs have not demonstrated that they are "within the class of persons who will be concretely affected" by the other provisions of § 433.400, they do not have standing to challenge them.

### B. The Rule's Interpretation of § 6008(b)(3) is Reasonable and Thus Should Be Upheld.

When analyzing an agency's construction of a statute it administers, courts apply "the two-step *Chevron* deference framework." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 507 (2d Cir. 2017). First, a court asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). But if the statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Courts "will accord deference to the agency's interpretation of the statute so long as it is supported by a reasoned explanation" and "a reasonable policy choice for the agency to make." *Catskill Mountains*, 846 F.3d at 507 (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005)).

### 1. Section 6008(b)(3) Is Ambiguous.

To qualify for the temporary FMAP increase, Section 6008(b)(3) of the FFCRA requires that states provide that beneficiaries who are "enrolled for benefits" under Medicaid as of or after March 18, 2020 are treated as eligible for "such benefits" for the duration of the public health emergency. But it is ambiguous whether the word "benefits" refers to the Medicaid program generally; to the specific amount, duration and scope of medical services that a state Medicaid plan or waiver covered on or after March 18, 2020; or to something in between the two. "To determine whether a statute is ambiguous," courts look to "'traditional tools of statutory construction' to ascertain if 'Congress had an intention on the precise question at issue' that 'must be given effect.'" *Catskill Mountains*, 846 F.3d

at 507 (citing *Chevron*, 467 U.S. at 843 n.9). A "high level of clarity is necessary" to resolve the case at the first step of the *Chevron* analysis. *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 120 (2d Cir. 2007).

*First*, Congress did not speak precisely to this issue in the text of § 6008(b)(3). "As with any question of statutory interpretation, [courts] begin with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012). Under § 6008(b)(3), a state will not receive the temporary FMAP increase if:

> the State fails to provide that an individual who is enrolled for benefits under such plan (or waiver) as of [March 18, 2020] or enrolls for benefits under such plan (or waiver) during the period beginning on [March 18, 2020] and ending the last day of the month in which the emergency period described in subsection (a) ends shall be treated as eligible for such benefits through the end of the month in which such emergency period ends unless the individual requests a voluntary termination of eligibility or the individual ceases to be a resident of the State.

FFCRA § 6008(b)(3). What exactly the phrase "such benefits" refers to is unclear. The FFCRA does not define "benefits." *See generally* FFCRA. Nor does the Medicaid Act. *See* 42 U.S.C. § 1396d. Dictionary definitions offer no more clarity. *See, e.g.*, *Benefit*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/benefit (listing various definitions of "benefit," including "something that produces good or helpful results or effects or that promotes well-being" and "a service (such as health insurance)"). Plaintiffs contend that the word "such" refers to the "same benefits for which that individual was enrolled." Pls.' Mot. at 31. But the word "same" does not appear in the statutory text. It is just as plausible that, if the first usage of "benefits" broadly means the medical assistance that a beneficiary receives under the Medicaid program as a whole, and not a specific level of assistance, the later use of "such benefits" is merely referring back to the general understanding of "benefits."

*Second*, "[a] statutory provision's plain meaning may be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *Catskill*

*Mountains*, 846 F.3d at 513. The statutory context confirms the ambiguity of the phrase "benefits" in § 6008(b)(3). The other subparts of § 6008(b) contain far more specific language, demonstrating that Congress intended those sections to refer to precise aspects of Medicaid coverage that the states must abide by to qualify for the temporary FMAP increase. Under subsection (b)(1), states are not eligible for the temporary FMAP increase if they make "eligibility standards, methodologies, or procedures" "more restrictive" than they were on January 1, 2020. FFCRA § 6008(b)(1). This subsection refers to a specific list of items—"eligibility standards, methodologies, or procedures"—that a state may not alter in a way that is more restrictive. Under subsection (b)(2), states are not eligible for the enhanced FMAP if "the amount of any premium imposed by the State . . . with respect to an individual enrolled under such plan (or waiver), exceeds the amount of such premiums" on January 1, 2020. *Id.* § 6008(b)(2). This subsection refers specifically to "premiums." And under subsection (b)(4), states are not eligible for the temporary FMAP increase if they do not cover, "without the imposition of cost sharing . . . any testing services and treatments for COVID-19, including vaccines, specialized equipment and therapies." *Id.* § 6008(b)(4). This statutory language clearly refers to testing and treatment for COVID-19, even listing out examples of such "testing services and treatments." *Id.* By contrast, the word "benefits" in § 6008(b)(3) could have a more general meaning, referring to the "benefits" one receives under the Medicaid program as a whole. And typically, "[g]eneral terms are to be given their general meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) (discussing the "general-terms canon").

Moreover, another part of the same statute refers to "levels of benefits." *See* FFCRA § 1101(b). If Congress intended the word "benefits" in § 6008(b)(3) to refer to a specific *level* of benefits, Congress knew how to use language that would unambiguously do so. *See United States v. Zukerman*, 897 F.3d 423, 431 (2d Cir. 2018) (noting that "the presumption of consistent usage and meaningful variation, and the textual [canon] of *expressio unius est exclusio alterius* suggest that the presence of a phrase

18

applicable to one factor makes clear that the phrase's omission elsewhere was deliberate") (citation omitted); *cf. Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."). Congress decided not to use the phrase "level of benefits," instead including in § 6008(b)(3) the more ambiguous "benefits."

*Third*, neither the legislative history nor the purpose of the statute clarifies the meaning of the ambiguous term "benefits." The legislative history contains no references to § 6008(b)(3). Regardless, the Second Circuit has been "reluctant to employ legislative history at step one of *Chevron* analysis." *Mizrahi v. Gonzales*, 492 F.3d 156, 166 (2d Cir. 2007).

In sum, nothing in the statutory text, surrounding context, legislative history or purpose establishes that "benefits" in § 6008(b)(3) has an unambiguous meaning. Accordingly, Congress did not speak directly to the precise question at issue in this case, and the Court should proceed to *Chevron* Step Two.

## 2. The Agency's Interpretation of the Statute Set Forth in the Rule Is Reasonable.

Under *Chevron* Step Two, as long as the agency's interpretation is "reasonable," a court must defer to the agency's interpretation. *Chevron*, 467 U.S. at 844. "That inquiry is deferential, asking only whether the agency's interpretation is reasonable, while respecting legitimate policy choices made by the agency." *New York v. FERC*, 783 F.3d 946, 954 (2d Cir. 2015) (citation omitted). "The agency's view need not be 'the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts.'" *Catskill Mountains*, 846 F.3d at 520 (quoting *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009)).

CMS's interpretation of § 6008(b)(3) in the Rule is reasonable. Under the Rule, an individual "who is enrolled for benefits" under a state's Medicaid plan or waiver remains eligible for Medicaid

throughout the public health emergency and states must keep them in the same "tier" of coverage during this time period. Termed the "blended approach," the approach taken in the Rule falls between the "enrollment interpretation" under which states must only ensure that beneficiaries remain on Medicaid throughout the public health emergency, and CMS's prior interpretation, under which states could not change the amount, duration and scope of medical services offered to beneficiaries throughout the public health emergency.

CMS provided a "reasoned explanation" for deciding to adopt the blended approach. *Catskill Mountains*, 846 F.3d at 524. This requirement is a "rather minimal" one. *Id*. CMS first remarked that the statutory language was "somewhat ambiguous" and that its prior interpretation described in guidance documents was "not the only possible interpretation that could be made." 85 Fed. Reg. at 71,160; *see also Catskill Mountains*, 846 F.3d at 524 (holding that the agency gave a reasoned explanation for a policy when it "analyzed the text of the statute" and "explain[ed] how its interpretation was justified by its understanding" of the operative statutory language).

Then, CMS thoroughly considered the various options before it, discussing each at length. *See Ctr. for Food Safety v. Becerra*, 565 F. Supp. 3d 519, 535 (S.D.N.Y. 2021) (holding that agency provided reasonable explanation when it considered two policy options before it). CMS outlined its prior interpretation of § 6008(b)(3) but observed that "[s]tates have expressed concern" that, aside from not being the only permissible interpretation of the statute, the prior interpretation "makes it challenging for them to manage their programs effectively and still qualify for the increased Federal financial participation." 85 Fed. Reg. at 71,161. Specifically, the prior interpretation "severely limits state flexibility to control program costs in the face of growing budgetary constraints and developing fiscal challenges" and "could lead to significant backlogs in redeterminations" after the public health emergency ends. *Id*. CMS explained that "[i]n practice, the only cost-controlling measure available to states" under its original interpretation would be "reducing provider rates to the minimum level

permitted," which "could put some providers out of business" and "undermine the solvency of critical provider networks and their ability to serve beneficiaries in the future, particularly in rural areas." *Id.*

CMS went on to analyze an alternative interpretation, the "enrollment interpretation." *Id.* Under this interpretation, the states "must maintain the enrollment of beneficiaries who enrolled in the state's Medicaid program as of or after March 18, 2020, through the end of the month in which the [public health emergency] ends." *Id.* When a beneficiary became ineligible for enrollment in his current Medicaid group and eligible for a different one, the state would transition the beneficiary to the new group regardless of whether the two groups provided different levels of benefits. *Id.* This interpretation would also allow states to make programmatic changes, such as "changes to the medical necessity criteria or utilization control procedures in determining coverage for benefits," elimination of optional coverage, or increases in cost-sharing responsibilities. *Id.* at 71,161-62. While "[i]n most cases, transferring a beneficiary from one eligibility group to another would not result in a significant change in available benefits," CMS explained that, absent any safeguards, the enrollment interpretation may "make it more challenging for some beneficiaries to access medically necessary services." *Id.* at 71,162.

After "examin[ing] the implications of both the existing and alternative interpretations," CMS chose to adopt a "blended approach" that would "balance the interests of states, providers, and beneficiaries, without materially undermining their ability to address the challenges presented by COVID-19." *Id.* CMS considered states' need for flexibility to "stretch scarce financial resources over the long term" as well as beneficiaries' interest in maintaining comprehensive Medicaid coverage. *Id.* at 71,163. It was reasonable for CMS to weigh the interests of these major stakeholders and adopt a permissible interpretation of the statutory language that balances the interests of both. The Rule is protective of beneficiaries because it ensures that they will receive the same general level of coverage— for example, a state cannot transition a beneficiary who is receiving Minimum Essential Coverage to

a group that does not provide such coverage, *id.*—while also giving states some flexibility to address cost and administration concerns.

The Rule also "reasonably interprets" CMS's statutory authority. *See Catskill Mountains*, 846 F.3d at 525. The Rule is "supported by several valid arguments—interpretive, theoretical, and practical." *Id.* As described in *supra* I.B.1, CMS reasonably understood "benefits" in § 6008(b)(3) to refer to Medicaid generally and interpreted that section as requiring that states must keep beneficiaries enrolled in Medicaid for the duration of the public health emergency, with certain safeguards. Consistent with the language in § 6008(b)(3), the Rule guarantees that states cannot terminate beneficiaries' Medicaid coverage. At the same time, the Rule allows states to transition beneficiaries between certain Medicaid coverage groups so long as they remain in the same tier of coverage—i.e., they maintain a comparable level of benefits. As discussed at length in the Rule, *see* 85 Fed. Reg. at 71,161-63, this interpretation allows states to accept the temporary FMAP increase while still maintaining some flexibility to avoid unsustainable cost increases that could otherwise only be counteracted by cutting provider rates. Given that the COVID-19 pandemic is ongoing, ensuring that states continue to benefit from the additional federal funding also reflects the purpose of the FFCRA, which was intended to "provide the crucial support for our workforce and economy amid the current public health emergency." FFCR, 116th Cong. 14 (2020) (statement of Rep. Eddie Johnson). Further, CMS reasonably concluded that this approach would not harm most beneficiaries, since "[i]n most cases, transferring a beneficiary from one eligibility group to another [within the same tier] would not result in a significant change in available benefits." 85 Fed. Reg. at 71,162.

The blended approach is also consistent with CMS's other statutory authority. *See id.* at 71,163-64. The Medicaid Act gives CMS the authority to "provide for such methods of administration . . . as are found by the Secretary to be necessary for the proper and efficient operation of" each state's Medicaid plan. 42 U.S.C. § 1396a(a)(4). The Rule gives the states "more flexibility" to manage their

Medicaid programs and to "decrease backlogs in redeterminations and appeals following" the public health crisis. 85 Fed. Reg. at 71,163. It also permits the agency to establish "safeguards" protecting "the best interests of the recipients." 42 U.S.C. § 1396a(a)(19). The additional "safeguards" built into the tier framework ensure that beneficiaries' coverage does not drastically change, even if a state moves them to a new eligibility group. 85 Fed. Reg. at 71,163

Plaintiffs argue that the Rule is arbitrary and capricious because CMS changed its prior interpretation without offering good reasons and taking reliance interests into account. Pls.' Mot. at 32. But CMS did both. When an agency changes its policy, it is not "subjected to more searching review." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). An agency must only "display awareness that it *is* changing position" and "that there are good reasons for the new policy." *Id.* at 515. It "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.*

CMS extensively discussed its prior interpretation, which it had announced through guidance documents in the form of FAQs. 85 Fed. Reg. at 71,160-61. It also highlighted the burden that this interpretation imposed on states. *Id.* at 71,161. After thoroughly considering an "alternative interpretation" (the enrollment interpretation), CMS clearly signaled that it was implementing a third option—the blended approach—that differed from both the existing interpretation and the enrollment interpretation. *Id.* at 71,162-63. And CMS gave ample reasons for adopting the policy in the Rule, explaining at length that the new policy "adopts the state flexibility available through the enrollment interpretation . . . while also establishing parameters to prevent beneficiaries from losing access to comprehensive coverage." *Id.* at 71,163.

CMS also did indeed consider the "facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations*, 556 U.S. at 516. This is precisely why CMS adopted a blended approach that protected beneficiaries' access to "potentially necessary medical care" during

the public health emergency. 85 Fed. Reg. at 71,163. This approach also ensures that states continue to provide coverage of "COVID-19 testing services and treatments, including vaccines, specialized equipment, and therapies." *Id.* at 71,165. Regardless, § 6008(b)(3) (and by extension the Rule) is by its own terms a temporary measure that only applies through the duration of the public health emergency, and thus no "reliance interests" are at stake here. *Fox Television Stations*, 556 U.S. at 515. Under any interpretation of § 6008(b)(3), a beneficiary who became ineligible for Medicaid during the public health emergency could lose eligibility for coverage the month after the end of the public health emergency. And the prior interpretation of § 6008(b)(3) was in place for just over six months, from March 2020 to November 2020. By contrast, the Rule has been in effect for over eighteen months. Plaintiffs have had ample time to adjust their reliance to the new Rule.

Because § 6008(b)(3) is ambiguous, and because the Rule is a reasonable construction of the statute that is supported by a reasoned explanation, the Rule should be afforded *Chevron* deference. Accordingly, the Rule is not contrary to law.

### C. CMS Had Good Cause to Issue the Rule Without Advance Notice and Comment.

Notice-and-comment rulemaking is not required "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). An agency need only articulate "something specific" in order to "forgo notice and comment." *Biden v. Missouri*, 142 S. Ct. 647, 654 (2022).

CMS properly waived notice-and-comment procedures under the good cause exception here. *See* 85 Fed. Reg. at 71,181. The exception excuses advance notice and comment where delay could result in serious harm. *See Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004). Given the that the United States was "in the midst" of the quickly evolving COVID-19 public health emergency, CMS explained that "[i]t is critically important that the Departments implement the policies in [the Rule] as quickly as

possible." 85 Fed. Reg. at 71,181. In particular, immediately enacting 42 C.F.R. § 433.400 allowed states to continue to "claim the temporary funding increase" to their Medicaid programs, *id.*, since they had previously "sent a strong message to CMS that they need[ed] more flexibility to make choices that meet their unique needs." *Id.* at 71,163. Since the COVID-19 public health emergency remained ongoing, it was in the public interest that states continue to accept the increased FMAP so they could provide the necessary care to Medicaid beneficiaries in a time of outsized need.

Further, faced with accelerating costs and a population experiencing an unprecedented health crisis, states had "little ability to manage program costs" under the prior interpretation of § 6008(b)(3), "other than by cutting provider rates to the fullest extent" permitted. *Id.* Such rate cuts would have "represent[ed] a far more significant threat to providers and their continued availability to beneficiaries." *Id.* And in light of the burden the prior interpretation imposed on states, *see id.*, it is entirely possible that states would have rejected the additional FMAP funding rather than continuing to shoulder this burden. CMS thus concluded that the Rule was "immediately necessary" to enable states to "provide care and services during the [public health emergency] in a manner that is consistent with simplicity of administration and the best interests of beneficiaries and also claim the temporary funding increase." *Id.* at 71,181. Given all of these reasons, CMS has provided the "something specific . . . required to forgo notice and comment." *Missouri*, 142 S. Ct. at 654. Because CMS had good cause to dispense with advance notice and comment rulemaking, the Rule does not violate the APA's notice-and-comment requirement.

## II.   PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM.

Plaintiffs have failed to meet their burden to show that they will suffer irreparable harm in the absence of a preliminary injunction. To satisfy the irreparable harm requirement, Plaintiffs "must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if [the Court] waits until the

end of trial to resolve the harm.'" *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1999)). To satisfy the "high standard" for establishing irreparable harm, Plaintiffs must show that their asserted injuries are "real," "substantial," and "immediate," not speculative or conjectural. *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983); *see also Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir.1980) (per curiam) ("Real and imminent, not remote, irreparable harm is what must be demonstrated.").

Plaintiffs request that the Court award emergency relief to enjoin a rule that was issued over a year and a half before they filed suit. It is well-established that a party seeking such extraordinary relief as a preliminary injunction "must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985); *see also Costello v. McEnery*, 767 F. Supp. 72, 78 (S.D.N.Y.), *aff'd*, 948 F.2d 1278 (2d Cir. 1991) (collecting cases).

All five Plaintiffs were informed of changes to their Medicaid coverage nearly six months ago. Plaintiffs Carr and Moore received notices about their changed coverage on February 15, 2022. Carr Decl. ¶ 11; Moore Decl. ¶ 13. Wilson received a notice on February 10, 2022. Wilson Decl. ¶ 14. Shaw received a notice in December 2021. Shaw Decl. ¶ 12. And Katz received a notice on March 18, 2022. Katz Decl. ¶ 12. Such a lengthy delay in filing suit after Plaintiffs became aware of the alleged injury counsels against a finding of irreparable harm. *See, e.g.*, *Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 17 F.4th 793, 805 (8th Cir. 2021) ("Without question, '[a] long delay by plaintiff after learning of the threatened harm . . . may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.'") (quoting Wright & Miller, 11A Fed. Prac. & Proc., § 2948.1 & n.13 (3d ed. 2013)); *Citibank, N.A.*, 756 F.2d at 276 (ten-week delay in seeking an injunction

undercut the claim of irreparable harm); *R.R. P.B.A. of State of New York, Inc. v. Metro-N. Commuter R.R.*, 699 F. Supp. 40, 43 (S.D.N.Y. 1988) (no irreparable harm when plaintiff waited six weeks to file suit).

Plaintiffs have also not demonstrated that a preliminary injunction will certainly protect them from their alleged irreparable harm. The temporary FMAP increase is optional for states. If the Court determines that the Rule is likely unlawful and states must maintain the same amount, duration, and scope of medical services to qualify for the FMAP increase, it would be far from certain that Connecticut, Nebraska, and Delaware would continue to opt in to the funding. And if Plaintiffs' states declined the FMAP increase, Plaintiffs would be subject to their states' normal eligibility rules and would not be eligible for their prior Medicaid plans. Given this uncertainty (and the omission of the states from this lawsuit), Plaintiffs have not established that they will suffer irreparable harm absent a preliminary injunction.

## III.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST DOES NOT JUSTIFY RELIEF.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these considerations tilt decisively in the Government's favor.

An injunction would harm the public interest in protecting the health of the neediest populations during the COVID-19 pandemic. CMS adopted the Rule after states "expressed concern" that the prior interpretation of § 6008(b)(3) "ma[de] it challenging for them to manage their programs effectively and still qualify for the increased Federal financial participation." 85 Fed. Reg. at 71,161. If the Rule were enjoined, states may choose to reject the increased FMAP, which would "frustrat[e]" one purpose of the FFCRA—to "provide additional support to state Medicaid programs in their response to the COVID-19 pandemic." *Id.* Further, if a state decided not to accept the increased FMAP, the state would not need to abide by the other conditions set forth in § 6008(b)(1)-(2) & (4),

which also serve important functions in mitigating the harm from the pandemic. For example, § 6008(b)(4) requires states to cover "any testing services and treatments for COVID-19, including vaccines, specialized equipment and therapies." Amidst the pandemic, it serves the public interest to ensure that states offer such vital services to Medicaid beneficiaries.

CMS noted that its prior interpretation of § 6008(b)(3) would have left states "little ability to manage program costs other than by cutting provider rates to the fullest extent permitted." 85 Fed. Reg. at 71,161-63. Cutting provider rates could put providers out of business and "undermine the solvency of critical provider networks and their ability to serve beneficiaries in the future, particularly in rural areas where health care workforce shortages may already exist." *Id.* at 71,161. As CMS recognized, "such rate cuts represent a far more significant threat to providers and their continued availability to beneficiaries." *Id.* at 71,163. If the Rule were enjoined, it's more likely states might seek to cut provider rates, which would significantly undermine the public interest.

## IV.   ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO THE PLAINTIFFS AND THE PROVISION OF THE RULE THAT APPLIES TO THEM.

If this Court were to enjoin any aspect of the Rule (and it should not), any relief should apply only to the named Plaintiffs. "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). Thus, the "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934; *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162-64 (2010); *Printz v. United States*, 521 U.S. 898, 935 (1997). Injunctions must be no broader than "necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Because remedies "ordinarily 'operate with respect to specific parties,'" *California*, 141 S. Ct. at 2115 (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1486 (2018)), Plaintiffs can only vindicate the injuries that they have personally suffered.

Plaintiffs request an injunction preventing Defendant from enforcing the Rule and ordering Defendant "to notify all states" that (1) "they may not apply any provisions" of the Rule and (2) "they must immediately reinstate anyone cut off of full benefit Medicaid since the implementation of the IFR." Pls.' Mot. at 39. But Plaintiffs have no interest in the Rule's application to any other beneficiaries. Plaintiffs' alleged injuries are specific to how the Rule affects their own medical assistance under their state Medicaid plans in Connecticut, Delaware and Nebraska. Although Plaintiffs have moved for class certification, Defendant intends to oppose that motion and, at this time, the Court has not certified any class. Remedies should be "no more burdensome to the defendant than necessary" to provide complete relief to the plaintiffs. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And assuming *arguendo* that Plaintiffs' alleged injuries are redressable at all, *see supra* I.A., this Court could provide complete relief to Plaintiffs by enjoining the Rule only as to them.

Any injunction should also be limited to the subsection of the Rule that applies to the Plaintiffs because no other part of the Rule has caused their alleged injuries. A "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis*, 518 U.S. at 357; *see also Gill*, 138 S. Ct. at 1931 (holding that the remedy did not require "restructuring all of the State's legislative districts," only those that affected the Plaintiff voters' districts). As discussed, *see supra* I.A.2., Plaintiffs allege that they are Medicaid beneficiaries who "the state subsequently determine[d]" were eligible for an MSP group, and who the state then "furnish[ed] the medical assistance available" through an MSP group. 42 C.F.R. § 433.400(c)(2)(i)(B). They all fall under the specific provision of § 433.400 concerning MSPs, *see id.*, and no other part of § 433.400 has injured them beyond this subsection. Assuming *arguendo* that Plaintiffs' alleged injuries are redressable at all, the Court can grant Plaintiffs full relief by enjoining only § 433.400(c)(2)(i)(B) as to the five Plaintiffs.

Finally, Plaintiffs' request that Defendant "notify" states that they must reinstate those "cut off of full benefit Medicaid," Pls.' Mot. at 39, is unwarranted because the temporary FMAP increase

is optional, so states retain the choice to reject the funding rather than re-enroll beneficiaries. As explained, *see supra* I.A.1., a notification saying as much would not give beneficiaries any assurance that states would re-enroll them instead of deciding to reject the temporary FMAP increase. And because Defendant "has no power to enforce" an optional provision against the states in a mandatory fashion, "[t]here is no one, and nothing, to enjoin." *California*, 141 S. Ct. at 2116. Accordingly, the Court should tailor any remedy to the alleged injuries suffered by Plaintiffs personally.

## CONCLUSION

For the reasons explained above, the Plaintiffs' motion for a preliminary injunction should be denied.


DATED: September 8, 2022                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            MICHELLE R. BENNETT
                                            Assistant Director, Federal Programs Branch

                                            */s/ Madeline M. McMahon*
                                            MADELINE M. MCMAHON
                                            DC Bar No. 1720813
                                            Trial Attorney, U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street NW
                                            Washington, DC 20005
                                            Telephone: (202) 451-7722
                                            Fax: (202) 616-8470
                                            madeline.m.mcmahon@usdoj.gov

                                            *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2022, a copy of the foregoing Memorandum in Response to Plaintiffs' Motion for a Preliminary Injunction was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Madeline M. McMahon
MADELINE M. MCMAHON
DC Bar No. 1720813
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Telephone: (202) 451-7722
Fax: (202) 616-8470
madeline.m.mcmahon@usdoj.gov