UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DEBORAH CARR, BRENDA MOORE,
MARY ELLEN WILSON, MARY SHAW,
and CAROL KATZ, on behalf of themselves
and those similarly situated,

                Plaintiffs,

                v.

XAVIER BECERRA, SECRETARY,
UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

                Defendant.

Civil Action No. 3:22-cv-988 (MPS)

September 19, 2022

**SECOND DECLARATION OF SHELDON V. TOUBMAN IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
AND APPOINTMENT OF CLASS COUNSEL**

I, SHELDON V. TOUBMAN, declare as follows:

      1.      I am one of the attorneys representing Named Plaintiffs and the putative class in

the above-captioned action and I am submitting this Declaration in support of Plaintiffs' Motion

for Class Certification and Appointment of Class Counsel (Docket No. 44).

      2.      I am over the age of eighteen, have personal knowledge of the matters in this

declaration, and am competent to testify about them.

      3.      In my Declaration in Support of Plaintiffs' Motion for Class Certification (Docket

No. 44-5), I stated that documents related to the numbers of individuals affected by the

implementation of the Defendant's Interim Final Rule had been requested and were expected

shortly from the Connecticut Department of Social Services ("DSS"), in the form of a

transcript from the June 22, 2022 administrative hearing for Named Plaintiff Deborah Carr in her appeal of the termination of full benefit Medicaid coverage (under "HUSKY D"), and a response to my August 12, 2022 request for documents concerning such data under the Connecticut Freedom of Information Act ("FOIA").

4.      I also stated in that Declaration that my recollection was that the testimony at the administrative hearing from DSS's witness, Marjori Kapsis, was that about 6,600 people had been terminated in the initial implementation period by DSS from full benefit Medicaid for the reason that they were on a Medicare Savings Program ("MSP"), and that additional individuals were being cut off each month because they newly turned 65 or newly qualified for Medicare and thus for an MSP.

5.      Attached as Exhibit 1 are true and correct copies of pages 1-4 and 93-101 of the transcript of the June 22, 2002 hearing, received on September 13, 2022, confirming that the total number of individuals initially cut off of full benefit Medicaid for the reason of being 65 or over and eligible for Medicare and an MSP was about 2,400, and for the reason of qualifying for Medicare and an MSP under 65 was about 4,200 (Ex. 1 at 93-96), and that varying numbers of additional individuals are being cut off each month for the same reasons (Ex. 1 at 98-101).

6. Attached as Exhibit 2 is a true and correct copy of my August 12, 2022 request under the FOIA for documents containing data regarding the numbers of individuals terminated from Medicaid coverage for reasons newly authorized under the Defendant's Interim Final Rule.

7. Attached as Exhibit 3 is a true and correct copy of the letter from David Seifel, DSS FOIA Officer and Legislative Liaison, dated September 12, 2022, explaining an attached spreadsheet regarding numbers of individuals whose HUSKY D Medicaid cases were closed initially in June 2021 and January 2022, and every week thereafter, for the reasons of being: (1)

65 or over or (2) under 65, and on Medicare and an MSP, showing approximately 11,650 total closures for these two groups as of August 22, 2022. The provided spreadsheet also is included in Exhibit 3.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED:  September 19, 2022

/s/Sheldon V. Toubman
SHELDON V. TOUBMAN
Fed Bar No. ct08533
Phone: (475)345-3169
E-mail: sheldon.toubman@disrightsct.org
Disability Rights Connecticut
846 Wethersfield Avenue
Hartford, CT 06114

## Certificate of Service

I hereby certify that on September 19, 2022, a copy of the foregoing document was filed electronically and served by overnight delivery to anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by overnight delivery to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/Sheldon V. Toubman
Sheldon V. Toubman

# EXHIBIT 1

JUNE 22, 2022 HEARING TRANSCRIPT
Pages 1-4, 93-101

```
                 STATE OF CONNECTICUT

             DEPARTMENT OF SOCIAL SERVICES

         OFFICE OF LEGAL COUNSEL, REGULATIONS AND

                 ADMINISTRATIVE HEARINGS


---------------------------- x
 In RE:                      :
                             :
         DEBORAH CARR,       :  Case No. 100641958
                             :          RN 190840
                 Appellant.  :
                             :  June 22, 2022
----------------------------x

                        Venue:  66 Orange Steet, Apt 301
                                New Haven, Connecticut



                   ADMINISTRATIVE HEARING



         (Transcription from Electronic Recording)


Held Before:

                 SYBIL HARDY, Hearing Officer




                 Transcription Services of
             FALZARANO COURT REPORTERS, LLC
                     4 Somerset Lane
                   Simsbury, CT  06070
                      860.651.0258
             www.falzaranocourtreporters.com
```

A P P E A R A N C E S:

    <u>For the Appellant</u>:

        DISABILITY RIGHTS of CONNECTICUT
        846 Wethersfield
        Hartford, Connecticut 06114
            BY:  SHELDON TOUBMAN, ESQ.

    <u>For the Department of Social Services</u>:

        DEPARTMENT OF SOCIAL SERVICES
        55 Farmington Avenue - 11th Floor
        Hartford, Connecticut 06105
            BY:  MELANIE DILLON, ESQ.

    <u>Also Present</u>:

        DEBORAH CARR, Appellant

        DONALD DEMMITT, Care Partner

        MARJORI KAPSIS, DSS, Public Assistance
        Consultant

```
 1                    (Proceedings commenced.)

 2

 3            HEARING OFFICER HARDY:  The hearing

 4       record for Deborah Carr is now open.

 5       Although this is an informal hearing all

 6       those present who are going to testify must

 7       take an oath.  Everyone please raise their

 8       right hand.  If you could raise your right

 9       hand?

10            (Whereupon, the parties were duly sworn

11       by Hearing Officer Hardy.)

12            HEARING OFFICER:  Thank you.  And for

13       the record everyone present must state his

14       or her name, address and in what capacity he

15       or she is at this hearing.

16            My name is Sybil Hardy, I am the

17       Hearing Officer with the Department of

18       Social Services, Office of Legal Counsel,

19       Regulations and Administrative hearings

20       assigned to preside at this hearing.  So if

21       we could start with Ms. Carr please, if you

22       could state your full name and address for

23       the record.

24            MS. CARR:  My name is Deborah Carr.

25       The address is 66 Orange Street, Apartment
```

1          301, New Haven, Connecticut 06510.

2                  HEARING OFFICER:  Okay.  And your

3          witness?

4                  MR. DEMMITT:  My name is Donald

5          Demmitt, 66 Orange Street, Apartment 301,

6          New Haven, Connecticut.  I am her care

7          partner as I like to call it.

8                  HEARING OFFICER:  Okay.

9                  MS. KAPSIS:  I'm Marjori Kapsis.  I

10         work at the Department of Social Services.

11         I'm a Public Assistance Consultant.

12                 HEARING OFFICER:  Okay.

13                 MS. DILLON:  I'm Melanie Dillon, I am

14         attorney in the Office of Legal Counsel at

15         the Department of Social Services.

16                 MR. TOUBMAN:  I am Sheldon Toubman,

17         that's spelled T-o-u-b-m-a-n.  I'm an

18         attorney at Disability Rights Connecticut.

19         Do you want the address?

20                 HEARING OFFICER:  Yes.

21                 MR. TOUBMAN:  846 Wethersfield Avenue,

22         Hartford, Connecticut.  I think it's 06114,

23         and I'm representing Ms. Carr today.

24                 HEARING OFFICER:  Thank you.

25                 Okay, Ms. Carr, the Office of Legal

1    -- right, after changes announced by CMS.  What about

2    people who are non-citizens and who would otherwise be

3    subject to what's known as the 5-year bar?  Can you

4    talk about that?

5              MS. DILLON:  I'm going to object just

6              to relevance to the present hearing because

7              this is really limited to the determination

8              of --

9              MR. TOUBMAN:  Right.  But I'm just

10             trying to understand how the Department

11             reacts in general to see if it is across the

12             board, whether they imposed this change

13             across the board.  And just have a couple of

14             questions to ask about it.

15       A    I actually didn't work on the non-citizen

16    aspect of it.

17    BY MR. TOUBMAN:

18       Q    Okay, all right.  All right, I'm sorry.  But

19    are you aware that there were people who were affected

20    who were non-citizens by the change from CMS?

21       A    You know, I'm not really aware.  I don't --

22    didn't work on it.

23       Q    All right.  So can you tell me about how

24    many people roughly were affected the change -- when

25    you did ultimately implement the change which you said

1   was in March of 2011?  And let me ask you in two

2   groups.  I'm going to ask you about the people who you

3   said aged out of Husky D and then got Medicare and

4   Medicare Savings Program.  So how many people were in

5   that group?

6        A    Okay, and just to clarify, I'm not sure how

7   I stated it before but it was around that timeframe of

8   March 2021 and April 2021 where we started to plan to

9   make the changes, but we didn't implement them, you

10  know, until a little bit later on, so -- because it

11  was in the planning.

12       Q    Okay.

13       A    So the first group we did was the 65 and

14  over with MEC that were extended on Husky D and that

15  was 20 -- no, 30 -- approximately 2,400 people.

16       Q    2,400 people affected by that group.  And

17  was that the first group?  You said that -- okay.

18       A    Yep, yes.

19       Q    So what was the next group?

20       A    It was the under 65.

21       Q    Just to clarify it, under 65 who qualified

22  for Medicare and then Medicare Savings Program.

23       A    Correct.

24       Q    And about how many were there?

25       A    That was about 4,200.

1      Q    Okay.  So about 2,400 were over 65 and about

2   4,200 were under 65, with the same basic facts which

3   are that they qualified, newly qualified for Medicare

4   and then for MSP.  Do I have that correct?

5      A    I'm not sure when they qualified for it.

6   They might not have been newly qualified.

7      Q    Strike newly.  I shouldn't have said that.

8   I apologize.  I should have said that they were

9   getting cut off because they qualified for Medicare

10  and MSP.

11     A    And actually they were enrolled in it as

12  well so they may have qualified but they were enrolled

13  in Medicare and MSP.  They were beneficiaries of those

14  programs and so --

15     Q    Okay.

16     A    Yeah.

17     Q    For people over -- just so I understand, for

18  people over 65 were they cut off even if they weren't

19  actually enrolled in Medicare?

20     A    No.

21     Q    They have to actually be enrolled.

22     A    That's what we did.  We only did people with

23  -- somebody who had MSP that means they have Medicare

24  so, yeah, that's how we identified them.

25     Q    Okay.  So that between those two groups

1    that's like 6,600 people, 2,400 and -- roughly 6,400.

2    But there were other groups as well, right?

3         A    There were other groups, yep.

4         Q    Do you have the numbers on those groups?

5         A    I don't.  I mean it's a few a month.

6         Q    I'd like only to talk about them, I asked

7    you about going forward but I'm just really asking

8    only about initially when you finally implement you

9    said you started the process in March/April 2021 but

10   then it took a while to actually get to it.

11        A    Um-hum.

12        Q    Took several months.  Was that -- the

13   numbers I was asking about were about those people

14   done at that time sort of en masse so that -- right?

15        A    These were done en masse.

16        Q    Okay.  The 2,400 and the 4,200.  In terms of

17   people who were also done en masse where there any

18   significant numbers there?

19        A    Actually, the other ones weren't done en

20   masse because the way the system is we just started to

21   keep an individual, just not extend the individual

22   again.  We didn't have to -- wait, let's see how to

23   put this.  Hold on one second.  We would just -- we

24   would identify those who maybe became over income, you

25   know, a certain month that had MSP and went into an

1   S99 and those people weren't extended anymore.  So it

2   was monthly, it wasn't something that was done en

3   masse, it was just like a --

4       Q    You mean at the normal redetermination point

5   is when this would happen?

6       A    Yes.  So that it would just be stopped --

7   like if they had an income increase and then the

8   redetermination they would go ahead and they would

9   cascade to say -- we use the term cascade which means

10  like move into another group -- when they had MEC then

11  we would no longer say, you know, keep the previous

12  coverage group, we would like the cascade happen.

13          So that kind of didn't happen en masse.

14  There was no like all at one time of those.  It kind

15  of happened as the person changed.

16      Q    So like over -- let me ask you in terms of

17  last year, like 2021.  How many people do you think

18  there were in those other groups?

19      A    You know, I'm sorry, I didn't really look at

20  those numbers before this, so --

21      Q    Just hundreds, thousands?

22              MS. DILLON:  Objection.  She was asked

23          and answered.

24  BY MR. TOUBMAN:

25      Q    Okay, but do you have any sense about that,

```
 1   whether it's hundreds or thousands?

 2        A    I mean it wasn't a lot every month.

 3        Q    It was not.

 4        A    Yeah, it was something that could work, yep.

 5        Q    Something what?  I'm sorry.

 6        A    I mean something that I knew that we could,

 7   you know, was manageable to work.  I don't -- I really

 8   don't -- couldn't tell you the numbers.

 9        Q    Okay.

10        A    It wasn't like overwhelming or anything,

11   near a thousand or anything like that, I know that.

12        Q    So it was less than a thousand fair to say.

13             What about going forward?  How many people

14   are being cut off, you know, each month there are

15   people who -- I think this is where you use the

16   "newly," people who newly qualified for Medicare and

17   MSP, correct?

18        A    Correct, yep.

19        Q    And those people under this new

20   interpretation from CMS for so-called MEC regulation

21   you're talking about, so there's people newly being

22   cut off each month; is that accurate?

23        A    Those individuals if they have MEC we just

24   follow the normal Husky C transition process, so yes,

25   so we would just be using the business process of
```

```
  1  that.
  2      Q    And I'm just asking how many do you think
  3  that is each month?
  4      A    I'm sorry, I don't have those numbers
  5  either. I didn't review any of that, the figures --
  6      Q    Okay.
  7      A    -- except related to like the Husky D
  8  before.
  9      Q    Again I'm only asking this from your
 10  knowledge, you really don't know.
 11      A    Right.
 12      Q    Would you have a sense that that's in the
 13  hundreds every month?
 14           MS. DILLON:  I'm just going to object
 15           to the extent that she's already said she
 16           didn't look at the numbers so she doesn't
 17           know.
 18  BY MR. TOUBMAN:
 19      Q    Right.  But you might have a sense even
 20  though you didn't look at the numbers.
 21           MR. DEMMITT:  I -- sorry.
 22           MS. KAPSIS:  No, it's okay.  I'm sorry.
 23           MR. DEMMITT:  I just have a silly
 24           question.  She's never worked a day in her
 25           life but why wasn't she given new recipient
```

```
 1              status?
 2                   MR. TOUBMAN:  Don, can we -- like tell
 3              us (indiscernible) --
 4                   MR. DEMMITT:  Sorry.
 5                   MR. TOUBMAN:  I'm sorry.
 6   BY MR. TOUBMAN:
 7        Q    I was just asking you if you had any sense
 8   of the numbers.  Is it in the hundreds per month?
 9                   MS. DILLON:  Only answer if you know.
10                   MR. TOUBMAN:  Yeah.
11        A    You know, I remember looking at one month at
12   one time and it was like 200 and something.
13   BY MR. TOUBMAN:
14        Q    In a given month (indiscernible).
15        A    In a given month but that was one month that
16   I remember looking at and it probably was in the past,
17   you know, 8 months.  But other than that I don't
18   regularly, you know, look at those numbers.  So I
19   couldn't tell you a figure.
20        Q    Was there something unusual about that month
21   that you looked at or it just happened to be a random
22   month you looked at?
23        A    I don't usually cover any of those reports
24   and probably when somebody was out that, you know, I
25   received a copy or something.  Nothing unusual, no.
```

1     Q    Okay.  So anyway, that one month you looked

2  at in the last 8 months was about 200 and something.

3     A    Yes.  Yep.

4     Q    Okay.  And that's in addition to the 6,600

5  initially and then however many in the other

6  categories that you did initially, not en masse, but

7  that you did initially as they came up.

8     A    Yes.

9     Q    So just rough ballpark, as of this point

10  would you say it's fair -- is it fair to say there's

11  been somewhere in the range of 8, 9, 10,000 people

12  who've been cut off?

13             MS. DILLON:  I'm going to object to

14             that because I think since she doesn't know

15             specific numbers for the other population

16             you were asking about she really can't

17             testify to anything more than the 6,600.

18             MR. TOUBMAN:  Okay.  All right.  A

19             minimum of 6,600 for sure, but I'm just

20             trying to get some other figures.

21  BY MR. TOUBMAN:

22     Q    And you haven't heard of anybody talking

23  about a global figure.

24     A    No.  I have not really.

25     Q    Okay.  Is there any data that you know of on

# EXHIBIT 2

SHELDON V. TOUBMAN'S FOIA REQUEST
TO DEPARTMENT OF SOCIAL SERVICES
Submitted August 12, 2022



**Disability Rights Connecticut**
"Connecticut's protection and advocacy system"

**846 Wethersfield Avenue
Hartford, CT 06114**

August 12, 2022

**_By E-mail_**
foia.dss@ct.gov
Freedom of Information Act Officer
Department of Social Services
55 Farmington Avenue
Hartford, CT 06105

**Re: Freedom of Information Act Request Regarding Medicaid Termination/Reductions under Families First Coronavirus Response Act**

Dear Sir or Madam:

I am writing to request, under the Freedom of Information Act, Conn. Gen. Stat. § 1-200 et seq., copies of all documents in the possession of your agency, from November 6, 2020 until the date of your response to this request, referring or relating to the numbers of people who have been terminated from Medicaid, or who have had their Medicaid benefits reduced, based on the new exceptions to the Families First Coronavirus Response Act continuous enrollment requirements set forth in the Interim Final Rule published by the Center for Medicare and Medicaid Services on 11/6/20, 42 C.F.R. § 433.400, in each of these categories:

- Individuals who are 65 or older or disabled and on Medicare and also are eligible for a Medicare Savings Program, per 42 C.F.R. § 433.400 (c)(2)(i)(B)

- Individuals who are non-citizens legally present in the United States less than five years and who are no longer under 21 or are no longer in the post-partum period after being pregnant, per 42 C.F.R. § 433.400 (d)(2)

- Individuals who are deemed by your agency not to have been validly enrolled in Medicaid, as defined in 42 C.F.R. § 433.400(a)

- Individuals who were otherwise terminated or had their benefits reduced based on 42 C.F.R. § 433.400.

Also requested are all documents referring or relating to the numbers of people so terminated or reduced in each such category **each month** from when the terminations or reductions began to the present.

This request includes documents in any form, including email correspondence and any attachments thereto.  However, as an alternative if this is more efficient for your agency, it can just provide the numbers, initially and for each month thereafter, and dispense with the underlying documents. This will be viewed as full compliance.

I note that this request is made in the public interest and on behalf of clients of Disability Rights CT who are low-income individuals on or formerly on Medicaid, and therefore, pursuant to Conn. Gen. Stat. § 1-212(d), we request that any fees related to responding to this request be waived.

I thank you in advance for your attention to this matter within the timeframe provided by the Act.


Sincerely,


Sheldon V. Toubman
Litigation Attorney
(475)345-3169
sheldon.toubman@disrightsct.org

# EXHIBIT 3

LETTER WITH ATTACHMENT FROM DAVID SEIFEL,
FOIA OFFICER & LEGISLATIVE LIASON
FOR DEPARTMENT OF SOCIAL SERVICES,
IN RESPONSE TO FOIA REQUEST
September 12, 2022

Date: September 12, 2022

**Via E-Mail**

Sheldon V. Toubman, Esq.
Sheldon.toubman@disrightsct.org
Disability Rights Connecticut
846 Wethersfield Avenue
Hartford, CT 06114

      Re:  Freedom of Information Act request dated August 12, 2022

Dear Attorney Toubman:

This correspondence is in response to your request dated August 12, 2022, pursuant to the Freedom of Information Act, Conn. Gen. Stat. § 1-200, *et seq.*, for statistics as to the number of individuals who have been terminated from Medicaid or had Medicaid benefits reduced "based on the new exceptions to the Families First Coronavirus Response Act continuous enrollment requirements set forth in the Interim Final Rule published by the Center for Medicare and Medicaid Services on 11/6/20, 42 C.F.R. §433.400" for various categories of individuals as itemized in your August 12th request.

Unfortunately, while data within the Department's possession reflects the number of individuals who have transferred to a Medicare Savings Program (MSP) during the requested timeframe, the Department does not maintain any specific record or coding as to whether each such transfer was pursuant to implementation of the Interim Final Rule (IFR), nor whether such individuals subsequently enrolled in another Medicaid program such as HUSKY C.  As a result, the Department is unable to produce, or generate a report that accurately produces, such specific figures pursuant to your request.

However, the Department has generated a report based upon data and information that *is* in the Department's possession that may be of some assistance.  Please be advised that the Department commenced programmatic implementation of the IFR for the 65 and over population in June 2021, and for those under 65 in January 2022.  Accordingly, the attached Excel report identifies the number of individuals who have had HUSKY D closed due to enrollment in MSP each week since the Department commenced any potential processing of clients pursuant to the IFR.  As you may be aware, aside from the implementation of the IFR, individuals may have had their HUSKY coverage closed during the public health emergency if they passed away, moved out of state, or requested closure of their coverage. Each

individual receives a closure letter explaining the reason for HUSKY D closure as well as a HUSKY C supplemental form that the Department requires to determine HUSKY C eligibility.

The Department trusts that this information is useful.

Best Regards,

*David Seifel*

David Seifel
FOIA Officer and Legislative Liaison



| CATEGORY | File_Date | Count |
|---|---|---|
| Over Age 65 | 6/2/2021 | 2,451 |
| | 6/22/2021 | 11 |
| | 7/2/2021 | 177 |
| | 7/5/2021 | 128 |
| | 7/12/2021 | 9 |
| | 7/19/2021 | 23 |
| | 7/26/2021 | 8 |
| | 8/2/2021 | 149 |
| | 8/9/2021 | 13 |
| | 8/17/2021 | 8 |
| | 8/23/2021 | 16 |
| | 8/31/2021 | 21 |
| | 9/7/2021 | 39 |
| | 9/13/2021 | 54 |
| | 9/20/2021 | 48 |
| | 9/27/2021 | 43 |
| | 10/4/2021 | 40 |
| | 10/11/2021 | 33 |
| | 10/18/2021 | 64 |
| | 10/25/2021 | 26 |
| | 11/1/2021 | 43 |
| | 11/8/2021 | 364 |
| | 11/15/2021 | 72 |
| | 11/22/2021 | 37 |
| | 11/29/2021 | 55 |
| | 12/6/2021 | 39 |
| | 12/13/2021 | 74 |
| | 12/20/2021 | 69 |
| | 12/27/2021 | 1 |
| | 1/3/2022 | 81 |
| | 1/13/2022 | 25 |
| | 1/17/2022 | 169 |
| | 1/24/2022 | 28 |
| | 1/31/2022 | 182 |
| | 2/7/2022 | 182 |
| | 2/14/2022 | 17 |
| | 2/21/2022 | 29 |
| | 2/28/2022 | 11 |
| | 3/7/2022 | 13 |
| | 3/14/2022 | 14 |
| | 3/21/2022 | 34 |
| | 3/28/2022 | 15 |
| | 4/4/2022 | 20 |
| | 4/11/2022 | 16 |
| | 4/18/2022 | 11 |
| | 4/25/2022 | 38 |
| | 5/2/2022 | 17 |
| | 5/9/2022 | 22 |
| | 5/16/2022 | 25 |
| | 5/23/2022 | 13 |
| | 5/30/2022 | 12 |
| | 6/6/2022 | 15 |
| | 6/13/2022 | 32 |
| | 6/20/2022 | 15 |
| | 6/27/2022 | 10 |
| | 7/4/2022 | 18 |
| | 7/11/2022 | 23 |
| | 7/18/2022 | 9 |
| | 7/25/2022 | 48 |
| | 8/1/2022 | 33 |
| | 8/8/2022 | 6 |
| | 8/15/2022 | 20 |
| | 8/22/2022 | 38 |
| | TOTAL | 5,356 |

| CATEGORY | File_Date | Count |
|---|---|---|
| Under Age 65 | 1/31/2022 | 3,897 |
| | 2/7/2022 | 263 |
| | 2/14/2022 | 72 |
| | 2/21/2022 | 39 |
| | 2/28/2022 | 44 |
| | 3/7/2022 | 116 |
| | 3/14/2022 | 150 |
| | 3/21/2022 | 31 |
| | 3/28/2022 | 31 |
| | 4/4/2022 | 176 |
| | 4/11/2022 | 42 |
| | 4/18/2022 | 16 |
| | 4/25/2022 | 60 |
| | 5/2/2022 | 21 |
| | 5/9/2022 | 243 |
| | 5/16/2022 | 49 |
| | 5/23/2022 | 28 |
| | 5/30/2022 | 23 |
| | 6/6/2022 | 208 |
| | 6/13/2022 | 41 |
| | 6/20/2022 | 30 |
| | 6/27/2022 | 27 |
| | 7/4/2022 | 210 |
| | 7/11/2022 | 23 |
| | 7/18/2022 | 51 |
| | 7/25/2022 | 50 |
| | 8/1/2022 | 28 |
| | 8/8/2022 | 208 |
| | 8/15/2022 | 83 |
| | 8/22/2022 | 40 |
| | TOTAL | 6,300 |