UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEBORAH CARR, BRENDA MOORE, MARY ELLEN WILSON, MARY SHAW, and CAROL KATZ, on behalf of themselves and those similarly situated, | |
| Plaintiffs, | Civil Action No. 3:22-cv-988 (MPS) |
| v. | CLASS ACTION REQUESTED |
| XAVIER BECERRA, SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | December 2, 2022 |
| Defendant. | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF REGARDING PLAINTIFFS' PENDING REQUEST FOR A NATIONWIDE PRELIMINARY INJUNCTION**

Plaintiffs file this response pursuant to the Court ruling allowing supplemental briefing on Plaintiffs' pending request for a nationwide injunction and Plaintiffs' substantive Administrative Procedure Act (APA) claim (ECF## 81, 83).

**The Ruling by the Honorable Omar A. Williams Properly Applied the Preliminary Injunction Standards.**

Judge Williams's Ruling Granting Preliminary Injunction (ECF# 77) (Ruling), found that Plaintiffs suffered irreparable harm, that they demonstrated a substantial likelihood of success on the merits of their claim that Defendant violated the APA by his failure to provide advance notice and comment prior to issuing 42 C.F.R. § 433.400, and that the public interest and balance of equities favored Plaintiffs. Ruling at 17, 19. Finding it unnecessary to reach the issue, Judge Williams declined to rule on likelihood of success of Plaintiffs' substantive APA claim. *Id.* at 17.

Judge Williams also rejected the Defendant's two standing arguments. Defendants argued no relief was possible because: (1) only the states, not the Department of Health and Human Services, can decide whether to reinstate a beneficiary, and (2) some states *might* withdraw from the enhanced reimbursement program under the Families First Coronavirus Response Act (FFCRA) entirely if ordered to maintain class members on Medicaid during the Public Health Emergency (PHE). *Id.* at 9, 9n.11. Judge Williams found the first argument by Defendant unpersuasive, noting both that, where Defendant already advised states that the IFR would not be applied as to certain Named Plaintiffs (due to an agreement to avert a Temporary Restraining Order), *see id.* at 10-11, reinstatement was essentially immediate, and that "'to have standing, a federal plaintiff must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury,'" *Id.* at 10, quoting and citing *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994) (emphasis in original). He similarly found Defendant's second argument, that "the states could decide to stop accepting the additional funding, and thus would cease to be bound by the conditions of acceptance," to be "mere speculation." Ruling at 9 n.11. Judge Williams rejected the similar merits argument made by Defendant that there was "good cause," *id.* at 14-17, for adopting the IFR without going through the APA notice and comment process because following such a process "might have caused states entirely to forego the FMAP increase." *Id.* at 14-17.

These detailed findings by Judge Williams are the "law of the case," *Remington Products, Inc. v. North American Philips Corp.*, 755 F. Supp. 52, 54 (D. Conn. 1991), and directly refute several of the arguments made by Defendant in his Supplemental Brief.

**Irreparable Harm is Established for the Entire Class.**

Defendant assumes the Court's thoughtful questions in its September 29, 2022 Minute

Order (ECF# 59) about irreparable harm for absent class members equal a definitive ruling that proof of individualized harm for all of the thousands of class members is required for a class-wide PI. Def.'s Suppl. Br. at 2 (ECF# 85) (Def.'s Suppl. Br.). But such a ruling would be contrary to long-standing Second Circuit precedent, which requires no such proof. The cases discussed at pages 21-24 of Plaintiffs' initial brief in support of their motion for a PI (ECF# 3-1) establish that lack of coverage for health care and even *fear* of not having access to needed treatment due to the termination of insurance coverage is inherently irreparable harm *as a matter of law. See, e.g.*, *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55 (2d Cir. 2004).

Defendant maintains these cases involve only limited classes of individuals with specialized circumstances, but only discusses two of them. Def.'s Suppl. Br. at 5-6. Plaintiffs' many citations, however, include cases finding irreparable harm for very broad classes or groups of affected parties. *Whelan v. Colgan* for example, upheld a PI for a class of striking workers on the grounds that "the threatened termination of benefits such as medical coverage for workers and their families obviously raised the specter of irreparable injury." 602 F.2d 1060, 1062 (2d Cir. 1979).

In none of these cited cases was individualized proof of medical circumstances required for a class-wide finding of irreparable harm. *See, e.g.*, *Olson v. Wing*, 281 F. Supp. 2d 476 (E.D.N.Y. 2003) (granting class-wide PI even prior to class certification for *all* individuals cut off of post-9-11 "Disaster Relief Medicaid" and who appealed same, without any consideration of their particular circumstances or medical needs), *aff'd by summary order*, 66 Fed. App'x 275 (2d Cir. 2003); *Fishman v. Daines*, 2014 WL 4638962 *6 (E.D.N.Y. 2014) (finding irreparable harm to class of Medicaid enrollees who had their Medicaid appeal hearings dismissed for failure to appear, without consideration of their specific facts other than that they involved appeals of

Medicaid terminations, on the basis that "[c]ourts have repeatedly held that the wrongful denial of Medicaid benefits, in situations analogous to this case, is the type of non-monetary, imminent harm that is properly characterized as irreparable"), *rev'd on other grounds*, *Fishman v. Paolucci*, 628 Fed. Appx. 797, 800-801 (2d Cir. 2015) (reversing finding on likelihood of success, but agreeing that "lack of medical services is exactly the sort of irreparable harm that preliminary injunctions are designed to address.").[1]

Tellingly, Defendant cites only a Third Circuit case, *Adams v. Freedom Forge Corp.,* 204 F.3d 475 (3d Cir. 2000), to support its position that individualized presentation of harm was needed to obtain a class-wide PI. That is not the law in the Second Circuit.

Defendant argues that class members terminated because they qualified for Medicare and a Medicare Savings Program (MSP) suffered no irreparable harm because Medicare plus an MSP is "generally comprehensive" and that such individuals still had "similar coverage." Def's Suppl. Br. at 3, 6. This argument ignores all of the contrary evidence presented to Judge Williams. As he found, Medicare simply does not cover long-term care, meaning that some Plaintiffs, like Ms. Carr and Ms. Moore, will lose 40 to 70 hours per week of essential home care services needed to avoid institutionalization. *See* Ruling at 4-5 (discussing testimony of Ms. Carr and Ms. Moore). Judge Williams also noted that dental services and medical transportation, routinely needed by those on Medicaid, are not covered by Medicare, so being on an MSP was of no use in accessing these services. *See id.* at 4-5, 7 (discussing Plaintiffs' testimony). And, he noted the

---

[1] To further illustrate, several years ago, the Honorable Janet Arterton of this Court granted a class-wide PI for all individuals on Medicaid in Connecticut who were being denied any kind of durable medical equipment for any kind of medical problem based on the defendant Medicaid agency's argument that it could exclude any type of equipment not listed on its fee schedule. This was after having found irreparable harm for the handful of individual named plaintiffs but without any assessment of individualized medical need for absent class members. *DeSario v. Thomas*, 139 F.3d 80, 83-84 (2d Cir. 1998), *vacated and remanded on other grounds*, *Slekis v. Thomas*, 525 U.S. 1098 (1999).

unaffordability of some of the cost-sharing under Medicare for low-income individuals who lost their full benefit Medicaid coverage or even who are shifted from the Qualified Medicare Beneficiary (QMB) to the Specified Low-Income Medicare Beneficiary (SLMB) program within MSP. *See id.* at 6 (discussing Ms. Katz's testimony).

But it is not just Judge Williams who found this significant gap between Medicaid and Medicare/MSPs. In Defendant's Notice announcing his own decision to consider rescission of the IFR, he recognized concerns of commenters "about the potential loss of Medicaid benefits that could be experienced by beneficiaries transitioned from an eligibility group providing full coverage to a Medicare Savings Program eligibility group, which provides coverage for Medicare premiums and cost sharing alone." 87 Fed. Reg. 58457 (Sept. 27, 2022). Defendant attempts to argue that, "unlike in *LaForest*, the Rule does not permit states to terminate beneficiaries from Medicaid; rather, it ensures that beneficiaries maintain *similar* coverage to that of their prior eligibility group." Def.'s Suppl. Br. at 6 (emphasis added). Zero dental coverage and zero coverage for personal care assistants (PCAs) needed to avoid institutionalization can hardly be considered "similar" to full benefit Medicaid coverage which covers both. Moreover, individuals disqualified under the other IFR exceptions, for: (1) certain lawfully residing immigrants who have not been in the country for five years and (2) individuals deemed not to have been validly enrolled, receive coverage only for immediately life-threatening emergency medical conditions, or nothing at all, respectively. *See* Pls.' Reply Br. in Support of Mot. for a PI at 6-7 (ECF# 53) (Pls.' PI Reply Br.). They do not qualify for coverage remotely "similar" to full Medicaid coverage either.

Defendant offers two last ditch arguments: (1) that "one type of MSP, a Qualified Medicare Beneficiary program (QMB), fully funds Medicare Part A premiums, Part B premiums, deductibles, coinsurance, and copayments," and (2) that a beneficiary moved to QMB "could not claim any harm from premiums or copayments," Def.'s Suppl. Br. at 3. But these

5

arguments ignore that even this purportedly generous MSP program provides *no* coverage for services like PCAs, dental, hearing aids and transportation coverage, not covered at all by Medicare; individuals must pay the entire cost of these services. And the defense that people losing full benefit Medicaid "may even be relieved of premiums or copayments that they may otherwise have been required to pay under Medicaid," *id.*, is specious: individuals *involuntarily* cut off of full benefit Medicaid under the IFR already made the determination, in the few states that impose limited premiums for Medicaid, that it was worth staying on and paying those premiums because of the services they would lose without it.

While his decision technically reserved judgement on the question of a class-wide PI, Judge Williams's finding in his Ruling about the situation of low-income individuals losing access to their health coverage *generally* is fully in line with Second Circuit precedent:

> A gap in healthcare is not likely to result in the sort of injury which can be corrected with a monetary award, particularly in Plaintiffs' age of seniority. Plaintiffs already are reporting that they are declining to seek medical assistance for serious conditions, limiting their visits to doctors for ongoing care, and facing the threat of residing at a nursing home (during a pandemic in which nursing home fatalities are distressingly frequent) in order to receive the level of care they require for everyday functioning. The enforcement of the IFR has cost these individuals the level of health which only follows early and consistent medical care and treatment. No monetary award can halt the progression of cancer, reverse the effects of COVID, or retract periods of anxiety and pain. These harms clearly are non-compensable in monetary damages. *See LaForest [v. Fromer Clean Air Holding Co.,]*, 376 F.3d [48,] 56 [2d. Cir. 2004] (finding district court did not abuse its discretion in holding that retirees had shown irreparable harm in a reduction in healthcare benefits which would have adverse health results).

Ruling at 18-19.

Indeed, while Defendant argues in his brief that " '[o]ne cannot infer from the fact that a few members with unique problems might be able to meet the standard that the impact is class wide,' " Def.'s Suppl. Br. at 4 (alteration in original, citation omitted), his decision in September to issue a new proposed rule indicates that Named Plaintiffs' problems are hardly unique. An

6

important purpose of the FFCRA was to protect individuals from losing Medicaid coverage during the PHE, presumably because this would harm them. This comports with Second Circuit precedent that the termination of *any* Medicaid benefits constitutes inherently irreparable harm. Defendant's only support for his argument is rank hearsay in unsworn comments submitted by a few states in the pending rulemaking proceeding. The comments that Defendant relies on describe the proposed rescission of the Rule as an annoyance and "difficult," and assert that "the vast majority of beneficiaries who experienced a change in their Medicaid coverage were not negatively impacted by that change" *Id.* at 3 (citing Louisiana Department of Health's comment letter). But these unverified contentions cannot form the basis for dismissing the motion for class-wide preliminary injunctive relief for the class. First, they are only hearsay; they are directly contradicted by dozens of other comments submitted in the same rulemaking proceeding urging rescission.[2] Second, they contradict Congress' presumption underlying Section

---

[2] Defendant argues that "other putative class members, including those moved to a SLMB program, may not forgo any medical care—either because they have more financial resources than Shaw and Katz or because they have fewer or less severe medical needs than Shaw or Katz. Indeed, one reason a beneficiary may be transferred to a SLMB program is due to an increase in the beneficiary's financial resources." Def.'s Suppl. Br. at 4. This is highly speculative. Many people lose their Medicaid coverage for reasons other than income increases, such as, in the case of four of the five Named Plaintiffs, becoming eligible for Medicare due to age or disability without any change in income level, or, in the case of five year bar individuals, no longer being in the post-partum period or no longer being under 21. Moreover, under the IFR, those with incomes too high to qualify for any MSP in fact do not lose their full benefit Medicaid coverage at all: it is those with more limited incomes, who generally cannot afford these out of pocket expenses, who lose their full benefit Medicaid coverage or are shifted from an MSP that at least covers Medicare cost sharing to one that does not. As one set of recent comments from Pennsylvania recounted:

> AM, an SSD recipient, was receiving Medicaid in Pennsylvania's Aged, Blind, Disabled category. When her child turned 21 and was no longer part of her Medicaid household, AM's full Medicaid was terminated, and she was left with only a Medicare Savings Program that covered her Part B premium and nothing else. This termination coincided with AM injuring her back and developing a blood infection. It also occurred while she was undergoing a course of prior approved Medicaid-covered dental work. AM has not been able to afford to have her back injury evaluated by an orthopedist and is currently in the hospital for the second time for the blood infection fully expecting to owe upwards of $20,000 for her inpatient stay. She was also forced to cancel her dental work. Because of the timing of the termination of her Medicaid, AM must wait

6008(b)(3) of the FFCRA, and the strong case law from the Second Circuit.

Finally, Defendant claims that Plaintiffs' harms are not "imminent" because they "provide no evidence that putative class members whose benefits changed sometime in the last two years are facing *certain* irreparable harm *today*," *Id.* at 5 (emphasis in original). But Defendant does not cite any case law that requires harm to be "certain" to qualify for injunctive relief. He also suggests, implausibly, that if harm has already occurred it cannot be imminent, even if it is still ongoing. Nevertheless, even fear of lack of access to treatment for a new condition no longer covered, because of the termination of Medicaid benefits, constitutes imminent irreparable harm in this Circuit. *See Laforest*, 376 F.3d at 55.

**A Nationwide Preliminary Injunction Will Bring Relief to the Entire Class.**

Defendant reiterates an argument already made to Judge Williams: "There now exists a real possibility that states would reject the FMAP increase rather than incur the enormous administrative and financial burden that could result if the Court granted class-wide relief, as shown by the recent comments of states in response to CMS's [Centers for Medicare & Medicaid Services] notice reopening the comment period for the Rule." Def.'s Suppl. Br. at 7. Not only has Judge Williams already essentially rejected this argument, Ruling at 9 n.11, but, as Plaintiffs previously pointed out, the argument contradicts the findings on which the agency itself rested the IFR: then, as now, CMS referenced some states' gripes about the burden of compliance, but noted that "it is not aware of any states or territories not currently claiming this temporary FMAP increase, or of *any* state or territory that intends to cease claiming it," 85 Fed. Reg. 71148

---

until January 2023 to be enrolled in and use a Medicare Advantage plan that might allow her to continue her dental treatment and help control her out of pocket costs.

Letter from Cmty. Legal Servs. of Phila. & Pa. Health Law Project, to Chiquita Brooks-LaSure, Director, CMS (Oct. 27, 2022), *available at* https://www.regulations.gov/comment/CMS-2020-0129-0286.

(emphasis added). The *post hoc* nature of Defendant's argument aside, it remains mere speculation. Not one of the nine state comments attached to Defendant's supplemental brief says they *intend* to relinquish supplemental funding under the FFCRA rather than comply with his original interpretation — only that it would be administratively difficult for them to comply. Those claims, moreover, are unsubstantiated by affidavits and Defendant has not elected to call any of the commenters as witnesses, or even sought to obtain declarations from them.

Finally, counsel's *post hoc* argument on brief ignores what the Defendant himself says in his September 27th Notice: the subsequent major infusion of "hundreds of billions of dollars" to the states under the American Rescue Plan Act, has made such departures even *less* likely now. "This funding," he observed, "may have mitigated the concerns that States had raised with CMS and that CMS had considered in issuing the IFR. *Accordingly, some of the reasons underlying the approach taken in the IFR may no longer apply.*" 87 Fed. Reg. 58457 (emphasis added).

As support for his argument that an injunction would do more harm than good, Defendant cites the recent rulemaking comments of the National Association of Medicaid Directors (NAMD) for the proposition that it would take "'up to 12 months'" for states to reinstate beneficiaries to their prior eligibility groups. Def.'s Suppl. Br. at 9. This argument conflates CMS's 12-month unwinding process for *cutting* benefits with the much more limited process for *restoring* benefits removed under the IFR. By Defendant's own explanation, the "unwinding process" requires states to individually reconsider *all* potential eligibility categories for all individuals before being cut off benefits after the PHE is over, and then to comply with due process prior to any ultimate terminations. *See id.* at 8 n.3. This process covers many times more people than the class, about 14 million compared with a few hundred thousand. *See* Jennifer Tolbert & Meghana Ammula, KFF, 10 Things to Know About the Unwinding of the Medicaid

Continuous Enrollment Requirement, Nov. 16, 2022, https://www.kff.org/medicaid/issue-brief/10-things-to-know-about-the-unwinding-of-the-medicaid-continuous-enrollment-requirement/. By contrast, under Plaintiffs' request, the states only need to restore Medicaid services to persons cut off due to the IFR. This process, as noted previously, requires *no* individualized assessment. Thus, restoration happened within days of the respective states being notified of the preliminary injunction for all of the Named Plaintiffs, and the same will apply to everyone else, even if it is "difficult" for states to implement.

**The Public Interest and Balance of Hardships Favor a Nationwide Preliminary Injunction.**

Defendant asserts that "Plaintiffs essentially ask the Court to order Defendant to restore the prior eligibility of thousands of beneficiaries, something Defendant does not have the authority to do." Def.'s Suppl. Br. at 9. But Defendant's notice states that he "may *require* States to offer Medicaid beneficiaries whose coverage was changed in a manner consistent with § 433.400 an opportunity to re-enroll in, or to have their enrollment changed back to, their prior coverage." 87 Fed. Reg. 58458 (emphasis added). In any event, this appears to be a misreading of the requested relief. If the Court applies the same relief ordered by Judge Williams, Ruling at 20, to the class, it would not be reordering resumption of coverage, but rather ordering the suspension of the IFR, the restoration of Defendant's original interpretation of the FFCRA, and the notification to the states of the reinstatement of the original interpretation. The *effect* is that states would be advised that, to maintain their supplemental funding, they would need to restore coverage, such that restoration would occur, as it readily has for all of the named Plaintiffs in three different states. That is something Defendant can do and *has* done.

Defendant again relies on hearsay to suggest dire consequences if the requested nationwide injunction is issued. Citing the comments of NAMD, Defendant argues that, "'if

10

states are required to undo policy that has been in place for nearly two years,' it will 'create new demands on already overtaxed state eligibility teams responsible for unwinding preparations . . . .'" Def.'s Suppl. Br. at 10-11 (citing NAMD's comment letter). But, in making this claim, he ignores the irreparable and ongoing daily harm for people who are going without access to healthcare. On the one hand is administrative burden, for which states have been generously compensated under the FFCRA.[3] On the other hand are low-income people facing lack of coverage for some or all of their health care.[4]

       The fact that potential class members are all low-income individuals who have qualified for Medicaid is of particular importance in the balancing. Thus, for example, in a case where a preliminary injunction was entered against CMS over its failure to comply with the APA's notice and comment requirements in promulgating a method of calculating hospital-specific supplemental Medicaid payment limits, the court noted "that 'there is a robust public interest in safeguarding access to health care for those eligible for Medicaid, whom Congress has

---

[3] *See* Elizabeth Williams, *Fiscal and Enrollment Implications of Medicaid Continuous Coverage Requirement During and After the PHE Ends*, KFF, May 10, 2022, https://www.kff.org/medicaid/issue-brief/fiscal-and-enrollment-implications-of-medicaid-continuous-coverage-requirement-during-and-after-the-phe-ends/ ("Over the three-year period from FY 2020 through FY 2022, we estimate that states will have received approximately $100.4 billion in fiscal relief due to the enhanced FMAP, which is more than double the total estimated state costs due to the additional MOE enrollees ($47.2 billion").

[4] Defendant also speculates that "Medicaid beneficiaries (including putative class members) could also be harmed if states are required to reinstate prior coverage for beneficiaries who were transferred to another eligibility group under the Rule. For example, because medical expenses may be considered in calculating benefits for other assistance programs such as SNAP, TANF and Child Care Assistance, reinstating prior eligibility may negatively impact the benefits some individuals receive from these other aid programs." Def's Suppl. Br. at 11 (citing Iowa Department of Health & Human Services' comment letter). But Congress made the decision that maintaining health insurance under Medicaid without reduction in benefits, unless the person *asked* to go off of those benefits, was the priority and chose to prohibit only cuts to Medicaid benefits during the PHE. Indeed, under Defendant's theory, no one should have been maintained on Medicaid because they might have then disqualified themselves from some other benefit programs. Defendant is essentially disagreeing with Congress that maintaining Medicaid is the priority. Reliance upon speculative harm to a very small number of people does not override the balancing already made by Congress.

11

recognized as "the most needy in the country." ' " *Texas Children's Hospital v. Burwell*, 76 F. Supp. 3d 224, 246 (D.D.C. 2014) (internal quotes omitted).

As articulated by Pennsylvania advocates, the balance tips decidedly in favor of members of the plaintiff class here, all of whom are or have been Medicaid enrollees:

> The clients described above, and thousands of other Pennsylvanians like them who have lost access to the Medicaid benefits they were entitled to receive under the FFCRA, have suffered through a public health crisis without access to critical health care services. They have suffered while the state has received an estimated 300% *more* in federal Medicaid dollars than it has spent to comply with FFCRA's MOE requirements during the public health emergency . . . .
>
> The harm suffered by those who have been unlawfully disenrolled from Medicaid greatly outweighs any administrative burden of reenrolling them. To comply with the FFCRA's mandate, states will need to restore Medicaid to all those whose Medicaid was terminated or reduced during the PHE and who still live in the state. Pennsylvania has easily accessible information about people's state residency. The state's Medicaid agency, the Pennsylvania Department of Human Services, also administers the state's SNAP, TANF, LIHEAP, and childcare subsidy programs, all of which include state residency information. In addition, the state uses the National Change of Address database and receives data that includes address information from a variety of sources, including the Social Security Administration and others.

Letter from Cmty. Legal Servs. of Phila. & Pa. Health Law Project, to Chiquita Brooks-LaSure, Director, CMS (Oct. 27, 2022), *available at* https://www.regulations.gov/comment/CMS-2020-0129-0286.

Finally, equitable principles would support a ruling by this Court, having found that the rule at issue is almost certainly invalid as having been issued in violation of the APA, and having enjoined its application for five individuals in three states for that reason, that it would remedy the plight of those other individuals in these states and other states similarly situated. Even if this were not a class action, courts, in APA cases, recognize that a plaintiff with standing may challenge the entirety of a rule that is procedurally defective, *Sierra Club v. Adams*, 578 F.2d 389, 392 (D.C. Cir. 1978) (plaintiff with standing "entitled to raise other inadequacies" in regulatory document based on public interest), and that "'[w]hen a reviewing court determines

12

that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual [plaintiffs] is proscribed.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998); *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 37 (D.D.C. 2020) ("because Defendants unlawfully failed to comply with the APA's notice-and-comment requirements, the [Interim Final] Rule must be vacated"). The Second Circuit has recognized that a nationwide preliminary injunction may be appropriate provided (as here) there is no conflict with any other pending litigation challenging the same rule. *See New York v. DHS*, 969 F.3d 42, 88 (2d Cir. 2020).[5] It is not in the public interest for a uniform federal rule already ruled likely unlawful to be applied arbitrarily to some small set of individuals but not others, simply because the former were able to find counsel to represent them as named plaintiffs.

**Defendant's Reliance upon Chevron Deference to Defeat Plaintiffs' Substantive APA Claim Fails on Multiple Levels.**

Defendant repeats his earlier arguments that his reversal on the meaning of Section 6008(b)(3) is entitled to *Chevron* deference. Def.'s Suppl. Br. at 12. Plaintiffs have previously explained that Defendant's interpretation fails at *Chevron* step one: using the "ordinary tools of statutory construction," Defendant's interpretation exceeds the limited ambiguity the statute allows. We will not repeat those arguments here. *See* Pls.' PI Br. at 30-32; Pls.' PI Reply Br., at 3-7. But even assuming the existence of an ambiguity that would otherwise qualify the regulation

---

[5] Examples where federal courts have entered nationwide preliminary injunctions after finding a uniform federal rule to have been issued in violation of the APA, without a class action having been certified or even sought, abound. *See, e.g. Pangea Legal Services v. DHS*, 512 F. Supp. 3d 966 (N.D. Cal. 2021); *Marland v. Trump,* 498 F. Supp. 3d 624 (E.D. Pa. 2020); *District of Columbia v. U.S. Department of Agriculture*, 444 F. Supp. 3d 1 (D.D.C. 2020). While this case readily meets the standards for such an injunction in the Second Circuit as set forth in *New York v. DHS*, if the Court certifies the requested class, it need not consider the non-class case law because it would be entering relief for everyone directly before it as absent class members.

for *Chevron* deference, Defendant's claim here fails on multiple levels.

First, Defendant's failure to employ prior notice and comment procedures disqualifies the agency from invoking *Chevron* deference. "*Chevron* deference is not warranted where the regulation is 'procedurally defective' — that is, where the agency errs by failing to follow the correct procedures in issuing the regulation." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 220 (2016). As the Supreme Court held in that case, "where a proper challenge is raised to the agency procedures, and those procedures are defective, a court should not accord *Chevron* deference to the agency interpretation." *Id.* As Judge Williams has found, the agency's failure to follow notice and comment procedures was a fatal procedural defect; indeed, so fatal that he found it unnecessary to consider Plaintiffs' substantive APA claim. Ruling at 17.

Second, even assuming Defendant was not disqualified from raising a *Chevron* defense, the interpretation offered on brief, was, as Plaintiffs have previously shown, the *post-hoc* creation of counsel, rendering the interpretation unreasonable. Pls.' PI Reply Br. at 5. Defendant responds that "Plaintiffs appear to confuse arbitrary and capricious review (where it may be relevant whether a reason offered by the agency is post-hoc) with review of an agency's construction of a statute (where it is not)." Def.'s Suppl. Br. at 12. But this misstates the relevant law. There is no daylight between an impermissible interpretation at *Chevron* step two and an "arbitrary and capricious" interpretation.

As the Supreme Court stated in *Encino Motors,* "an arbitrary and capricious regulation . . . receives no *Chevron* deference." *Id*. at 221. The District of Columbia Circuit, which gets its fill of APA cases, has repeatedly stated that, in determining whether an agency's interpretation of an ambiguous statutory provision is reasonable, it will consider whether the agency's interpretation satisfies the "arbitrary and capricious" standard. *Nat. Ass'n of Regulatory Utility Commissioners*

14

*v. ICC*, 41 F.3d 721, 726–27 (D.C. Cir. 1994) (recognizing that *Chevron* step two "overlaps analytically" with arbitrary and capricious review under the APA); *Shays v. Federal Election Com'n*, 414 F. 3d 76, 96 (D.C. Cir. 2005); *Chamber of Commerce of the U.S. v. FEC*, 76 F.3d 1234, 1235 (D.C. Cir.1996) (*citing Nat'l Ass'n of Regulatory Utility Comm'rs v. ICC*, 41 F.3d 721, 726-27 (D.C. Cir.1994)); *Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D. C. Cir. 2000); *Gen. Am. Transp. Corp. v. ICC*, 872 F.2d 1048, 1053 (D.C. Cir.1989); *South Coast Air Quality Management Dist. v. EPA*, 554 F. 3d 1076, 1080 (D.C. Cir. 2009).

Defendant implicitly concedes that *post hoc* rationale of counsel may render the agency's decision arbitrary. *See* Defs' Suppl. Br. at 12. But, as shown above, Defendant's reliance on counsel's *post hoc* explanation for the agency's changed interpretation of a statute also renders the interpretation impermissible under *Chevron* step two. This follows from the nature of *Chevron*, which grants deference to the *agency'*s interpretation. Thus, where an agency relies on a court's determination of a statute's meaning, rather than its *own* interpretation, it is not entitled to *Chevron* deference. *Sea-Land Service, Inc. v. Department of Transportation*, 137 F.3d 640, 646 (D.C. Cir. 1998); *Prill v. N.LR.B.*, 755 F.2d 941, 947 (D.C. Cir. 1985). Counsel's *post hoc* explanation for the agency's changed interpretation fails for the same reason. Final agency action can only be sustained on the basis of the agency's own stated rationale. *Burlington Truck Lines, Inc. v. United States*, 371 US 156, 168-69 (1962) ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action; *Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself").

Finally, even ignoring the post hoc nature of the interpretation offered by agency counsel, that interpretation is implausible. Plaintiffs have explained why previously and will not repeat those arguments here. Pls.' PI Br. at 30-34; Pls.' Reply PI Br. at 4-7.

DATED:  December 2, 2022　　　　　　　　　　Respectfully Submitted,

/s/Sheldon V. Toubman
SHELDON V. TOUBMAN
Fed Bar No. ct08533
Phone: (475)345-3169
E-mail: sheldon.toubman@disrightsct.org
DEBORAH A. DORFMAN (Admitted *Pro Hac Vice*)
CT Juris No. 442946
Phone: (860)469-4463
E-mail: deborah.dorfman@disrightsct.org
Disability Rights Connecticut
846 Wethersfield Avenue
Hartford, CT 06114

CAROL A. WONG (Admitted *Pro Hac Vice*)
DC Bar No. 1035086
Justice in Aging
1444 I Street, NW, Suite 1100
Washington, DC  20005
Phone: (202) 683-1995
E-mail: cwong@justiceinaging.org
REGAN BAILEY (Admitted *Pro Hac Vice*)
DC Bar No. 465677
Justice in Aging
1444 I Street, NW, Suite 1100
Washington, DC  20005
Phone: (202) 683-1990
E-mail: rbailey@justiceinaging.org

JANE PERKINS (Admitted *Pro Hac Vice*)
NC Bar No. 9993
CA Bar No. 104784
Email: perkins@healthlaw.org
MIRIAM HEARD (Admitted *Pro Hac Vice*)
NC Bar. No. 39747
Email: heard@healthlaw.org
National Health Law Program
1512 E. Franklin St., Ste. 110
Chapel Hill, NC 27514
Phone: (984) 278-7661

        HARVEY L. REITER (Admitted *Pro Hac Vice*)
        STINSON LLP
        1775 Pennsylvania Avenue, N.W.
        Suite 800
        Washington, D.C. 2006
        Email: harvey.reiter@stinson.com
        Phone: (202)728-3016
        Fax: (202)572-9968

        PLAINTIFFS' COUNSEL

### Certificate of Service

I hereby certify that on December 2, 2022, a copy of the foregoing document was filed electronically and served by overnight delivery to anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by overnight delivery to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

        *s/Sheldon V. Toubman*
        Sheldon V. Toubman