UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEBORAH CARR, BRENDA MOORE, MARY ELLEN WILSON, MARY SHAW, and CAROL KATZ, on behalf of themselves and those similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>XAVIER BECERRA, SECRETARY, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>*Defendant*. | No. 3:22cv988(MPS) |

RULING ON MOTIONS FOR CLASS CERTIFICATION
AND PRELIMINARY INJUNCTION

I.     **Introduction**

On November 6, 2020, the Centers for Medicare & Medicaid Services issued an Interim Final Rule ("IFR") changing its interpretation of Section 6008(b)(3) of the Families First Coronavirus Response Act ("FFCRA"), a provision governing Medicaid benefits.  The named Plaintiffs, five Medicaid recipients, allege they experienced a reduction in their medical benefits as a result of the IFR and filed suit against the Secretary of Health and Human Services, alleging that the IFR violates procedural and substantive provisions of the Administrative Procedure Act, 5 U.S.C. §§ 553 & 701 *et seq*.  ECF No. 43.  On November 7, 2022, U.S. District Judge Omar A. Williams granted the Plaintiffs' motion for preliminary injunction in part, ordering the Defendant to "refrain from enforcing the IFR with respect to the named plaintiffs for the pendency of this action, and to reinstate its previous guidance with respect to the named plaintiffs," and "to inform

. . . the relevant state agencies of this revised position with respect to the named plaintiffs."[1]  ECF No. 77 at 20.

In the interim, the Plaintiffs filed an amended complaint with class action allegations and moved to certify a nationwide class of Medicaid recipients and for appointment of their lawyers as class counsel under Fed. R. Civ. P. 23.  ECF Nos. 43, 44.  They also sought a preliminary injunction for the class.  ECF No. 79.  I permitted supplemental briefing on whether, should the Court certify a class, the injunction granted in Judge Williams's order, or some other injunctive relief requested by the Plaintiffs, should be extended to the entire class.  ECF No. 81.  I also held a hearing on that issue and on the motion for class certification on December 6, 2022.  ECF No. 94.  For the reasons that follow, I grant the motion for class certification, although I narrow the proposed class to address standing issues; I also appoint Plaintiffs' counsel as class counsel and grant injunctive relief to the class through March 31, 2023, the last day upon which the IFR will affect the class.

## II.    Factual Background

The following facts are drawn from the operative complaint, the parties' briefs on the Plaintiffs' motions for preliminary injunction and class certification, and the accompanying affidavits and exhibits.

Medicaid "is a cooperative federal-state program designed to provide medical assistance to persons whose resources are insufficient to meet the costs of their necessary medical care." *Davis v. Shah*, 821 F.3d 231, 238 (2d Cir. 2016).  Medicaid offers benefits not normally covered by Medicare, like nursing home care and personal care services. https://www.medicare.gov/basics/costs/help/medicaid.   "On the federal level, the program is

---

[1] Because of my trial schedule, I referred the motion to Judge Williams, with his consent, as he was duty judge at the time.  ECF No. 59.

administered by the Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS")." *Id.* While a State is not required to participate in the program, all states do. *Texas v. Comm'r of Internal Revenue*, __ U.S.___, 212 L. Ed. 2d 413, 142 S. Ct. 1308 (2022). "Participating states must comply with the requirements of the Medicaid Act and implementing regulations promulgated by [HHS]." *Olson v. Wing*, 281 F. Supp. 2d 476, 480 (E.D.N.Y.), *aff'd*, 66 Fed. App'x 275 (2d Cir. 2003). Medicaid is funded jointly by the federal government and the states. 42 U.S.C. § 1396d(a). "Once the federal government approves a state Medicaid plan, it then subsidizes a significant portion of the cost of the coverage - including optional services that the state has agreed to provide." *Rodriguez v. City of New York*, 197 F.3d 611, 613 (2d Cir. 1999). This subsidized portion is called the federal medical assistance percentage ("FMAP"). 42 U.S.C. § 1396b(a)(1).

## A.     Section 6008(b)(3) of the FFCRA

The FFCRA was enacted on March 18, 2020 in response to the COVID-19 public health emergency. Pub. L. No. 116-127 (2020). Under § 6008(b)(3) of the FFCRA, states receive a temporary, optional 6.2% increase in the FMAP for their Medicaid programs if they meet certain conditions. *Id.* A state may not receive the increased FMAP if:

> the State fails to provide that an individual who is enrolled for benefits under such plan (or waiver) as of the date of enactment of this section or enrolls for benefits under such plan (or waiver) during the period beginning on such date of enactment and ending the last day of the month in which the emergency period described in subsection (a) ends shall be treated as eligible for such benefits through the end of the month in which such emergency period ends unless the individual requests a voluntary termination of eligibility or the individual ceases to be a resident of the State.

§ 6008(b)(3). The "emergency period described in subsection (a)" refers to the COVID-19 public health emergency, which was declared by the Secretary on January 31, 2020, and which the

Secretary may extend — and has to date extended — at 90-day intervals.[2]

1.      **CMS's Original Interpretation of § 6008(b)(3)**

Beginning shortly after the adoption of the FFCRA, CMS informed the states that to receive the increased FMAP under § 6008(b)(3), they were required to provide "continuous coverage, through the end of the month in which the emergency period ends, to all Medicaid beneficiaries who were enrolled in Medicaid on or after March 18, 2020, regardless of any change in circumstances or redeterminations that would otherwise result in termination."  ECF No. 3-5 at 8. Under this continuous coverage requirement, a state had to keep beneficiaries enrolled in Medicaid, if they were enrolled on or after March 18, 2020, with the "same amount, duration, and scope of benefits" through the end of the month in which the COVID–19 public health emergency ends.  Additional Policy and Regulatory Revisions in Response to the COVID-19 Public Health Emergency, 85 Fed. Reg. 71,142, 71,160 (Nov. 6, 2020).  A state could not terminate coverage for any beneficiary enrolled in Medicaid during the emergency period unless the beneficiary voluntarily requested to be disenrolled or was no longer a resident of the state.  ECF No. 3-5 at 8. Further, if the state received information that would make a beneficiary eligible for a different eligibility group with fewer benefits, greater cost sharing, or increased beneficiary liability, the state could not transition that beneficiary to the new eligibility group but had to maintain the beneficiary's enrollment in the existing eligibility group.  ECF No. 3-5 at 9, ECF No. 43 at 84. States could not subject beneficiaries to any increase in cost sharing or beneficiary liability for

---

[2] Specifically, a public health emergency ("PHE") declaration lasts until the Secretary declares that the PHE no longer exists or upon the expiration of the 90-day period beginning on the date the Secretary declared a PHE exists, whichever occurs first. The Secretary may extend the PHE declaration for subsequent 90-day periods for as long as the PHE continues to exist and may terminate the declaration whenever he determines that the PHE has ceased to exist. 42 U.S.C. § 247d(a).  On January 11, 2023, the Secretary renewed the declaration of a PHE through April 11, 2023.  https://www.cnn.com/2023/01/11/politics/covid-19-public-health-emergency/index.html

institutional services or other long-term services and supports during this time period.  ECF No. 3-5 at 41.

### 2.      The IFR and 42 C.F.R. § 433.400

In its November 6, 2020 IFR, now codified at 42 C.F.R. § 433.400, CMS announced a new - and very different - interpretation of section 6008(b)(3).  Additional Policy and Regulatory Revisions in Response to the COVID-19 Public Health Emergency, 85 Fed. Reg. 71,142, 71,160-67 (Nov. 6, 2020).  In the preamble, CMS stated that "the language in section 6008(b)(3) of the FFCRA is somewhat ambiguous" and that CMS's "current interpretation was not the only possible interpretation that could be made."  85 Fed. Reg. 71,142, 71,160.  According to CMS, states expressed concern that CMS's interpretation of section 6008(b)(3) makes it "challenging for them to manage their Medicaid programs effectively" and "severely limits state flexibility to control program costs in the face of growing budgetary constraints and developing fiscal challenges during the emergency period." 85 Fed. Reg. 71,142, 71,161.  Further, states reported that CMS's interpretation "interfered with their ability to implement cost-saving decisions in the face of increasing beneficiary enrollment and declining state revenue."  85 Fed. Reg. 71,142, 71,163. After considering various possible interpretations of section 6008(b)(3), CMS stated that it had adopted a new approach that would give states "more flexibility" to manage their Medicaid programs.  85 Fed. Reg. 71,142, 71,162-63.  The new regulation, 42 C.F.R. § 433.400, provides that to claim the temporary FMAP increase, a state must meet the requirements in paragraph (c)(2):

> (c)(2) Except as provided in paragraph (d) of this section, for all beneficiaries validly enrolled[3] for benefits under the state plan, a waiver of such plan, or a

---

[3] The regulation defines "validly enrolled" as meaning that "the beneficiary was enrolled in Medicaid based on a determination of eligibility. A beneficiary is not validly enrolled if the agency determines the eligibility was erroneously granted at the most recent determination, redetermination, or renewal of eligibility (if such last redetermination or renewal was completed prior to March 18, 2020) because of agency error or fraud (as evidenced by a fraud conviction) or abuse (as determined following the completion of an investigation

demonstration project under section 1115(a) of the Act as of or after March 18, 2020, the state must maintain the beneficiary's enrollment as follows, through the end of the month in which the public health emergency for COVID-19 ends:

(i)(A) For beneficiaries whose Medicaid coverage meets the definition of MEC[4] in paragraph (b) of this section as of or after March 18, 2020, the state must continue to provide Medicaid coverage that meets the definition of MEC, except as provided in paragraph (c)(2)(i)(B) of this section.

> (B) For beneficiaries described in paragraph (c)(2)(i)(A) whom the state subsequently determines are eligible for coverage under a Medicare Savings Program eligibility group[5], the state satisfies the requirement described in paragraph (c)(2) of this section if it furnishes the medical assistance available through the Medicare Savings Program.

(ii) For beneficiaries whose Medicaid coverage as of or after March 18, 2020 does not meet the definition of MEC in paragraph (b) of this section but does include coverage for testing services and treatments for COVID–19, including vaccines, specialized equipment, and therapies, the state must continue to provide Medicaid coverage that includes such testing services and treatments.

(iii) For beneficiaries not described in paragraph (c)(2)(i) or (ii) of this section, the state must continue to provide at least the same level of medical assistance as was provided as of or after March 18, 2020…..

42 C.F.R. § 433.400(c).  The regulation goes on to set forth certain "exceptions," two of which

are relevant here:

> (d) Exceptions.

---

pursuant to §§ 455.15 and 455.16 of this chapter) attributed to the beneficiary or the beneficiary's representative, which was material to the determination of eligibility." 42 C.F.R. § 433.400(b).

[4] The regulation defines "minimum essential coverage" ("MEC") as having "the meaning provided under section 5000A(f)(1) of the Internal Revenue Code and implementing regulations at 26 CFR 1.5000A–2 and includes minimum essential coverage determined by the Secretary under 26 CFR 1.5000A–2(f)." 42 C.F.R. § 433.400(b).  MEC includes: an employer-sponsored coverage, a plan offered in an individual market within a state, a grandfathered health plan or other coverage that the Secretary recognizes as Minimum Essential Coverage, Medicare Part A coverage, and coverage under a Medicare Savings Program eligibility group, see n.5.  26 U.S.C. § 5000A(f).

[5] The Medicare Savings Program ("MSP") helps low-income Medicare-eligible beneficiaries pay for Medicare premiums and sometimes cost-sharing. 42 C.F.R. § 433.400(b).  MSPs provide different levels of assistance based on income.  The MSP eligibility groups are: Qualified Medicare Beneficiary ("QMB") Program, Specified Low Income Beneficiary ("SLMB") Program, Qualified Individual ("QI") Program, and Qualified Disabled Working Individual (QDWI) Program. https://www.medicaid.gov/medicaid/eligibility/seniors-medicare-and-medicaid-enrollees/index.html

(1) Consistent with the condition to claim the temporary FMAP increase described in paragraph (c)(2) of this section, a state may terminate a beneficiary's Medicaid enrollment prior to the first day of the month after the public health emergency for COVID–19 ends in the following circumstances:

(i) The beneficiary or the beneficiary's representative requests a voluntary termination of eligibility;

(ii) The beneficiary ceases to be a resident of the state; or

(iii) The beneficiary dies.

(2) States which have elected the option under section 1903(v)(4) of the Act to provide full benefits to lawfully residing children or pregnant women must limit coverage for such beneficiaries if they no longer meet the definition of a lawfully residing child or pregnant woman under such section to services necessary for treatment of an emergency medical condition, as defined in section 1903(v)(3) of the Act.

42 C.F.R. § 433.400(d).

As indicated, the IFR divides Medicaid coverage programs into three tiers: (1) benefit packages that provide Minimum Essential Coverage ("MEC"), (2) packages that do not provide MEC but do provide COVID-19 treatment and testing, and (3) packages that do neither.  42 C.F.R. § 433.400(c)(2)(i) –(iii).  CMS takes the position that, under the IFR, if an individual in the highest tier – the MEC tier in § 433.400(c)(2)(i) - becomes ineligible for the group in which she is currently enrolled – for example, due to age – but qualifies for a MSP program, the state *must* transition her to the MSP, even if the benefit package is less comprehensive because MSPs meet the definition of MEC.  ECF No. 45 at 14; ECF No. 3-5 at 190.  Therefore, under the IFR, a Medicaid beneficiary who turns 65 and becomes eligible for Medicare would be switched to the MSP (as long as she met the income requirements) and would lose full Medicaid coverage in favor of Medicare, thus losing access to benefits that are covered only by Medicaid. https://www.medicare.gov/basics/costs/help/medicaid ("Medicaid offers benefits not normally covered by Medicare, like nursing home care and personal care services."); 85 Fed. Reg. 71,142, 71,165 ("unless that beneficiary was also eligible for another full-benefit Medicaid eligibility

group, all of the beneficiary's health care services would be provided through Medicare and the beneficiary would not receive any other Medicaid covered services."); ECF No. 43 ¶¶ 63, 66.

The second tier is Medicaid coverage that does not meet the definition of MEC but does include coverage for testing services and treatments for COVID-19. § 433.400(c)(2)(ii).  If an individual falls in this tier, the state must transition the individual to a new eligibility group if the new group offers MEC (tier one) or provides COVID-19 testing or treatment.  85 Fed. Reg. 71,142, 71,165; ECF No. 45 at 14.

The third tier is Medicaid coverage that does not meet the requirements of tier one or tier two because it is not MEC and does not include testing and treatment for COVID-19.  § 433.400(c)(2)(iii).  If an individual becomes ineligible for the tier three group in which she is enrolled and becomes eligible for another group within tier three, the state cannot transition the individual to the new eligibility group.  85 Fed. Reg. 71,142, 71,165.

Under § 433.400(c)(3), states may generally make changes to benefits offered under the state plan. 85 Fed. Reg. 71,142, 71,166.  For example, the IFR does not prohibit a state from eliminating an optional benefit from its state plan. Therefore, a state could eliminate dental services for individuals age 21 and above, and still comply with section 6008(b)(3) of the FFCRA.  *Id.*

In addition, under § 433.400(d)(2), states that have elected to provide Medicaid coverage to non-citizens legally present in the United States less than five years and who are children or pregnant women must limit services to those necessary for the treatment of an emergency medical condition when they no longer meet the eligibility criteria in 42 U.S.C. § 1396b(v)(4)(A) – that is, when they are no longer under 21 or are no longer pregnant.  85 Fed. Reg. 71,142, 71,167.

Finally, the IFR expanded the categories of individuals states should terminate from Medicaid.   Under § 433.400(c)(2), states may disenroll beneficiaries who were not "validly

enrolled" at the time of the passage of the FFCRA.  See, *supra*, footnote 3; 85 Fed. Reg. 71,142, 71,164.  "[P]rior to termination, however, the state must complete a redetermination consistent with 42 CFR 435.916 and provide the beneficiary with advance notice and the opportunity for a fair hearing consistent with 42 C.F.R. part 431, subpart E."  *Id.*

The IFR, which became effective immediately upon being promulgated, was issued without following the notice and comment procedures under the Administrative Procedure Act. 85 Fed. Reg. 71,142, 71,181.  CMS stated that there was good cause for it to waive the advance notice and comment requirement because it was "immediately necessary to ensure that states can determine eligibility and provide care and services during the PHE in a manner that is consistent with simplicity of administration and the best interests of beneficiaries and also claim the temporary funding increase."  *Id.*

**B.      Named Plaintiffs**

The named Plaintiffs all suffer from serious medical conditions.[6]  As a result of the IFR, Plaintiffs Carr, Moore, Wilson, and Shaw were transitioned to a MSP under § 433.400(c)(2)(i)(B). *See* ECF No. 3-2 at 6, Notice to Carr ending her Medicaid and enrolling her in MSP; ECF No. 3-3 at 1, Notice to Moore ending her Medicaid and enrolling her in MSP; ECF No. 3-4 at 5, Notice to Wilson discontinuing her coverage under Medicaid because she was enrolled in the MSP; ECF No. 44-3 at 9, Notice to Shaw, stating that Medicaid coverage would be terminated and that she was eligible for payment of Medicare Part B premiums through a MSP.  Plaintiff Katz, who was

---

[6] Deborah Carr suffers from a progressive neurological condition and needs assistance with dressing, bathing, toileting, and eating.  She has received home health services under Medicaid for  years.  ECF No. 43 ¶ 114.  Brenda Moore suffers from a severe vascular condition and requires daily assistance with bathing, dressing, transferring and toileting, and meal preparation.  *Id.* ¶ 118.  Mary Ellen Wilson has multiple sclerosis and dental complications related to decades of anti-seizure medication usage.  *Id.* ¶ 123.  Mary Shaw was treated for cancer and suffers from emphysema. *Id.* ¶¶ 131-32.  Carol Katz has severe rheumatoid arthritis, COPD, lung nodules, high blood pressure, fibromyalgia, a carotid artery occlusion, cerebrovascular disease, dilation of the aorta, muscle weakness and an anxiety disorder.  *Id.* ¶ 136.

on the QMB[7] MSP, was switched to a different MSP - SLMB - which provides less coverage because it only pays for Medicare Part B premiums.  ECF No. 43 ¶¶ 142, 144; ECF No. 44-4 at 4, 6, Notice to Katz switching her from QMB to SLMB.  The Plaintiffs allege that the transfer mandated by the IFR deprived them of access to coverage for health services they needed and each has submitted evidence as to her loss in coverage and reduction of needed benefits.[8]  *See* ECF No. 3-2 at 2, Carr Decl. (loss of home health care services); ECF No. 3-3 at 1, Moore Decl. (loss of personal care assistant); ECF No. 3-4 at 3, Wilson Decl. (loss of benefits that were covered by Medicaid, including dental coverage and transportation to medical appointments); ECF No. 44-4 at 4, Katz Decl. (loss of coverage for cost-sharing under Medicare for her doctor visits and the costs for her needed infusion treatments); ECF No. 44-3 at 4, Shaw Decl. (foregoing treatment for emphysema, dental work and potential cancerous growth because she is unable to pay for the co-pays).

**C.     CMS Reexamines its Interpretation**

In September 2022, after the Plaintiffs filed this lawsuit, CMS issued a notice that it was reexamining its interpretation of the IFR.  Medicaid Program; Temporary Increase in Federal Medical Assistance Percentage ("FMAP") in Response to the COVID-19 Public Health Emergency ("PHE"); Reopening of Public Comment Period, 87 Fed. Reg. 58,456 (Sept. 27, 2022) ("Supplemental Notice").  CMS explained that it had "become aware that the IFR's implementation of Section 6008(b)(3) of the FFCRA has negatively affected some Medicaid beneficiaries." 87 Fed. Reg. 58,456, 58,457.  CMS specifically recognized "the potential loss of

---

[7] The QMB program helps low-income Medicare beneficiaries pay for Medicare Part A and Part B premiums, deductibles, and co-insurance. The SLMB program helps pay for Medicare Part B premiums. https://www.medicare.gov/basics/costs/help/medicare-savings-programs#collapse-2625 (last visited Jan. 4, 2023).

[8] Judge Williams made factual findings, which I adopt and incorporate by reference, as to each of the named Plaintiffs on this point.  ECF No. 77 at 4 - 7.

Medicaid benefits that could be experienced by beneficiaries" transitioned to a MSP from an eligibility group providing full Medicaid coverage.  *Id.*  CMS also noted that the "fiscal situations of many States may have changed since the IFR was issued" as a result of federal appropriations. *Id.*  Given these circumstances, CMS stated that it was considering whether § 433.400 should be rescinded and whether CMS should return to its original interpretation from the spring of 2020 under which "to be eligible for the temporary FMAP increase, a State would be required to keep its beneficiaries enrolled in Medicaid, if they were enrolled as of, on, or after March 18, 2020, and would not be permitted to reduce the amount, duration, or scope of their benefits or modify their cost sharing . . . ." *Id.*  CMS "plans to review the IFR to determine if consideration of the comments we received and changed circumstances warrant adopting the original interpretation of section 6008(b)(3) of the FFCRA in its final rulemaking."  87 Fed. Reg. 58,456, 58,458.  According to CMS, if it decides to revert back to its original interpretation, "it may require States to offer Medicaid beneficiaries whose coverage was changed in a manner consistent with § 433.400 an opportunity to re-enroll in, or to have their enrollment changed back to, their prior coverage." *Id.*

The Defendant has submitted comment letters to CMS from various states in response to the Supplemental Notice reflecting these States' opposition to the proposal because of the administrative cost and burden associated with "undoing" the steps they had taken to implement the IFR, especially in light of the anticipated unwinding from the enrollment requirements of FFCRA and returning beneficiaries to their normal eligibility groups once the PHE ends. ECF No. 85-1 at 2-48.  The Plaintiffs charge that these comment letters are hearsay and may not be considered by the Court.  ECF No. 93 at 7.

D.    **Subsequent Legislation**

On December 29, 2022, after the parties briefed the issues of class certification and

injunctive relief, President Biden signed into law the Consolidated Appropriations Act, 2023 (the "CAA"), which amends section 6008(b)(3) of the FFCRA. Pub. L. 117–328.  In particular, the CAA provides that section 6008(b)(3) terminates on March 31, 2023, rather than at the end of the PHE.[9]  This means that starting April 1, 2023, states may terminate coverage for beneficiaries who are no longer eligible, following a redetermination.  § 5131 of the CAA.  It also means that the provisions of the IFR challenged by Plaintiffs will cease to have any impact after March 31, 2023.  Starting April 1, 2023, the CAA phases out the 6.2% FMAP increase, with the increase fully eliminated after December 31, 2023.  *Id.*  https://www.medicaid.gov/sites/default/files/2023-01/cib010523_1.pdf.  As a condition of receiving the phased-down FMAP increases, states must satisfy a number of requirements, including conducting renewals in accordance with all federal requirements.  *Id.*

### III.    Discussion

The Plaintiffs allege that the IFR is unlawful because (1) the Defendant promulgated it without notice and comment in violation of 5 U.S.C. § 553 and cannot show good cause for dispensing with the notice-and-comment requirement, and/or (2) it is inconsistent with section 6008(b)(3) of the FFCRA.  They also move to certify the following nationwide class of individuals whose Medicaid benefits were "terminated or reduced to a lower level":

> All individuals who were enrolled in Medicaid in any state or the District of Columbia on March 18, 2020 or later and had their Medicaid eligibility terminated or reduced to a lower level of benefits on or after November 6, 2020, or will have their Medicaid eligibility terminated or reduced to a lower level of benefits prior to a redetermination conducted after the end of the Public Health Emergency, for a

---

[9] As amended by the CAA, section 6008(b)(3) states that a beneficiary who "is enrolled for benefits under such plan (or waiver) as of March 18, 2020, or enrolls for benefits under such plan (or waiver) during the period beginning on March 18, 2020, and ending March 31, 2023, shall be treated as eligible for such benefits through March 31, 2023, unless the individual requests a voluntary termination of eligibility or the individual ceases to be a resident of the State."  See Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Division FF, Title V, Subtitle D, § 5131, 136 Stat. 4459 (available at https://www.congress.gov/bill/117th-congress/house-bill/2617/text).

reason other than moving out of the state or the District (including through death) or voluntarily disenrolling from benefits.

ECF No. 43 ¶ 29; ECF No. 44-1 at 14.

The Defendant argues the Court should deny the motion for class certification because the proposed class (1) lacks standing, (2) is not ascertainable, (3) does not meet the commonality and typicality requirements of Rule 23(a), and (4) does not satisfy Rule 23(b)(2).  ECF No. 58.

## A.      Standing

"For a federal court to have subject-matter jurisdiction, the parties must have standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  To meet the Article III standing requirement, a plaintiff must have suffered an "injury in fact"; the injury must be "fairly traceable" to the challenged action; and the injury must be "likely" redressable by a favorable decision.  *Id.* at 560-61.

### 1.      Injury in Fact

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotations and citation omitted).  The "threatened injury must be certainly impending to constitute injury in fact and [a]llegations of possible future injury are not sufficient." *Am. C.L. Union v. Clapper*, 785 F.3d 787, 800 (2d Cir. 2015) (internal quotation marks and citation omitted).

"The filing of suit as a class action does not relax [the] jurisdictional requirement" of standing.  *Denney v. Deutsche Bank AG,* 443 F.3d 253, 263 (2d Cir. 2006)*.*  While each member of a class is not required to submit evidence of personal standing, "no class may be certified that contains members lacking Article III standing." *Id.* at 263-64.  In other words, the class "must ... be defined in such a way that anyone within it would have standing." *Id.* at 264.

**Named Plaintiffs**

The named Plaintiffs have adduced evidence that each of them experienced a reduction in benefits as a result of the transition to a MSP under § 433.400(c)(2)(i)(B), and, at the time they filed the original motion for a preliminary injunction, faced "certainly impending" injury, because they were incurring higher costs for their health care and/or choosing to forego needed medical care as a result of the change in coverage. *See* ECF No. 3-2 at 2, Carr Decl. (loss of home health care services which likely will result in institutionalization); ECF No. 3-3 at 1, Moore Decl. (same); ECF No. 3-4 at 3, Wilson Decl. (loss of benefits that were covered by Medicaid, including dental coverage and transportation to medical appointments); ECF No. 68-1 at 2, Katz Decl. (lost coverage for her infusion treatment for severe rheumatoid arthritis); ECF No. 44-3 at 4, Shaw Decl. (unable to afford appointments and ongoing treatment); ECF No. 77 at 4 -7.[10]  Thus, the Plaintiffs demonstrated an injury in fact to support the injunctive relief awarded by Judge Williams, and the Defendant does not argue otherwise.  ECF Nos. 44, 58, 77 at 9.

**Class Members**

The Plaintiffs contend that the proposed class is properly defined under *Denney* because each member has an injury in fact  - a reduction in the level of medical benefits.  In support of their argument that this suffices for standing, they point to *Whelan v. Colgan,* 602 F.2d 1060 (2d Cir. 1979), *United Steelworkers of America v. Textron, Inc*., 836 F.2d 6 (1st Cir. 1987), *Commc'ns Workers of Am., Dist. One, AFL-CIO v. NYNEX Corp*., 898 F.2d 887 (2d Cir. 1990), and *LaForest v. Former Clean Air Holding Co*., 376 F.3d 48 (2d Cir. 2004).[11]

---

[10] Here again, I adopt and incorporate by reference the specific findings made by Judge Williams.  ECF No. 77 at 4 -7.

[11] Although these cases concern injunctive relief, for present purposes, the standards governing Article III injury in fact and for injunctive relief are very similar.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) ("case-or-controversy considerations obviously shade into those determining whether the complaint

Upon a careful review of this case law, I am not persuaded that it sweeps as broadly as the Plaintiffs contend.

In *Whelan*, the defendants, three employer-designated trustees of a health and welfare fund, blocked payments of medical and welfare benefits to striking employees. *Whelan v. Colgan*, 602 F.2d 1060, 1061 (2d Cir. 1979). The district court granted a preliminary injunction ordering defendants to pay benefits to "[s]triking members of the Union and their dependents." *Id.* On appeal, the defendants challenged the lower court's finding of irreparable harm. *Id.* at 1062. The Second Circuit concluded, without discussion, that "the threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury." *Id.*

In *Textron*, a First Circuit case, the defendant ceased paying medical insurance premiums to retired former employees. *United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6, 7 (1st Cir. 1987). The Court of Appeals upheld the district court's grant of a preliminary injunction ordering the defendant to resume the payments. In affirming the district court's finding of irreparable harm, the Court considered:

> general facts that either are commonly believed or which courts have specifically held sufficient to show irreparable harm; such general facts as (1) most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life.

*Id.* at 8. In addition, the Court had before it an affidavit of a union official attesting to three of the

---

states a sound basis for equitable relief") (internal quotation marks and citation omitted); *Williams v. New York State Off. of Mental Health*, No. 10CV1022, 2011 WL 2708378, at *3 (E.D.N.Y. July 11, 2011) ("The requirement that Plaintiff be under threat of suffering injury in fact . . . is akin conceptually to the showing of irreparable harm necessary for the issuance of an injunction.") (internal quotation marks and citation omitted).

retirees who needed medical care and had suffered financial loss as a result of the termination of benefits. *Id.* (noting one "was hospitalized with a brain tumor and died", leaving his wife with unpaid bills). The Court concluded that there was "adequate support for the district court's finding of 'irreparable harm' in respect to loss of medical benefits." *Id.* at 9.

Like *Whelan*, *NYNEX* involved striking union members. *Commc'ns Workers of Am., Dist. One, AFL-CIO v. NYNEX Corp.*, 898 F.2d 887 (2d Cir. 1990). The defendant employer terminated medical coverage and unlawfully conditioned the provision of COBRA continuation coverage "on the payment of the initial premium for such continuation coverage." *Id.* at 890. NYNEX took the position that, until the striking workers electing continuation coverage had actually paid the premium, they were not covered, and NYNEX so informed health care providers. *Id.* NYNEX's agent, CobraServ, omitted from its weekly listing to providers of insured employees all employees who had elected continuation coverage but had not yet paid the premium. *Id.* This created difficulties in obtaining medical treatment for striking workers who had elected continuation coverage but who had not yet paid the premium, even though the 45–day grace period provided by law had not expired. *Id.* The Union sought a preliminary injunction to prevent NYNEX from denying coverage to those striking workers who had elected continuation coverage. *Id.* The district court ordered NYNEX to provide COBRA continuation coverage to all qualified beneficiaries who timely elect such continuation coverage without "conditioning the provision of such coverage on payment of any premium prior to the completion" of the 45-day grace period. *Id.* On appeal, the Court upheld the district court's finding of irreparable harm, pointing to an affidavit detailing instances in which striking workers had sought medical care but had had difficulty in obtaining such care from providers as a result of the defendants' conduct. *Id.* at 891.

The most recent Second Circuit case to consider the issue, *LaForest*, involved a putative class of retirees whose average age, the Court emphasized, was 83. *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 50 (2d Cir. 2004). The plaintiffs alleged they had suffered a drastic reduction in the level and quality of health care benefits because the defendant had failed to maintain their benefits at a previously promised level. The district court issued a preliminary injunction ordering the defendants to comply with the previous agreement to provide a higher level of health benefits. *Id.* at 50-51. On appeal, the defendants argued that the plaintiffs failed to adequately demonstrate irreparable harm. *Id.* at 54. The Court of Appeals found that the record supported that the plaintiffs had done so. The Court detailed the changes in the plaintiffs' medical coverage and pointed out that the plaintiffs had provided six affidavits from retirees that set forth "individualized evidence of the impact of these changes on [them], including an imminent threat that they would have to forego needed prescriptions." *Id.* The Court of Appeals found that the district court did not abuse its discretion in finding that plaintiffs provided a sufficient foundation that the six affidavits - all of which were from absent class members - on which it relied were representative of the class. *Id.* at 58. The Court stated "it is worth noting that every member of the class was either an employee of the same firm or is a surviving spouse of such an employee, and defendants do not contest the fact that the average age of the approximately 600 retirees at issue is 83 years old" and concluded that "the district court did not abuse its discretion in inferring from the evidence presented that irreparable harm was class-wide." *Id.*

Mindful of these authorities as to injury in the context of reductions of medical benefits, I must determine under *Denney* whether the class is "defined in such a way that anyone within it would have [Article III] standing." *Denney,* 443 F.3d at 264.

**Absent Class Members**[12]

The proposed class includes Medicaid beneficiaries who were transferred to a MSP under

§ 433.400(c)(2)(i)(B). As indicated, the named Plaintiffs have adduced evidence that they were

injured as a result of this provision because they either forewent or paid more for necessary medical

care, and no one disputes their standing. Further, it is reasonable to infer from the evidence they

submitted that their experience is representative of absent class members who were likewise

transferred to a MSP as a result of the adoption of the IFR. Such class members are, like the named

Plaintiffs, elderly and poor, because subsection 433.400(c)(2)(i)(B) applies to those who are on

Medicaid, a program for the low income, and who, due to their age, are moved to a MSP. Like

the named Plaintiffs, such class members are likely to have extensive health care needs that require

medical care on account of their age and income levels. And like the named Plaintiffs, as a result

of a move to a MSP, they face a reduction in coverage for, and thus an increase in the costs of,

needed health care. *See LaForest*, 376 F.3d at 58 (plaintiffs' evidence regarding six absent class

members who faced increased costs and the threat of having to forego their prescriptions was

representative of the class, which consisted of elderly retirees whose average age was 83). Indeed,

the Supplemental Notice acknowledged this very scenario – noting that the Secretary had become

aware that beneficiaries who were transitioned to a MSP could suffer a loss in benefits. 87 Fed.

Reg. 58,456, 58,457. Given this, the Plaintiffs have shown that class members affected by

§ 433.400(c)(2)(i)(B) have suffered an injury in fact.

The proposed class, however, also encompasses persons affected by other subsections of

the regulation who are not, in any way, represented by the named plaintiffs. The class definition

---

[12] "[T]he majority of district courts in the Second Circuit have analyzed the standing of absent class members as an Article III question, rather than an issue that can be addressed when reviewing the Rule 23 requirements governing class actions." *Tomassini v. FCA US LLC*, 326 F.R.D. 375, 384 (N.D.N.Y. 2018). I follow this approach.

covers persons affected by § 433.400(d)(2), which provides that states that have elected to provide Medicaid coverage to non-citizen children and pregnant women lawfully residing in the United States must limit these services to those necessary for the treatment of an emergency medical condition when they no longer meet the eligibility criteria in 42 U.S.C. § 1396b(v)(4)(A) – that is, when they are no longer pregnant or under 21.  85 Fed. Reg. 71,142, 71,167.  The Plaintiffs argue that persons affected by this provision have demonstrated an injury in fact because their health insurance benefits have been reduced.  But the authorities discussed above do not hold that merely being placed in a lower category of benefits, without more, is per se a cognizable injury in fact. Rather, with the exception of *Whelan*, which includes no analysis and no description of the medical needs of the striking union members, each of the cases discussed above cited record evidence that the plaintiffs or class members whose benefits had been reduced actually sought and were denied, or at least demonstrably needed, medical care as a result of the challenged action.  *See LaForest,* 376 F.3d at 56 (plaintiff retirees whose coverage was reduced had experienced an actual impact as a result of the change in health coverage, including "an imminent threat that they would have to forego needed prescriptions"); *NYNEX*, 898 F.2d at 891 (affidavit detailing instances of strikers encountering difficulties in obtaining medical care); *Textron*, 836 F.2d at 8 (affidavit of a union official attesting to three  retirees who needed medical care and had suffered financial loss as a result of the termination of benefits).  By contrast, there are no allegations or evidence in this case that Medicaid beneficiaries who until recently were lawfully residing children or pregnant women actually experienced a denial of needed medical care as a result of the IFR, that is, that they were likely to use the benefits but, on account of the IFR, were unable to do so.  *See NYNEX*, 898 F.2d at 892 (2d Cir. 1990) ("acts that result in a denial of covered treatment justify a finding of irreparable harm.")  None of the named Plaintiffs falls within this group and there is nothing in the

record from which the Court can infer that the experiences of beneficiaries who were recently under the age of 21 or pregnant - a contingent much younger and less likely to need frequent medical care than the named Plaintiffs - resembles that of the named Plaintiffs, who are elderly and suffer from serious medical conditions for which they require treatment.  Nor does the Supplemental Notice mention this younger contingent; it notes only concerns about injury engendered by the IFR's MSP provision and does not address any of the IFR's other provisions. 87 Fed. Reg. 58,456, 58,457.[13]  There is no basis in the record for me to find, as I must under *Denney*, that lawful resident beneficiaries whose coverage was reduced as a result of the IFR because they were no longer under 21 or no longer pregnant have suffered an injury in fact.

The class is overbroad in another respect: It encompasses persons whose coverage is terminated because they are not "validly enrolled." § 433.400(c)(2).  Under this provision, states claiming the temporary FMAP increase may terminate Medicaid coverage for beneficiaries who are not validly enrolled. A beneficiary is not validly enrolled if (1) the determination of eligibility was incorrect at the time it was made due to agency error or (2) eligibility was erroneously granted due to beneficiary fraud for which the beneficiary has been convicted or beneficiary abuse as determined by the agency in accordance with existing regulations at 42 C.F.R. § 455.16.  85 Fed. Reg. 71,142, 71,164 ("Terminating the eligibility of beneficiaries who are not validly enrolled as defined at § 433.400(b) will not impact a state's ability to claim the temporary FMAP increase. We note that prior to termination, however, the state must complete a redetermination consistent

---

[13] I also note that in August 2022, the Plaintiffs made a request to the Connecticut Freedom of Information Commission seeking the "numbers of people who have been terminated from Medicaid, or who have had their Medicaid benefits reduced" as a result of 42 C.F.R. § 433.400.  ECF No. 54 at 19-20.  In its September 2022 response, the Commission provided data only as to individuals who were transferred to a MSP.  ECF No. 54 at 22.  There was no mention of individuals affected by other provisions of the IFR, even though Plaintiffs' request specifically asked for information regarding lawfully residing persons who recently turned 21 or completed a pregnancy.  *Id.;* ECF No. 54 at 19.

with 42 CFR 435.916 and provide the beneficiary with advance notice and the opportunity for a fair hearing . . . .")  As to this group, there is no evidence in the record concerning their age or medical needs and nothing suggesting any of them were actually denied or chose to forego medical care as a result of the IFR; nor is it reasonable to infer, given that, for many of them, their income levels exceeded the threshold for Medicaid eligibility, that they could not meet any medical needs they faced without the assistance of the Medicaid program.[14]

Because the class definition includes class members who do not have standing, it is too broad.  "When confronted with an overly broad class definition, a court has the discretion to modify the class definition. . . . Indeed, a number of district courts in this circuit have narrowed class definitions to exclude putative class members without standing, rather than outright denying a motion for class certification."  *Tomassini v. FCA US LLC*, 326 F.R.D. 375, 386-87 (N.D.N.Y. 2018) (citing cases).  Accordingly, to address the lack of standing of class members not affected by § 433.400(c)(2)(i)(B), I modify the class definition as follows:

> All individuals who were enrolled in Medicaid in any state on March 18, 2020 or later and, as a result of the adoption of the IFR on November 6, 2020, either had their Medicaid eligibility reduced to a lower level of benefits and were determined to be eligible for a Medicare Savings program or will have their Medicaid eligibility reduced to a lower level of benefits and be determined to be eligible for a Medicare Savings Program prior to a redetermination conducted after March 31, 2023.[15]

### 2.     Redressability

Redressability is the "non-speculative likelihood that the injury can be remedied by the

---

[14] In any event, even if they had standing and were properly part of the class, I would not grant them injunctive relief.  Injunctions are equitable and extraordinary remedies, *Am. C.L. Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and I would not grant such a remedy in favor of individuals who are not entitled to benefits and whose coverage was terminated after a state found, following notice and a hearing, that it was improvidently granted due to fraud or agency error.

[15] I use this date, rather than the end of the PHE as in the Plaintiffs' proposed class definition, because it is the date on which, by virtue of the CAA, section 6008(b) terminates.

requested relief." *Hu v. City of New York*, 927 F.3d 81, 89 (2d Cir. 2019) (internal quotation marks and citation omitted).

The Defendant argues that the Plaintiffs' injuries are not redressable by the Defendant.[16] ECF No. 45 at 19; ECF No. 58 at 9.   The Defendant asserts that even if the Court enjoins enforcement of the IFR, which is the injunctive relief the Plaintiffs request, only the states, not the Defendant, have the authority to transition a Medicaid beneficiary from one group to another.  *Id.* Accordingly, the Defendant contends, the Plaintiffs lack standing and the Court has no jurisdiction over this case.  I disagree.

The District Court for the District of Columbia rejected a similar argument in *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014).   In that case, the plaintiffs challenged CMS's answer to a Frequently Asked Question ("FAQ") governing the calculation of certain payments to hospitals and sought a preliminary injunction enjoining the Secretary's enforcement of the FAQ.  The defendants argued that the plaintiffs' injury was caused by the state Medicaid agencies and challenged plaintiffs' ability to obtain redress from the Court.  *Id.* at 238. The district court found that the defendants "enforced" the FAQ "against the state agencies" and that the FAQ was "the only thing standing between the plaintiffs and redress of their injuries[.]" *Id.* at 239.  The court therefore concluded that an injunction against the defendants' enforcement of the FAQ would likely redress plaintiffs' injuries.  *Id.*

Here, the Plaintiffs were transitioned from one Medicaid eligibility group to another due to the states' compliance with the IFR.   Although the Defendant emphasizes that the states administer the Medicaid program, in doing so they must comply with federal regulations.  A state

---

[16] The Defendant previously raised this argument in its opposition to the Plaintiffs' motion for preliminary injunction.  Judge Williams was not persuaded and found that the Plaintiffs' injuries were redressable. ECF No. 77 at 8-12.

may not receive the additional FMAP under the FFCRA unless it complies with the IFR.  ECF No. 45 at 8, 14; ECF No. 58 at 6.  In addition, the record reflects that when the Defendant informed the State of Connecticut that CMS would not, while the Court was considering the original motion for a preliminary injunction, "enforce 42 C.F.R. § 433.400(c)(2)(i)(B) against Connecticut with respect to Plaintiffs Deborah Carr and Brenda Moore," the state responded by returning the two individuals to their previous level of benefits.  ECF No. 20; ECF No. 53 at 3.  Similarly, after Judge Williams's order, Wilson, Shaw, and Katz were reinstated to their previous coverage by the states of Connecticut, Nebraska, and Delaware, respectively.  ECF No. 91.  Finally, the Defendant has stated in the continuation of the proposed rulemaking that CMS was contemplating "*requir[ing]* States to offer Medicaid beneficiaries whose coverage was changed in a manner consistent with § 433.400 an opportunity to re-enroll in, or to have their enrollment changed back to, their prior coverage." 87 Fed. Reg. 58,456, 58,458 (emphasis added).

The Defendant also argues that the Plaintiffs have not shown redressability because if the Court enjoins enforcement of the IFR, the states might forgo the increased FMAP rather than restore coverage.  ECF No. 45 at 27-28.  But there is no evidence before the Court to lift this argument out of the realm of speculation.  The Defendant acknowledged in the IFR that CMS is not aware of any state that intends to cease claiming the increased FMAP. 85 Fed. Reg. 71,142, 71,148.  And more recently, the Defendant did not identify this as a concern in the Supplemental Notice, which is silent on this issue even as CMS indicated that it is considering returning to its more expansive interpretation.[17] 87 Fed. Reg. 58,456.  In addition, although some states voiced opposition to CMS's proposal in the Supplemental Notice to return to its original interpretation

---

[17] In fact, the Supplemental Notice observed that as a result of federal appropriations, including the American Rescue Plan Act of 2021, the fiscal situation of many states may have changed since the IFR was issued in November 2020.  87 Fed. Reg. 58,456, 58,457.

because of the administrative burden it would entail, none of the letters submitted by the Defendant

(hearsay though they may be, *see infra*) suggest that any state might forgo the increased FMAP

rather than comply.  ECF No. 85-1.  For these reasons, I find that the Plaintiffs and the modified

class described above have standing.

**B.      Rule 23 Analysis**

A party seeking class certification must satisfy each of the requirements set forth in Rule

23(a) of the Federal Rules of Civil Procedure:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or
> defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the
> class.

Fed. R. Civ. P. 23(a).  "These prerequisites are referred to as 'numerosity, commonality, typicality,

and adequacy of representation.'" *Martinez v. Avantus, LLC*, No. 3:20CV1772(JCH), 2023 WL

112807, at *4 (D. Conn. Jan. 5, 2023) (*quoting Amgen Inc. v. Connecticut Ret. Plans & Trust

Funds*, 568 U.S. 455, 460 (2013)).  "In addition to these four explicit conditions, the Second Circuit

has recognized an implied requirement that the class be ascertainable."  *Alexander v. Azar*, 370 F.

Supp. 3d 302, 325 (D. Conn. 2019).  Finally, a party seeking class certification must satisfy one of

the subsections of Rule 23(b).  Here, the Plaintiffs seek to certify a class under Rule 23(b)(2),

which requires them to show that "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory

relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The party seeking

class certification bears the burden of establishing each of Rule 23's requirements by a

preponderance of the evidence. *Amara v. CIGNA Corp.*, 775 F.3d 510, 519 (2d Cir. 2014). In

determining whether a proposed class meets these requirements, the court must resolve any factual

disputes and find any facts relevant to this determination. *In re Initial Public Offerings Securities Litigation*, 471 F.3d 24, 41 (2d Cir. 2006).

**Ascertainability Requirement**

"The ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017). "This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.* at 269. "In other words, a class should not be maintained without a clear sense of who is suing about what." *Id.* The ascertainability analysis is limited to the question of whether determining class membership is "objectively *possible*," *id.* at 270 (emphasis in original), "not whether it is practical or administratively feasible." *BlackRock Balanced Cap. Portfolio (FI) v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 5619957, at *7 (S.D.N.Y. Aug. 7, 2018).

The Defendant argues that the Plaintiffs' proposed class fails the ascertainability test because it is defined by subjective, not objective, criteria and that, in some circumstances, identifying its members would require a "mini-trial." ECF No. 58 at 10. The Defendant contends that when a state transfers a beneficiary from one eligibility group to another, the two groups may have different benefit packages, and it "may not be readily apparent which package best meets the beneficiary's needs or which provides a 'lower level' of benefits." ECF No. 58 at 11. But contrary to the Defendant's argument, determining who is in the class is not subjective and no mini trial would be required to determine whether the transition resulted in a reduction in coverage. The very purpose of the IFR was to ease the States' fiscal pressure by permitting them to *reduce* the scope of benefits offered under the state plan. *See* 85 Fed. Reg. 71,142, 71,163 ("States have sent a strong message to CMS that they need more flexibility to make choices that meet their unique

needs. They have made clear that our existing interpretation of section 6008(b)(3) of the FFCRA has interfered with their ability to implement costsaving decisions in the face of increasing beneficiary enrollment and declining state revenues.")  Further, there can be little doubt that transferring beneficiaries who are likely to need frequent medical care from full-benefit Medicaid to a MSP will result in either a cost increase or some reduction in the level of care, because a MSP helps only to pay some of the out-of-pocket costs of Medicare, which does not cover certain categories of care that are covered by Medicaid, such as nursing home care and personal care services.  As the experience of the named Plaintiffs illustrates, the members of the narrowed class face the loss of medical benefits they will likely need.  The redefined class provides a "clear sense of who is suing about what." *In re Petrobras*, 862 F.3d at 269.

### Numerosity

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  "Numerosity is presumed for classes larger than forty members." *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014).  Here, the proposed class is a nationwide group of Medicaid beneficiaries, which Plaintiffs estimate as numbering in the thousands. ECF No. 43 ¶ 30.  The Defendant does not contest numerosity. ECF No. 58.  Accordingly, the Plaintiffs have satisfied the numerosity requirement.

### Commonality and Typicality

"The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).  The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-*

*Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (internal quotation marks and citation omitted).  The class members' claims "must depend upon a common contention ... of such a nature that it is capable of classwide resolution - which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 350.  "In other words, the relevant inquiry is whether a classwide proceeding is capable of generating common *answers* apt to drive the resolution of the litigation."  *Jacob v. Duane Reade, Inc*., 602 Fed. Appx. 3, 6 (2d Cir. 2015) (internal quotation marks, alteration, and citation omitted; emphasis in original).  The typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Grp., Inc*, 960 F.2d 285, 291 (2d Cir. 1992).

The Defendant argues that commonality and typicality are lacking because "each member of the putative class would have vastly different legal and factual circumstances."  ECF No. 58 at 12.[18]  The Defendant asserts that the "proposed class definition rests on the inherently fact-specific inquiry of a beneficiary's eligibility determination." *Id.*  The Defendant points to Plaintiff Katz, who was switched to a MSP that provided less coverage, and asserts that Delaware's "fact-intensive adjudication involved evaluating Katz's unique circumstances and determining which Medicaid program she qualified for." *Id.* at 13.  Each class member, the Defendant claims, would similarly require an individualized assessment of eligibility.

The Defendant's argument misses the mark.  While it is true that each state has its own eligibility requirements governing its Medicaid plan, all members of the revised class were moved out of their existing coverage to a MSP (with a concomitant reduction in coverage) for a common

---

[18] The Defendant contends Plaintiffs do not satisfy the typicality requirement for the same reasons they do not meet the commonality requirement.  ECF No. 58 at 16.

reason - the IFR.  Thus, a determination that the IFR is unlawful, as the Plaintiffs contend, would, in a single stroke, likely return all class members to the level of benefits they enjoyed between March 18, 2020, and November 6, 2020.

Taylor v. Zucker, 2015 WL 4560739, at *1 (S.D.N.Y. July 27, 2015), to which the Defendant points, is inapposite.  In that case, the plaintiffs sought to certify a class of Medicaid recipients whose home care services were reduced without sufficient notice and without a change in their circumstances that would justify a reduction.  The court concluded that the class lacked commonality, reasoning that the "Named Plaintiffs in the case at bar seek to litigate hundreds of independent decisions regarding different individuals at the same time." Id. at *9. The court concluded that the plaintiffs "fail to provide 'glue' connecting the reason for each enrollee's reduction or termination of care together." Id. (emphasis in original).  The court held that plaintiffs had not shown that each class member's situation arose out of "the same course of events" because they "have been and are being evaluated by numerous medical personnel, working under multiple supervisors, in 68 different decision-making agencies spread across . . . the State of New York." Id. at *12.

But that does not describe this case, where, by virtue of the modified class definition, all the decisions to reduce coverage resulted from the Defendant's adoption of the IFR.  The Plaintiffs have sufficiently shown a common question that goes to the core of this class action, i.e., whether the IFR was lawfully adopted.  The determination of whether or not it was is capable of classwide resolution because "will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc, 564 U.S. at 350.[19]

---

[19] The Defendant's argument that the named Plaintiffs' claims are not typical because the proposed class encompasses those affected by other provisions of 42 C.F.R. § 433.400 is mooted by the Court's narrowing of the class definition.  I note, however, that if I had found that beneficiaries who were until recently

**Adequacy**

Adequacy requires "inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). "The focus is on uncovering conflicts of interest between named parties and the class they seek to represent. In order to defeat a motion for certification, however, the conflict must be fundamental." *In re Flag Telecom Holdings, Ltd. Securities Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks and citations omitted).

The Plaintiffs are represented by experienced and qualified counsel, and there is no evidence of a conflict or other reason to think that the named Plaintiffs are inadequate representatives of the class. The Defendant does not contest that Plaintiffs have satisfied the adequacy requirement. ECF No. 58. Accordingly, I find that the Plaintiffs have satisfied both prongs of the adequacy requirement.

**Rule 23(b)(2)**

To satisfy the requirements of Rule 23(b)(2), the Plaintiffs must demonstrate that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Thus, a class cannot be certified "when each individual class

---

lawfully residing children or pregnant women or who were not validly enrolled had standing, I would find that the named plaintiffs' claims were not typical of the claims of those in these other categories. That is so because the latter categories likely include younger, healthier individuals with less pressing health needs who would likely face greater obstacles, for example, to showing irreparable harm, and would likely have to raise some different legal arguments to support a claim for injunctive relief. *See Robidoux v. Celani*, 987 F.2d 931, 937-38 (2d Cir. 1993) (noting that plaintiffs who challenged State of Vermont's administration of three distinct welfare programs on grounds of unlawful delay had made no showing of delay in the processing of applications in one of the programs, and would thus need to show, on a remand ordered for independent reasons, that a plaintiff or intervenor had suffered delay with respect to that program before a class targeting that program could be certified).

member would be entitled to a different injunction or declaratory judgment against the defendant." *Wal-Mart Stores, Inc*, 564 U.S. at 360.

The Defendant argues that the putative class fails to satisfy Rule 23(b)(2). ECF No. 58 at 17. According to the Defendant, a single injunction would not provide relief to the putative class because "[s]tates are free to reject the increased Medicaid funding." *Id.* In that case, "any putative class members in the relevant state(s) would remain in the Medicaid group for which they would be eligible in the absence of § 6008(b)(3), and their injuries would remain." *Id.* But as discussed earlier in this ruling, the Defendant's argument that states would opt out rather than comply is speculative.

"Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc.*, 564 U.S. at 360. The Plaintiffs satisfy this requirement. They seek a single injunction ordering the Defendant to refrain from enforcing the IFR as to the class members for the pendency of this action.[20] This "proposed injunctive relief sweeps broadly enough to benefit each class member." *Alexander v. Price*, 275 F. Supp. 3d 313, 324-25 (D. Conn. 2017) (internal quotation marks and citation omitted).

For the reasons discussed above, the motion for class certification is GRANTED as set forth in this ruling. Plaintiffs' counsel are appointed as class counsel.

## C.   Classwide Preliminary Injunction

I apply the following legal standard to the Plaintiffs' request to extend the preliminary injunction granted by Judge Williams to the entire (modified) class. The Plaintiffs must establish (1) irreparable harm absent injunctive relief; (2) a "clear" or "substantial" likelihood of success on the merits, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the

---

[20] Plaintiffs' counsel stated on the record during oral argument that they seek the same relief for the class as was ordered by Judge Williams for the named Plaintiffs.

public interest. *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021). [21]  Where, as here, the government is a party to the suit, the final two factors merge. *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).

As noted, Judge Williams granted a preliminary injunction in favor of the named Plaintiffs. ECF No. 77.  He determined that they had shown a substantial likelihood of success on the merits of their claim that HHS cannot show good cause for failing to engage in the notice-and-comment period before publishing the IFR.[22]  ECF No. 77 at 17.  He also found that the Plaintiffs had shown irreparable harm grounded in his findings regarding the Plaintiffs' experiences of losing coverage and being unable to afford necessary medical care, including in-home health aides. ECF No. 77 at 4 - 7.  As relief, Judge Williams ordered the Defendant to "refrain from enforcing the IFR with respect to the named plaintiffs for the pendency of this action, and to reinstate its previous guidance with respect to the named plaintiffs," and "to inform . . . the relevant state agencies of this revised position with respect to the named plaintiffs."[23]  ECF No. 77 at 20.

---

[21] I require Plaintiffs to show a likelihood of success on the merits - as opposed to the lesser showing of "sufficiently serious questions going to the merits to make them fair ground for litigation" - because they are arguably challenging governmental action taken in the public interest under "a statutory or regulatory scheme." *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014).  Also, like Judge Williams, I assume, without deciding, that the heightened standard of showing "a clear or substantial likelihood of success on the merits," as opposed to a "likelihood of success on the merits" or "serious questions on the merits and a balance of hardships decidedly favoring the moving party," *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation marks omitted), applies because the injunctive relief Plaintiffs seek is mandatory.  A mandatory injunction (as opposed to a prohibitory injunction) alters the status quo, which is the "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).  Arguably the IFR, which has been in place more than two years, is the status quo.  But I need not conclusively resolve these issues because I find that the Plaintiffs meet the higher standard.

[22] Judge Williams did not discuss the merits of the Plaintiffs' other claim, *i.e.*, that the IFR conflicts with the unambiguous provisions of Section 6008(b)(3) of the FFCRA.  ECF No. 77 at 17.  Because I agree with and adopt Judge Williams's resolution of the notice-and-comment issue, I do not address the other claim either.

[23] Judge Williams confined the relief ordered to the "part of the IFR which negatively impacted Plaintiffs[.]" ECF No. 77 at 12.

The Plaintiffs' counsel stated during oral argument that the Plaintiffs seek the same relief for the class as was ordered by Judge Williams for the named Plaintiffs.  The Defendant argues that the Court should not extend the preliminary injunction to the class members because: (1)  Plaintiffs have not demonstrated irreparable harm; (2) the public interest and the balance of the hardships weigh in favor of the Defendant; and (3) Plaintiffs are not likely to succeed on the merits because there was good cause to promulgate the IFR without a notice-and-comment period.

### 1.      Irreparable Harm

"To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent  a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam) (internal quotation marks omitted). An injury is considered irreparable when the Plaintiff demonstrates that it is "non-compensable in terms of money damages." *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 56 (2d Cir. 2004).

The Defendant argues that Plaintiffs have not shown irreparable harm on behalf of the class because they have not shown that "all (or even most) putative class members will forgo medical care if the Court does not enter class-wide preliminary injunctive relief."  ECF No. 85 at 8.  I disagree. As explained above in the standing discussion, see *supra*, and footnote 11, the Plaintiffs have laid a sufficient foundation from which to infer that members of the narrowed class are likely to need medical care that is no longer covered while the litigation is pending and will as a result suffer irreparable harm absent injunctive relief.  As detailed above, the named Plaintiffs submitted evidence of particularized harms to their health and of severe financial hardship as a result of the

IFR,[24] and it is reasonable to infer that they are similarly situated to the class members - who are also impoverished and elderly individuals whose medical benefits were reduced and/or healthcare costs increased - and that the harms they face are representative of those of the class members.  *See LaForest*, 376 F.3d at 58 (six affidavits from absent class members, along with the fact that "every member of the class was either an employee of the same firm or is a surviving spouse of such an employee, and defendants d[id] not contest the fact that the average age of the approximately 600 retirees at issue [wa]s 83 years old[,]" was sufficient evidence from which the Court could infer that irreparable harm was class-wide).  The Plaintiffs have sufficiently shown that the class members have been and/or will be faced with a denial of needed health care as a result of the IFR and have made the requisite showing of irreparable harm in the absence of the requested injunction.[25]

### 2.    Likelihood of Success

The Plaintiffs allege that the Defendant violated the APA because it issued the IFR without providing advance notice and opportunity for comment as required under 5 U.S.C. § 553 and cannot show "good cause" for failing to do so.  ECF No. 43 ¶ 152.  The Defendant argues that the Plaintiffs cannot show a likelihood of success because CMS had good cause to forgo notice and comment.  ECF No. 45 at 31.

---

[24] In concluding that the named Plaintiffs had shown irreparable harm, Judge Williams found that as a result of the transition in their coverage, they were "declining to seek medical assistance for serious conditions, limiting their visits to doctors for ongoing care, and facing the threat of residing at a nursing home (during a pandemic in which nursing home fatalities are distressingly frequent) in order to receive the level of care they require for everyday functioning."  ECF No. 77 at 18-19. I adopt his findings.

[25] The Defendant makes a brief argument that the Plaintiffs have not shown "imminent" harm because the class includes members whose Medicaid benefits were changed some time ago (on or after November 6, 2020).  Under the circumstances, I am not persuaded that this in itself is sufficient to deny Plaintiffs' motion for preliminary injunction.  As noted by Judge Williams in considering a similar argument as to the period between the IFR and the commencement of suit, the Plaintiffs were confronted with barriers including their their age, physical limitations, indigency, and probable lack of knowledge regarding the legal process.  ECF No. 77 at 18.  And the fact that the transition might have occurred in the past does not mean the harm is not ongoing.

Under the APA's "good cause" exception to notice and comment rulemaking, an agency may forgo notice and comment when it "for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The Court reviews an agency's claim of good cause "de novo" and "must examine closely the agency's explanation *as outlined in the rule*[.]" *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin*., 894 F.3d 95, 113 (2d Cir. 2018) (emphasis added). The agency bears the burden to establish that notice and comment need not be provided. *Id.* The good cause exception "should be narrowly construed and only reluctantly countenanced." *Id.* at 114. "It is generally limited to 'emergency situations, or where delay could result in serious harm.'" *Id.* (quoting *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (internal citation omitted). These are "exacting standards." *Id.*

I agree with Judge Williams's well-reasoned and thorough decision that the Plaintiffs have shown a likelihood of success on their claim. In his ruling, Judge Williams observed that the Defendant's proffered justification for waiving notice and comment - that delay could result in serious harm - appears to be post hoc reasoning and not supported, as it must be, by the text of the IFR. ECF No. 77 at 14-16. Judge Williams carefully parsed the IFR and found the explanation set forth therein failed to constitute good cause. ECF No. 77 at 15-17. I am persuaded by his thorough analysis of this issue, which I need not repeat, and adopt and incorporate by reference his findings.

### 3.      Public Interest/Balance of Hardships

Finally, the Defendant argues that the public interest and balance of hardships factors weigh in its favor because if states were required to re-enroll beneficiaries, Medicaid beneficiaries as well as State Medicaid programs would suffer significant harm. ECF No. 45 at 34, ECF No. 85 at 14. Here again, the Defendant raises the specter of states choosing to decline the FMAP

increase, which it asserts would undermine the FFCRA's purpose of providing additional support to state Medicaid programs during the pandemic.  But as discussed, this argument finds no support in the record.

The Defendant subsequently revised its argument, contending that these factors weigh in its favor because of the impact of the CAA.   Under the CAA, section 6008(b)(3) - and the challenged provisions of the IFR implementing it - ends March 31, 2023, and there is thus no need to enjoin the operation of these provisions after that date.  ECF No. 97.  As of April 1, 2023, states may begin the process of "unwinding," that is, redetermining the eligibility of all Medicaid beneficiaries and terminating those individuals who are no longer eligible.  The Defendant argues that the confusion to the beneficiaries from a two-month reversion to its earlier, more expansive interpretation of section 6008(b)(3) that an injunction would entail, as well as the additional expense to the States of complying with the Defendant's earlier interpretation for such a short period before switching their systems to the post-March 31 regime, tip the public interest and balance of hardships against injunctive relief.  This argument is not without traction, but the Defendant has failed to support it with affidavits or other admissible evidence.  As Plaintiffs note, the letters from state officials submitted by the Defendant are hearsay, and the Defendant has not submitted any evidence from such officials in admissible form.

And against these largely unsubstantiated considerations I must weigh the real harm shown by the Plaintiffs – Medicaid recipients going without needed medical treatment, even for a short period of time.  *Doe v. Siena Coll.*, 2023 WL 197461, at *20 (N.D.N.Y. Jan. 17, 2023) ("[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided.")  I conclude that the weighing of these considerations points towards granting the plaintiffs an injunction through March 31st.

**IV.     Conclusion and Orders**

For these reasons, the Plaintiffs' motion for class certification, ECF No. 44, is GRANTED,

except that I modify the definition of the proposed class for the reasons explained above.

Specifically, I certify the following class:

> All individuals who were enrolled in Medicaid in any state on March 18, 2020 or
> later and, as a result of the adoption of the IFR on November 6, 2020, either had
> their Medicaid eligibility reduced to a lower level of benefits and were determined
> to be eligible for a Medicare Savings program or will have their Medicaid eligibility
> reduced to a lower level of benefits and be determined to be eligible for a Medicare
> Savings Program prior to a redetermination conducted after March 31, 2023.

In addition, the Plaintiffs' motion for a preliminary injunction, ECF No. 3, is GRANTED in part

as to the certified class as follows:

> The Defendant is ordered to refrain from enforcing the IFR with respect to the
> members of certified class through the close of business on March 31, 2023, and to
> reinstate its previous guidance with respect to these individuals.  Defendant is
> further ordered to inform (within 7 days of this order) the relevant state agencies of
> this revised position as to the class members.

> In light of the CAA, which provides, *inter alia*, an end date (March 31, 2023) for section

6008(b)(3) of the FFCRA, the above injunction will expire at the close of business Eastern Time

on March 31, 2023.

IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                January 31, 2023

36